The Honorable Marsha J. Pechman

1

2



3

4

5    03-CV-01252-DECL

6

7              UNITED STATES DISTRICT COURT FOR THE
8              WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9    THEODORE C. SWARTZ,                          )    Case No. C03-1252 P
                                                  )
10                    Plaintiff,                   )
                                                  )
11   KPMG, LLP,  PRESIDIO GROWTH, LLC,            )    DECLARATION OF DUNCAN
     PRESIDIO ADVISORY SERVICES, INC.,            )    C. TURNER IN OPPOSITION
12   HAYES STREET MANAGEMENT, INC.,               )    TO ALL DEFENDANTS'
     NORWOOD HOLDINGS, INC, DEUTSCHE              )    MOTIONS TO DISMISS
13   BANK AG, DEUTSCHE BANK SECURITIES,           )
     INC., SIDLEY AUSTIN BROWN & WOOD,            )
14   LLP, DALE R. BAUMANN, JOHN M.                )
     LARSON, ROBERT A. PFAFF, DAVID AMIR          )
15   MAKOV, STEVEN BUSS, and R. J. RUBLE,         )
     and their respective marital communities, if any.  )
16                                                )
                      Defendants.                 )
17   _____

18          Duncan C. Turner deposes and states:

19          1.  I am an attorney representing Plaintiff T.C. Swartz in this action.  I have

20   personal knowledge of the matters stated herein and am competent to testify as to the

21   same.

22          2.  I am making this declaration to bring to the attention of the Court certain facts

23   and evidence that have only become available to the plaintiff on the date of this

24   declaration.  I am submitting this material in opposition to the various motions to dismiss

25   filed by the KPMG Defendants, the Brown & Wood Defendants, the Presidio Defendants,

26   DECLARATION OF DUNCAN C. TURNER                    BADGLEY ~ MULLINS
     IN OPPOSITION TO ALL DEFENDANTS'                   LAW GROUP
     MOTIONS TO DISMISS - 1                             5100 Washington Mutual Tower
     C03-1252 P                                         1201 Third Avenue
                                                        Seattle, Washington 98101
                                                        Telephone (206) 621-6566
                                                        Fax (206) 621-9686

ORIGINAL

1  and the Deutsche Bank Defendants. This information was not available at the time that

2  plaintiff's responses to the motions of KPMG, Presidio and Brown & Wood were filed

3  and served, having only been disclosed by the federal government yesterday.

4      3.  Two days ago, on October 14, 2003, the Tax Division of the Department of

5  Justice filed "United States' Ex Parte Petition for Leave to Serve 'John Doe' Summons"

6  for the purpose of obtaining documents and other information in the possession of Sidley

7  Austin Brown & Wood ("SAB&W") that would allow the Internal Revenue Service to

8  identify taxpayers who had participated in "listed transactions" or "potentially abusive tax

9  shelters."

10      4.  The government's Petition was supported by the Declaration of Richard E.

11  Bosch, an IRS Revenue Agent. A true and correct copy of Mr. Bosch's declaration, along

12  with selected exhibits thereto as discussed below, is attached as Exhibit 1 hereto.

13      5.  Mr. Bosch's declaration, in part, describes the long-standing relationship

14  between KPMG, Brown & Wood, and the Presidio defendants through which these parties

15  directed an ongoing enterprise for the purpose of developing and promoting the tax

16  shelters that the IRS has now identified as abusive and illegal attempts to evade taxes,

17  including the schemes variously entitled FLIPS, OPIS, COBRA, BLIPS, and CARDS.

18  Plaintiff T.C. Swartz has brought this suit based upon the defendants' promotion of the

19  BLIPS tax shelter.

20      6.  Exhibit E to the Bosch Declaration is a KPMG memorandum entitled

21  "Business Model – Brown & Wood" dated December 16, 1997, which was authored by

22  Randall S. Bickham of KPMG and sent to Gregg Ritchie of KPMG, with a copy to

23  defendant R.J. Ruble of Brown & Wood. The document contains many telling

24  admissions that are relevant to, and support, the allegations made in Mr. Swartz'

25  Complaint. The memorandum states:

26  DECLARATION OF DUNCAN C. TURNER
IN OPPOSITION TO ALL DEFENDANTS'
MOTIONS TO DISMISS - 2
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax: (206) 621-9686

The cornerstone of our business model is the development of strategic alliances to develop and market products for both high-wealth individuals and publicly-traded corporations. The logic underlying the decision to externalize critical functions is based upon the need to *create a branded image that transcends the common market perception of an accounting firm's ability* to participate in large transactions ....

Potential alliances for product development are KPMG WNT, "Wall Street" law firms that specialize in corporate finance (e.g., Brown & Wood), boutique tax products groups (e.g., Presidio) and financial institutions with a strong tax product orientation (e.g., Citibank). As to marketing and distribution of product, the primary requisite is alliances which will enhance our ability *to brand both products and the group*. The end objective for branding at the group level is to create a market perception of our *practice as being one which is KPMG-centric, but with concentric relationships with institutions* with exemplary reputations in the capital transactions market....

*To date, we have strategic alliances with* Quadra and *Presidio*.... The initial step is to further strengthen our existing alliance with Presidio and to look for additional sources of product development. Secondly we need to negotiate a formal strategic alliance with Brown & Wood.

*Brown & Wood is unique in that it can make significant contributions to the product development process and would allow immediate brand recognition*....

The primary objective of the alliance between Brown & Wood should be to build a mutually successful business based upon the *products that are jointly developed*. Our group has targeted March 31, 1998 as the date that we wish to have our *base organizational infrastructure* in place....

KPMG, like most financial services firms, has an organizational structure that is centralized and control oriented. For our business model to be successful, we must construct a non-traditional organizational structure, effectively, *a "virtual company"* that can manage a large group of strategic partners and that can react expeditiously to new market developments.

I have added emphasis to some of the key text in this extended quotation because they illustrate key facts alleged by Swartz. First of all, there was a formal relationship

DECLARATION OF DUNCAN C. TURNER
IN OPPOSITION TO ALL DEFENDANTS'
MOTIONS TO DISMISS - 3
C03-1252 P

**BADGLEY ~ MULLINS**
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone (206) 621-6566
Fax: (206) 621-9686

between KPMG, Presidio and Brown & Wood for the purpose of acting in concert to develop and promote tax shelters, including the BLIPS. Second of all, the "virtual company" that the defendants created clearly meets the definition of an "enterprise" under RICO. It has a purpose of its own, it had an identifiable structure, and it is something more than just concentration of the parties. The discussion of "branding" of the entity clearly indicates that the parties wished for their enterprise to have an identity that was different from either KPMG, Presidio, the participating bank, or Brown & Wood individually.

7. Even though the above memorandum identifies Citibank as an example of a financial institution that was a member of the enterprise, this is the same role that Deutsche Bank played in the Swartz transaction and, plaintiff has alleged, many other similar transactions.

8. The Brown & Wood defendants have attempted to insulate themselves from liability by suggesting that, in Mr. Swartz' case, they only rendered a tax opinion letter after the fact. Mr. Swartz, on the other hand, has alleged that Brown & Wood made "canned" opinions available that KPMG and other could use (or offer) as inducements to prospective tax shelter clients. Exhibit H to the Bosch Declaration consists of an e-mail from KPMG's Randall A. Hamilton to Gregg W. Ritchie, also of KPMG. In it, Mr. Hamilton states:

> You had previously indicated to me that we would not need to request the Brown and Wood opinion unless the client specifically requested it. At this time the client has only request [sic] our opinion but is aware that the Brown and Wood firm would issue the opinion if requested. Why are we now requiring this concurring opinion?

DECLARATION OF DUNCAN C. TURNER
IN OPPOSITION TO ALL DEFENDANTS'
MOTIONS TO DISMISS - 4
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone (206) 621-6566
Fax: (206) 621-9686

It appears that Mr. Ritchie's reply (in all capital letters) was as follows:

> IF WE ARE FOUND TO BE THE PROMOTER OF A TAX SHELTER, THE CLIENT IS NOT PROTECTED FROM 6662 PENALTIES BY RELIANCE ON OUR OPINION ONLY. ***ALSO OUR DEAL WITH BROWN AND WOOD IS THAT IF THEIR NAME IS USED IN SELLING THE STRATEGY, THEY WILL GET A FEE***…. IF YOU DID A DEAL THROUGH PRESIDIO, THE COST IS ALREADY BUILT INTO THE FEE SCHEDULE.   [EMPHASIS ADDED]

It is obvious from this message that Brown & Wood was providing canned opinions and that the law firm knew that its name would be used to promote tax shelters, whether or not its opinion letter was ever provided.  Timing was irrelevant to Brown & Wood's participation in the scheme.

9.   The Bosch Declaration also discussed the related Exhibit I.  This apparently is a prearranged division of fees that KMPG, Brown & Wood and Presidio would apply based upon which entity acted as "Developer" of the tax shelter, "Finder" of the prospect, "Presenter" of the sales pitch, "Closer" of the deal, "NRA" (whatever that means), "Implementer" of the strategy, "Opinion Risk" in providing comfort to the client, and significantly a final category denominated as "DB Relationship" (which presumably refers to Deutsche Bank).  Note as well that the compensation was tied to a "Deal Amount," which suggests the predetermined amount of tax loss to be generated.

10. Exhibit O to the Bosche Declaration consisted of an excerpt of a deposition testimony given by defendant John Larson of Presidio.  Although the discussion relates to the OPIS transaction, it clearly shows the mutual complicity of the defendants in developing their fraudulent tax shelters.

DECLARATION OF DUNCAN C. TURNER
IN OPPOSITION TO ALL DEFENDANTS'
MOTIONS TO DISMISS - 5
C03-1252 P

**BADGLEY ~ MULLINS**
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone (206) 621-6566
Fax (206) 621-9686

Q:  [Revenue Agent Daleiden]  So are you saying OPIS was developed by KPMG?

A:  [Mr. Larson]  I think I'm saying that the, at least the primary development work, as I recall was done by KPMG.  I believe there also would have been input from other sources, including Brown & Wood, and certainly some input from my company as well, but that the prime mover would have been at KPMG.

      11. I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

      Dated  this 16th day of October, 2003.

_____
Duncan C. Turner

DECLARATION OF DUNCAN C. TURNER
IN OPPOSITION TO ALL DEFENDANTS'
MOTIONS TO DISMISS - 6
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone (206) 621-6566
Fax: (206) 621-9686

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN THE MATTER OF THE TAX
LIABILITIES OF:

    JOHN DOES, United States taxpayers
who, during any part of the period January 1,
1996 through October 15, 2003, participated
in a transaction which was or later became a
"listed transaction" or other "potentially
abusive tax shelter" organized or sold by the
law firm of Sidley Austin Brown & Wood LLP
and its predecessor, Brown & Wood LLP.

_____/

## DECLARATION OF RICHARD E. BOSCH

    I, Richard E. Bosch, pursuant to 28 U.S.C. §1746, declare and state:

1.    I am a Revenue Agent with the office of Financial Services Industry, Large

and Mid-Size Business Division (LMSB), Internal Revenue Service, located in New

York, New York.  Prior to this position, I was a Revenue Agent in the Examination

Division of the IRS located in New York, New York.  I have been employed by the

IRS for 30 years.

2.    The IRS is conducting an investigation to determine the correct federal tax

liabilities of certain United States taxpayers who during any part of the period

January 1, 1996 through October 15, 2003, participated in a transaction which was

or later became a "listed transaction" or other "potentially abusive tax shelter"

organized or sold by the law firm of Sidley Austin Brown & Wood LLP, and its

predecessor, Brown & Wood LLP (SAB&W),[1] which has offices at Bank One Plaza, 10 South Dearborn Street, Chicago, Illinois 60603.

3.     I have been assigned responsibility to gather information from which the identities of the members of the "John Doe" class can be determined.   Identification of the participants is the first necessary step to enable the IRS to determine the correctness of federal tax returns filed by the participants and to determine the correct federal tax liabilities of the participants.

4.     To facilitate this investigation, the IRS has issued, under the authority of §§7602 and 7609 of the Internal Revenue Code (26 U.S.C.)[2], a "John Doe" summons to SAB&W. [Govt. Ex. A].[3]  This declaration is being made in support of a petition for authorization to serve the "John Doe" summons upon SAB&W.

5.     The IRS is also conducting an investigation into the role of SAB&W in the organization and sale of tax shelters, its compliance with the tax shelter registration requirements of §6111 and the list maintenance requirements of §6112, and whether SAB&W may be liable for penalties pursuant to §§6707 and 6708 for failure to

[1] On April 30, 2001, Sidley & Austin merged with Brown & Wood LLP.  References to "SAB&W" are to both Brown & Wood LLP prior to April 30, 2001, and to Sidley Austin Brown & Wood LLP on and after April 30, 2001, unless otherwise specified.

[2]  All "§" references are to the Internal Revenue Code, 26 U.S.C., unless otherwise specified.

[3]  The exhibits referred to in this Declaration are contained in a separately bound Appendix of Exhibits being filed in support of the United States' Petition For Leave To Serve Internal Revenue Service "John Doe" Summons.  Some of those exhibits have been redacted to protect the privacy of tax shelter participants or to eliminate matters not relevant to this petition.

comply with the registration and list maintenance requirements. I am one of the

agents assigned to conduct that examination.

### I. **SAB&W is Organizing and Selling Tax Shelters**

6.     Pursuant to §6111, tax shelter "organizers" must register certain tax shelters

with the IRS. In addition, pursuant to §6112, "organizers and sellers" of "potentially

abusive tax shelters" must maintain a list of investors which is to be provided to the

IRS upon request. Shelters for which list maintenance is required are those for

which registration is required under §6111(c) or (d), and "listed transactions," *i.e.,*

those which the IRS has through notice, regulation or other published guidance,

identified as tax avoidance transactions. Failure to comply with the registration and

list maintenance requirements subjects the organizer or seller to monetary penalties

pursuant to §§6707 and 6708.

7.     The types of activities which may constitute organization and/or sale are:

   a.     management of assets or business of the corporations (including
   subchapter S corporations) or partnerships involved in the tax shelter,
   direction of activities of banks involved with the shelter, or instructing or
   advising sales persons;

   b.     involvement during the conception of the transactions and/or
   marketing to potential participants, or solicitation of investors;

   c.     relatedness to the tax shelter or any principal organizer of the tax
   shelter, which would include employment by the shelter or its organizer,
   including being paid by the shelter or its organizer;

   d.     participation in the entrepreneurial risks or benefits of the tax shelter,

including whether compensation was based, in whole or in part, on whether interests in the tax shelter actually were sold or the value of the investment in the shelter.

*See e.g.*, Temp. Treas. Regs. §§301.6111-1T, Q&A 27-29 and 301.6112-1T, Q&A 5&6.

8.     The IRS considers a "listed transaction" and all substantially similar transactions to have been structured for a significant tax avoidance purpose.  The IRS has from time to time published notices of such "listed transactions."  See, e.g., Notices 2001-51 (summary of notices); 2002-21 (CARDS); 2001-16 (MIDCO); 2001-45 (basis shifting); 2000-44 (Son-of-boss); 99-59(Boss). [Govt. Ex. B].

9.     As set forth in more detail below, based upon the investigation of SAB&W thus far, it appears that SAB&W was involved in the organization and sale of transactions which were or later became "listed transactions," or that may be other "potentially abusive tax shelters."  The organization and sale of these transactions appears to have been coordinated by SAB&W primarily through or at the direction of Raymond J. Ruble.

10.    During the investigation, I learned that SAB&W  issued approximately 600 opinions with respect to certain listed transactions promoted (or co-promoted) by, among others, KPMG, Arthur Andersen, BDO Seidman,  Diversified Group, Inc., and Ernst & Young.  I also learned that SAB&W was able to estimate the amount of fees collected with respect to each transaction.

11.    SAB&W has refused to disclose the identities of the taxpayers who paid these fees.

4

12.     The IRS has identified transactions for which SAB&W provided opinions, which were given names such as FLIPS, OPIS, COBRA, BLIPS and CARDS, as "listed transactions."

13.     On December 22, 2001, the IRS published Announcement 2002-2, 2002-1 C.B. 304 (Disclosure Initiative), in which it encouraged taxpayers to disclose their participation in and tax treatment of tax shelters in exchange for the IRS' waiver of certain penalties under 26 U.S.C. §6662, if the IRS determined that the taxpayers made an underpayment of tax. As part of the Disclosure Initiative, taxpayers were required to identify the parties that promoted, solicited or recommended that they participate in the tax shelter.

14.     In response to the Disclosure Initiative, the IRS received approximately 80 Disclosure Statements identifying SAB&W as promoting, soliciting, or recommending their participation in certain tax shelters.

15.     Copies of e-mail communications obtained from KPMG confirm that SAB&W was involved in the organization of potentially abusive tax shelters as early as 1997, through the coordination or at the direction of Ruble, with the approval of his managing partner, Tom Smith. By e-mail dated December 15, 1997 [Govt. Ex. D], Ruble confirmed that the law firm would begin working with KPMG to jointly develop and market tax products:

> This morning my managing partner, Tom Smith, approved Brown & Wood LLP working with the newly conformed tax products group at KPMG on a joint basis in which we would jointly develop and market tax products and jointly share in the fees, as you and I have discussed.

5

16.    A KPMG memo dated December 16, 1997, describes the "need to negotiate a formal strategic alliance with Brown & Wood" in that "Brown & Wood is unique in that it can make significant contributions to the product development process and would allow immediate brand recognition." It further states that "[t]he primary objective of the alliance between KPMG and B&W should be to build a mutually successful business based on the products that are jointly developed." [Govt. Ex. E].

17.    Toward this end, as shown in internal KPMG memo dated November 6, 1997 and an e-mail dated March 14, 1998, Ruble became part of a "working group" with persons at KPMG to jointly develop tax shelters. [Govt. Exs. F & G].

18.    It appears that SAB&W and KPMG had a fee agreement with respect to the sale of the tax shelter products by KPMG, whereby a fee was to be paid so long as a representation was made to a prospective participant that SAB&W would issue a favorable tax opinion, regardless of whether such an opinion was actually given. [Govt. Ex. H]. In an e-mail exchange within KPMG, Gregg Ritchie explained:

> OUR DEAL WITH BROWN AND WOOD IS THAT IF
> THEIR NAME IS USED IN SELLING THE STRATEGY
> THEY WILL GET A FEE. WE HAVE DECIDED AS A
> FIRM THAT B&W OPINION SHOULD BE GIVEN IN
> ALL DEALS.

19.    It appears that SAB&W and KPMG developed a fee splitting template. [Govt. Ex. I].

20.    In December 2002, a group of disappointed investors (Thorpe Plaintiffs) filed suit against SAB&W, KPMG, and Presidio Advisors seeking damages relating to the sale, promotion, and implementation of the FLIP/OPIS transactions. *Thorpe, et al.,*

*v. KPMG, Presidio Advisors, and Sidley Austin, Brown and Wood*, Case No. 5-03-CV-68, (USDC. E.D.N.C. January 27, 2003). The Thorpe Plaintiffs allege that the transactions were established and implemented with R.J. Ruble of SAB&W, in which Ruble advised them on specific components of the transactions and assisted them in the operation of a Limited Liability Company (LLC). [Govt. Ex. J, ¶¶7-9].

21.    In June 2003, Theodore Swartz filed suit against SAB&W, KPMG, Presidio, and certain other defendants, alleging a conspiracy between KPMG, SAB&W, Ruble, Presidio, and Deutsche Bank in the sale and promotion of the BLIPS transaction. *Swartz v. KPMG, SAB&W, Presidio Growth, LLP, Presidio Advisory Services, Inc., Hayes Street Management, Inc., Norwood Holdings, inc., Deutsche Bank AG, Deutsche Bank Securities, Inc., Dale R. Baumann, John M, Larson, Robert A. Pfaff, David Amir Makov, Steven Buss, and R.J. Ruble*, Case No. C03-1252 (USDC W.D.WA. June 6, 2003). Swartz alleges that the BLIPS transaction is the same as or substantially similar to the transactions described in Notice 99-59 and Notice 2000-44. [Govt. Ex. K, ¶ 28-29].

22.    Swartz alleges that he was informed by Dale Baumann of KPMG that KPMG, together with Brown & Wood, had developed the BLIPS strategy to shield substantial capital gains incurred by taxpayers. [Govt. Ex. K, ¶ 33].

23.    Swartz also alleges that the promoters of BLIPS, including SAB&W, split fees associated with the BLIPS transaction and that those fees were computed by the amount of the capital losses claimed by the BLIPS clients on their tax returns and the amount of the tax the clients would avoid. [Govt. Ex. K, ¶ 71].

24.    SAB&W and Diversified entered into one or more "Designation Agreements," agreeing that they were each "involved in activities as sellers of investments that may be considered to be 'tax shelters' by the Internal Revenue Service" and that Diversified would maintain the list required by §6112 with respect to certain tax shelters. [Govt. Ex. L & M].  On or after December 12, 2000, SAB&W entered into a "Designation Agreement" with Diversified (which had previously been entered into among Diversified and others) with respect to transactions described as listed transactions in Notice 2000-44, in which SAB&W again acknowledged that it was an organizer and/or seller of such transactions. [Govt. Ex. M].

25.    On March 4, 2003, Israel Press, a Tax Partner in the Financial Services Group of Grant Thornton, admitted, upon questioning by the IRS, that:

   a.    SAB&W was hired and paid by Diversified to provide a legal opinion to the investors [Q&A , Govt. Ex. N, pp.96:23-97:5; 101:17-22 and 101:23-25];

   b.    The fee paid to SAB&W was "included in the overall fee paid to Diversified" by the investor [Q&A, Govt. Ex. N, pp. 102:2-5];

24.    On October 15, 2002, John Larson, Director of Presidio Advisors, an investment firm, testified, upon questioning by the IRS, that:

   a.    SAB&W provided opinions to participants in a basis shifting, 302/318 shelter, which is a listed transaction under IRS Notice 2001-45 [Q&A, Govt. Ex. O, p. 23:15-25];

   b.    SAB&W provided opinions to participants in a "premium loan transaction" [Q&A, Govt. Ex. O, p. 100:20-23]; and

   c.    SAB&W had input into the development of the basis shifting shelter known as OPIS [Q&A, Govt. Ex. O, p. 208:12-18].

8

25.    In an affidavit offered in support of a motion for summary judgment in

*Diversified Group, Inc. v. Daugerdas*, 139 F.Supp.2d 445 (S.D.N.Y. 2001)[Govt. Ex. P,

¶11], Ruble stated that he helped develop a transaction known as OPS [Option

Partnership Strategy]:

> To the best of my knowledge, the OPS strategy arose out of
> an early 1998 conversation between Orrin Tilevitz, who
> was then an employee of Price Waterhouse LLP, and me.

The IRS has determined that OPS is the same as or substantially similar to the

"listed transaction" described in Notice 2000-44.

## II. The Requirements For Service of a
## John Doe Summons Have Been Met

### A. The Investigation Relates to an Ascertainable Group

26.    The IRS is conducting an investigation to determine the correctness of returns

filed by, and the correct federal tax liabilities of, certain United States taxpayers

who, during any part of the period January 1, 1996 through October 15, 2003,

participated in a transaction which was or later became a "listed transaction" or

other "potentially abusive tax shelter" organized or sold by SAB&W.

27.    It appears that SAB&W can ascertain the members of the John Doe class as:

a.    I have learned of at least thirteen (13) transactions for which SAB&W
provided opinions, along with an estimated number of opinions provided with
respect to 13 transactions, approximating 600;

b.    SAB&W has provided "non-client specific" information regarding some
of the "listed transactions" and apparently withheld information from which
the identities of the participants can be determined; and

c.    SAB&W has informed the IRS that it has contacted participants in at
least one "listed transaction" who are unknown to the IRS.

## B. There is a Reasonable Basis for Believing
## That Members of the John Doe Class May Fail or
## May Have Failed to Comply with the Internal Revenue Laws

28.     Based upon its examination of SAB&W and the examination of co-promoters

and participants in transactions apparently organized or sold by SAB&W, it appears

that SAB&W, during the periods January 1, 1996 through October 15, 2003, was

organizing and selling transactions which were or later became "listed transactions"

or other potentially abusive tax shelters. Such transactions have a potential for tax

avoidance.

29.     Based on examinations of taxpayers who engaged in the "listed transactions"

such as those described in Notice 99-59 (Boss),Notice 2000-44 (Son-of-Boss, COBRA,

BLIPS), Notice 2001-16 (MIDCO), Notice 2001-45 (basis shift, FLIP/OPIS), and

Notice 2002-21 (CARDS), the IRS has concluded that taxpayers who engaged in such

transactions have failed or may fail to comply with the internal revenue laws.

## C. The Information Sought Is Not
## Readily Available From Other Sources

30.     The information sought by the summons, including the identity of the

participants in the potentially abusive tax shelters, is not readily available to the

IRS from its own records. Through the examination of taxpayers who engaged in

transactions organized or sold by SAB&W, or transactions similar to those promoted

by SAB&W but promoted by others, the IRS has concluded that the transactions are

designed in such a way that taxpayers may not disclose their involvement in the

transaction on their tax return, other than claiming the ultimate tax benefit, *i.e.,*

deduction, loss or credit. Actual inspection of a particular taxpayer's return is not likely to reveal understatements or misstatements of income resulting from "listed transactions" or other potentially abusive tax shelters.

31.    The IRS has attempted to obtain the information from its own records and from other sources, but has not been successful in identifying all the members of the John Doe class. Such information cannot be located and/or is not readily available, especially when the identity of the participant is unknown. In any event, the IRS cannot inspect every tax return filed or audit every taxpayer.

32.    While the IRS has, it believes, identified a number of SAB&W tax shelter participants, it has not identified all members of the class. Based upon the IRS' examination of co-promoters the IRS has identified a number of the taxpayers who purchased potentially abusive tax shelters organized and sold by SAB&W during the period January 1, 1996 through October 15, 2003. However, it does not appear that all members of the "John Doe" class have been identified.

33.    All administrative prerequisites for issuance of the summons have been met.


I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the

foregoing is true and correct.

Executed this ___10th___ day of October, 2003.


                          _/s/ Richard Bosch_____
                          RICHARD E. BOSCH
                          Revenue Agent
                          Financial Services Industry
                          Large and Midsize Business
                          Internal Revenue Service

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN THE MATTER OF THE TAX
LIABILITIES OF:

    JOHN DOES, United States taxpayers
who, during any part of the period January 1,
1996 through October 15, 2003, participated
in a transaction which was or later became a
"listed transaction" or other "potentially
abusive tax shelter" organized or sold by the
law firm of Sidley Austin Brown & Wood LLP
and its predecessor, Brown & Wood LLP.
_____/

**UNITED STATES' EXHIBITS IN SUPPORT OF**
***EX PARTE* PETITION FOR LEAVE TO SERVE**
**INTERNAL REVENUE SERVICE "JOHN DOE" SUMMONS**

    The United States of America, by its attorney, Patrick J. Fitzgerald, United

States Attorney for the Northern District of Illinois, relies upon the following

exhibits in support of its Petition to Enforce Summonses, copies of which are

attached hereto:

| Exhibit | Description |
|---------|-------------|
| A | John Doe summons |
| B | IRS Notices 2001-51; 99-59; 2000-44; 2001-16; 2001-45; and 2002-21. |
| C | No Government Exhibit C |
| D | December 15 & 16, 1997 KPMG e-mail. |
| E | December 16, 1997 KPMG memorandum. |
| F | November 6, 1997 KPMG memo. |
| G | March 14, 1998 KPMG e-mail. |
| H | October 1, 1997 KPMG e-mail |

| Exhibit | Description |
|---------|-------------|
| I | Fee-splitting template. |
| J | *Thorpe, et al., v. KPMG, Presidio Advisors, and Sidley Austin, Brown and Wood*, Case No. 5-03-CV-68, (USDC. E.D.N.C. January 27, 2003). |
| K | *Swartz v. KPMG, SAB&W, Presidio Growth, LLP, Presidio Advisory Services, Inc., Hayes Street Management, Inc., Norwood Holdings, inc., Deutsche Bank AG, Deutsche Bank Securities, Inc., Dale R. Baumann, John M, Larson, Robert A. Pfaff, David Amir Makov, Steven Buss, and R.J. Ruble*, Case No. C03-1252 (USDC W.D.WA. June 6, 2003.) |
| L | October 31, 2000 Designation Agreement. |
| M | December 12, 2000 Designation Agreement. |
| N | Excerpt from Q&A of Israel Press. |
| O | Excerpt from Q&A of John Larson. |
| P | Ruble Affidavit |
| Q | Staff of the Senate Comm. on Finance, *Explanation of the Provisions Approved by the Committee on March 21, 1984*, S. Prt. No. 98-169, Vol. I at 425-426 (1984). |
| R | H.R. Conf. Rep. No. 98-861 at 982 (1984), *reprinted in* 1984-3 C.B. (vol. 2) 1, 236. |
| S | "Tax Day Reminder: Treasury & IRS Continue to Crackdown on Abusive Tax Shelters," Treasury & IRS Press Release (April 15, 2003). |

| Exhibit | Description |
|---------|-------------|
| T | "Rossotti Details IRS Successes, Notes Much Work Remains for Years Ahead," *Daily Tax Report* (Oct. 30, 2002). |
| U | "IRS Chief Counsel Speech on Privilege and Shelters," *Tax Notes Today* (Jun. 7, 2002), 2002 TNT 110-29. |
| V | Internal Revenue Fact Sheet FS-2001-10, *Internal Revenue Abusive Tax Shelters Background Paper, Sept. 4, 2001,* 2001 WL 1008527. |

PATRICK J. FITZGERALD
United States Attorney

CRAIG OSWALD
Assistant U.S. Attorney

/s/ John A. Lindquist
JOHN A. LINDQUIST
JENNIFER COHEN
Trial Attorneys, Tax Division
U.S. Dept. of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6561/6403

# Exhibit E

**KPMG** Peat Marwick LLP

*Ex. 18 ?*

PFP

| | | | |
|---|---|---|---|
| To | Gregg Ritchie<br>Warner Center | Date | December 16, 1997 |
| From | Randall S. Bickham<br>Palo Alto | Sianc | ft<br>Ref c:\windows\temp\~me1d5c.doc |
| cc | R.J. Ruble - Brown & Wood | | |

**Business Model - Brown & Wood Strategic Alliance**

The cornerstone of our business model is the development of strategic alliances to
develop and market products for both high-wealth individuals and publicly-traded
corporations. The logic underlying the decision to externalize critical functions is based
upon the need to create a branded image that transcends the common market perception
of an accounting firm's ability to participate in large transactions (deals with professional
fees exceeding $1 million) and charge fees based upon value delivered. Simply stated, a
corporate transactions strategy group viewed by the market as a "Goldman Sachs"-style
practice will be significantly more profitable. In addition to profit enhancement, strategic
alliances will allow us to access technical expertise and relationship introductions which
are critical to developing our practice that would not be otherwise available to us.

Potential alliances for product development are KPMG WNT, "Wall Street" law firms
that specialize in corporate finance (e.g., Brown & Wood), boutique tax product groups
(e.g., Presidio) and financial institutions with a strong tax product orientation (e.g.,
Citibank). As to marketing and distribution of product, the primary requisite is alliances
which will enhance our ability to brand both products and the group. The end objective
for branding at the group level is to create a market perception of our practice as being
one which KPMG-centric, but with concentric relationships with institutions with
exemplary reputations in the capital transactions market. Our leverage in developing
concentric organization alliances is based upon our ability to contribute an outstanding
customer list base and our success to date in the high-wealth market sector.

To date, we have had strategic alliances with Quadra and Presidio. Whereas both
alliances have been beneficial to us, particularly in terms of product development with
Presidio, we need to evolve our business model to the next level in order to develop a
sustainable business model. The initial step is to further strengthened our existing
alliance with Presidio and to look for additional sources of product development.
Secondly, we need to negotiate a formal strategic alliance with Brown & Wood.

Brown & Wood is unique in that it can make significant contributions to the product
development process and would allow immediate brand recognition. Brown & Wood is

GOVERNMENT'S
EXHIBIT
E

644684

KPMG Peat Marwick LLP

Page 2
Gregg Ritchie
Warner Center
December 16, 1997

a preeminent "Wall Street" law firm with a market focus on structuring complex financial transactions. For the four period ending December 31, 1996, Brown & Wood ranked first among all U.S. law firms in terms the aggregate number of public debt and equity securities issues in the United States in which it was involved (either as counsel to the issuer or underwriters), and number two in terms of the aggregate dollar amount of the securities issued in such transactions (1,127 transactions that raised $176 billion).

Brown & Wood has positioned itself in the market as the "technical expert" in structuring transactions involving complex financial securities rather than going after the more traditional role of being a key M&A player. Of more importance to us is the market perception of technical excellence in the development of complex financial securities (from a branding perspective) and participation in the IPO market to enhance our distribution network. Whereas, Brown & Wood has not been a significant player to date in the IPO sector, they are making a significant strategic investment by building up their San Francisco-based practice.

The primary objective of the alliance between KPMG and Brown & Wood should be to build a mutually successful business based upon the products that are jointly developed. Our group has targeted March 31, 1998 as the date that we wish to have our base organizational infrastructure in place. Accordingly, we need to identify an initial product that can be focal point for negotiating a strategic alliance with Brown & Wood. In light of the timeframe and the following ancillary considerations, the most reasonable approach is to use the LLC product currently under development as our initial joint product:

- We must get the new LLC product "on the street" as soon as possible. Mid-January is the targeted date based upon significant support from Brown & Wood.

- Our targeted market for the LLC product is large capital gain transactions where a co-branded product could potentially give us a competitive advantage.

- Brown & Wood has a significant profile in the Midco transaction market which will potentially constitute the best channel for the LLC product.

- A co-developed product may ameliorate our tax shelter registration issue.

644685

KPMG Peat Marwick LLP

Page 3
Gregg Ritchie
Warner Center
December 16, 1997

KPMG, like most financial services firms, has an organizational structure that is centralized and control oriented. For our business model to be successful, we must construct a non-traditional organizational structure, effectively a "virtual company" that can manage a large group of strategic partners and that can react expeditiously to new market developments. In negotiating our strategic alliance with Brown & Wood, the following guidelines should be considered:

- Goals must be well articulated and formally adopted

- Everyone (individuals and institutions) must commit to honest, direct and frequent communication

- Decision-making processes must be unencumbered by institutional inertia

644686

# Exhibit H

Author:  Gregg W. Ritchie at KPMG_WARNER_CENTER
Date:    10/1/97  12:21 PM
Priority: Normal
TO: Randall A. Hamilton at KPMG_DES_MOINES
Subject: Re: Flip Tax Opinion
-------------------------------- Message Contents --------------------------------


_____ Reply Separator _____
Subject: Flip Tax Opinion
Author:  Randall A. Hamilton at KPMG_DES_MOINES
Date:    9/30/97 2:58 PM


Greg, in your September 23rd cc:mail message which attached the
September status memo, you indicated in paragraph 3(b) the fact
pattern must also be concurrently sent to R. J. Ruble at Brown and
Wood. You had previously indicated to me that we would not need to
request the Brown and Wood opinion unless the client specifically
requested it. At this time the client has only request our opinion
but is aware that the Brown and Wood firm would issue the opinion if
requested. Why are we now requiring this concurring opinion?

        IF WE ARE FOUND TO BE A PROMOTER OF A TAX SHELTER, THE CLIENT IS
NOT PROTECTED FROM 6662 PENALTIES BY RELIANCE ON OUR OPINION ONLY. ALSO, OUR
DEAL WITH BROWN AND WOOD IS THAT IF THEIR NAME IS USED IN SELLING THE STRATEGY,
THEY WILL GET A FEE. WE HAVE DECIDED AS A FIRM THAT B&W OPINION SHOULD BE GIVEN
IN ALL DEALS. IF YOU DID A QUADRA DEAL, OUR SHARE OF THIS COST IS $25K. IF YOU
DID A DEAL THROUGH PRESIDIO, THE COST IS ALREADY BUILT IN TO THE FEE SCHEDULE.



GOVERNMENT'S
EXHIBIT

# Exhibit I

Sheet1

| Subject: Profit Allocation Matrix | | | | | | |
|---|---|---|---|---|---|---|
| | | | Allocation of Benefit | | | |
| **Functions** | **Benefit (bps)** | **KPMG** | **B&W** | **Presidio** | **Total** | **Percentage** |
| Developer | 40 | | | | 0% | 15% |
| Finder | 70 | | | | 0% | 26% |
| Presenter | 10 | | | | 0% | 4% |
| Closer | 30 | | | | 0% | 11% |
| NRAs | 10 | | | | 0% | 4% |
| Implementer | 30 | | | | 0% | 11% |
| Opinion Risks | 70 | | | | 0% | 26% |
| DB Relationship | 10 | | | | 0% | 4% |
| | 270 | | | | | 100% |

| | | | Allocation of Benefit | | | |
|---|---|---|---|---|---|---|
| **Functions** | **Benefit (bps)** | **KPMG** | **B&W** | **Presidio** | **Total** | |
| Developer | 40 | 0 | 0 | 0 | 0 | |
| Finder | 70 | 0 | 0 | 0 | 0 | |
| Presenter | 10 | 0 | 0 | 0 | 0 | |
| Closer | 30 | 0 | 0 | 0 | 0 | |
| NRAs | 10 | 0 | 0 | 0 | 0 | |
| Implementer | 30 | 0 | 0 | 0 | 0 | |
| Opinion Risks | 70 | 0 | 0 | 0 | 0 | |
| DB Relationship | 10 | 0 | 0 | 0 | 0 | |
| | 270 | 0 | 0 | 0 | 0 | |

| Deal Amount | Profit @270 bps | KPMG Allocation | B&W Allocation | Presidio Allocation | Total Fee |
|---|---|---|---|---|---|
| $1,000,000 | $27,000 | $0 | $0 | $0 | $0 |
| $2,000,000 | $54,000 | $0 | $0 | $0 | $0 |
| $3,000,000 | $81,000 | $0 | $0 | $0 | $0 |
| $4,000,000 | $108,000 | $0 | $0 | $0 | $0 |
| $5,000,000 | $135,000 | $0 | $0 | $0 | $0 |

644194

GOVERNMENT'S
EXHIBIT

I

# Exhibit O



```
 1
 2        REPORTER'S TRANSCRIPT OF PROCEEDINGS
 3                      ""
 4                    --oOo--
 5
 6  IN RE:                        )
                                  )
 7  THE LIABILITY OF PRESIDIO     )
    ADVISORS, LLC FOR IRC         )
 8

 9

10

11

12

13

14          TESTIMONY OF
15          JOHN LARSON
16          _____
17          October 15, 2002
18
19
20
21
22  REPORTER: RENEE COMBS WOLF, RMR, CSR 11867 JOB 323063
23
24
25
                                              Page 1
```

```
 1                    --oOo--
 2        P R O C E E D I N G S
 3        MR. DALEIDEN:  Mr. Grigsby, are you going to
 4  be giving any testimony this morning or today?
 5        MR. GRIGSBY:  Me?
 6        MR. DALEIDEN:  Yes.
 7        MR. GRIGSBY:  No.
 8        MR. DALEIDEN:  Okay.  My name is Revenue
 9  Agent Terry Daleiden, and the purpose of this interview
10  is to establish facts in the promoter examination of
11  Presidio Advisors, LLC and its related entities and also
12  entities that Mr. Larson is doing business as.  And I'd
13  like to go around the room and introduce -- have the
14  parties introduce themselves.
15        MR. CUDLIP:  I'm Robert Cudlip from the IRS
16  Counsel, and I'm assisting Terry Daleiden.
17        MS. REX:  I'm Victoria Rex.  I'm acting team
18  manager for Terry.
19        MS. DIAZ:  Dora Diaz.
20        MR. GRIGSBY:  I didn't see you.  Hello.
21        MS. DIAZ:  Hi.  I just came in late, and I'll
22  be asking some questions regarding the TMP issue.
23        MS. ZHANG:  My name is Joanne Zhang.  I'm the
24  international examiner assisting Terry on the project.
25        MS. FLEMING:  My name is Maureen Fleming, and
                                              Page 3
```

```
 1        A P P E A R A N C E S
 2                    --oOo--
 3        DEPARTMENT OF THE TREASURY, INTERNAL REVENUE
 4  SERVICE, OFFICE OF CHIEF COUNSEL, 701 B Street, Suite
 5  901, San Diego, California 92101, represented by ROBERT
 6  E CUDLIP, Attorney at Law.
 7        INTERNAL REVENUE SERVICE, 450 Golden Gate
 8  Avenue, 6th Floor, Stop 6107, San Francisco, California
 9  94102, represented by DORA DIAZ, VICTORIA REX, JOANNE
10  ZHANG, MAUREEN FLEMING, AND TERRY DALEIDEN.
11        LATHAM & WATKINS, 555 Eleventh Street, N.W.,
12  Suite 1000, Washington, D.C., 20004, represented by
13  McGEE GRISBY, Attorney at Law, appeared as counsel on
14  behalf of John Larson.
15                    --oOo--
16        BE IT REMEMBERED that on Tuesday, October 15,
17  2002, commencing at 9:12 a.m. thereof, at 450 Golden
18  Gate Avenue, San Francisco, California, before me, RENEE
19  COMBS WOLF, a Certified Shorthand Reporter, personally
20  appeared
21            JOHN LARSON
22
23  called as a witness by the Internal Revenue Service,
24  who, having been first duly sworn, was examined and
25  testified as follows:
                                              Page
```

GOVERNMENT'S
EXHIBIT

0



```
20      Q.   Sure, all right.  What entity wrote the tax
21   opinions for the Presidio Advisors premium loan
22   transactions?
23      A.   KPMG and Brown & Wood.
24      Q.   And in the -- in the premium loan
25   transaction, what entity provided the tax advice for the
```

Page 100

25 (Pages 97 to 100)

John Larson    October 15, 2002

1    A.    I have withheld nothing from the attorneys.
2    Q.    Do you know if there is a privilege log
3    that's been created?
4    A.    I would have to consult my attorneys.
5    Q.    In going through the Section 302/318
6    transaction documents --
7         MR. GRIGSBY:  Can we go off the record for a
8    second.
9         (Discussion off the record.)
10        MR. DALEIDEN:  Q.  In reviewing the section
11   302/318 documents that have been provided, I noted that
12   there are no tax opinions that are provided.  What was
13   the reason the tax opinions were not provided with the
14   documents?
15   A.    The reason is we do not have tax opinions.
16   Q.    Were tax opinions obtained in connection with
17   the Section 302/318 transactions?
18   A.    I think you would have to ask the taxpayers.
19   Q.    Mr. Larson, you're stating that you have no
20   knowledge of whether tax opinions were created in
21   connection with the Section 302/318 transactions?
22   A.    As far as I'm aware, tax opinions were
23   created.
24   Q.    Who created the tax opinions?
25   A.    I believe KPMG and Brown & Wood.

Page 23

1    Q.    For each of the Section 302/318 transactions,
2    was a unique tax opinion created, or was a boilerplate
3    format used and fitted to the particular transaction?
4    A.    I don't know.
5    Q.    Were you ever in possession of the tax
6    opinions in connection with the Section 302/318
7    transactions?
8    A.    Could you ask the question again?
9    Q.    Yes.  Were you ever in possession of the tax
10   opinions in connection with the section 302/318
11   transactions?
12   A.    Are you asking me about opinions for all the
13   transactions?
14   Q.    I'm asking you about opinions that were
15   created in connection with each one of the Section
16   302/318 transactions.
17        MR. GRIGSBY:  I'm completely confused.  Why
18   don't you start over?
19        MR. DALEIDEN:  Okay.
20   Q    Were there tax opinions created in connection
21   with the Section 302/318 transactions?
22        MR. GRIGSBY:  I think he already answered
23   that question.  I think he said as far as he was aware,
24   there were tax opinions.
25        MR. DALEIDEN:  Q.  Did the --

Page 24

6 (Pages 21 to 24)

1

LARSON LARSON  December 5, 2002

Page 208

12      Q. So you are saying OPIS was developed by KPMG?
13      A. I think I'm saying that the, at least the
14  primary development work, as I recall, was done by
15  people at KPMG. I believe there also would have been
16  input from other sources, including Brown & Wood, and
17  certainly some input from my company as well, but that
18  the prime movers would have been at KPMG.