The Honorable Marsha J. Pechman

CC TO JUDGE __DJ__
_____ FILED _____ ENTERED
_____ LODGED _____ REC'D

DEC 3 2003   DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

THEODORE C. SWARTZ,

    Plaintiff,

KPMG, LLP, PRESIDIO GROWTH, LLC, PRESIDIO ADVISORY SERVICES, INC., HAYES STREET MANAGEMENT, INC., NORWOOD HOLDINGS, INC, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES, INC., SIDLEY AUSTIN BROWN & WOOD, LLP, DALE R. BAUMANN, JOHN M. LARSON, ROBERT A. PFAFF, DAVID AMIR MAKOV, STEVEN BUSS, and R. J. RUBLE, and their respective marital communities, if any.

    Defendants.

Case No. C03-1252 P

SECOND DECLARATION OF DUNCAN C. TURNER IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

03-CV-01252-DECL

Duncan C. Turner deposes and states:

1. I am an attorney representing Plaintiff T.C. Swartz in this action. I have personal knowledge of the matters stated herein and am competent to testify as to the same.

2. I am making this declaration to bring to the attention of the Court certain facts and evidence that have only become available to the plaintiff within the last few days. I am submitting this material in opposition to the various motions to dismiss filed by the KPMG Defendants, the Brown & Wood Defendants, the Presidio Defendants, and the

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 1
C03-1252 P

ORIGINAL

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax: (206) 621-9686

Deutsche Bank Defendants ["DB"]. This information was not available at the time that plaintiff's responses to the motions of KPMG, Presidio and Brown & Wood were filed and served, having only been disclosed by the federal government recently in conjunction with hearings on the subject of abusive tax shelters that were conducted by the Senate Permanent Subcommittee on Investigations November 18 - 20.

3. Each of the documents included herein were exhibits to the Senate hearings and are documents that were produced by Deutsche Bank or the other defendants in response to subpoenas issued by either the Subcommittee or the IRS. They are significant to the pending motions to dismiss in that they further illustrate the coordination among the defendants in implementing fraudulent tax shelter transactions and further highlight the complicity and knowing participation of Deutsche Bank. Also, they give further proof of the use of wire and mail by the defendants in the commission of their fraudulent scheme.

4. Attached as Exhibit 1 hereto (Senate Exhibit [hereinafter, "SE"] 69) is a memorandum dated April 20, 1999, sent by defendants Amir Makov of Presidio Advisors, LLC to John Rolfes of Deutsche Bank. In the memorandum, Makov outlines elements of the BLIPS transaction and Deutsche Bank's compensation for participating. The memorandum describes a process pursuant to which an Investor's LLC enters into a seven year loan transaction with the understanding that it will be paid off in unwound within 60 days. The "total friction costs" to Deutsche Bank and Deutsche Bank Securities are stated as being in the amount of $48,000 and "in our above example, Deutsche Bank will earn a fee of $620,000."

5. Attached as Exhibit 2 hereto (SE 70) is a document that appears to be an internal DB memorandum dated circa May of 1999. On the first page, it describes Presidio Advisors as "a well-known client of DB." It further notes that "last year through the OPIS program, which involved a large program of equity derivative trades, OPIS

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 2
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax: (206) 621-9686

generated fees to DB in excess of $35 mm, and net of expenses, the number was approximately $33mm." The second and third pages of the exhibits contain an outline of DB's critical role in the BLIPS transactions. The author notes that "the Company [or the client] will enter into a series of FX [foreign currency] transactions, all approved by DB and all executed by DB." Furthermore, "DB will have the right to terminate the Company and its activities as it will retain the right to approve/disapprove all trading activity in the Company." This memorandum illustrates that from the beginning DB knew that the purpose of the BLIPS transaction was simply to generate a tax loss. Items 12 and 13 on page 2 of the exhibit note that "it is imperative that the transaction be wound up after 45-60 days and the loan repaid due to the fact that the HNW [high net wealth] individual will not receive his/her capital loss (or tax benefit) until the transaction is wound up and the loan repaid." The remainder of the memorandum identifies ten DB employees and two of its outside counsel who were expected to participate in the BLIPS execution.

6. Exhibit 3 hereto (SE 67) consists of an e-mail message from Mick Wood to Francesco Piovanetti, both of DB. The message contains Wood's comments on an internal paper that described DB's participation in the BLIPS transaction. Wood identifies as one of the risks to DB that was not properly addressed in the paper as "the purpose of the structure (if indeed we care)." Wood's comments are guarded and indicate the unsavory nature of the BLIPS transaction. He also notes his care in not copying anyone else on this e-mail critique. Exhibit 3 also contains a slide presentation that was apparently attached to the e-mail message which further illustrates DB's role in the proposed BLIPS scheme.

7. Exhibit 4 hereto (SE 102) consists of an e-mail from William Boyle of Deutsche Bank to Mick Wood, with copies to other DB employees. The message consists of a draft description of the BLIPS transaction that has been edited by Boyle, as indicated

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 3
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax: (206) 621-9686

by his comments in italic script throughout the draft. It appears that the final document being developed would be used to "sell" DB management on the benefits of participating in the BLIPS transaction. Boyle is quick to point out that the financial strategy implies "negative carry" that the author should be "ready to address." Also of concern to the author and the reviewer is the "tax reputation risk" associated with being involved in the BLIPS scheme.

8. Exhibit 5 (SE 103) consists of an another e-mail from Mick Wood to Francesco Piovanetti, this one dated July 29, 1999. The message contains further comments on the paper being prepared for consideration by DB's Risk and Resources Committee [RRC]. In this message, Wood explicitly addresses the issue of the risk of a negative impact that could be suffered to DB's reputation by participating in the BLIPS scheme. Wood writes: "I think the problem here is that the paper skirts round the basic issue rather than addressing it head on (the tax reputational risk). I can understand why you have adopted that approach. I would have thought you could still ensure that the issues are highlighted by ensuring that the papers are prepared, and all the discussion held, in a way which makes them legally privileged. (Francesco – you may remember that was one of my original suggestions.) I have [] a number of quiries on that front which it might be best to discuss this with the lawyers present, which might preclude it for tomorrow's RRC." In other words, Wood has expressed his realization that the BLIPS transaction is probably unlawful but wants to cloak any discussion of DB's participation with the attorney-client privilege for the purpose of avoiding later discovery of incriminating documents (such as the one found here).

9. The second page of Exhibit 5 (SE 103) contains a description of certain aspects of DB's participation in the execution of BLIPS, all of which are designed to make it a riskless transaction for DB.

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 4
C03-1252 P

**BADGLEY ~ MULLINS**
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax: (206) 621-9686

10. Exhibit 6 hereto (SE 104) is an e-mail dated July 30, 1999, from Ivor Dunbar to Mick Wood addressing some of the concerns that Wood noted in Exhibit 5, including reputational risk and use of the attorney-client privilege to mask DB's internal discussions of BLIPS. Dunbar concludes that privilege "is not easy to achieve and therefore a more detailed description of the tax issues is not advisable." Going further, Dunbar notes that, "In this transaction, reputation risk is tax related and we have been asked by the Tax Department *not to create an audit trail* in respect to the Bank's tax affaires."

11. Exhibit 7 hereto (SE 113) consists of an e-mail string dated October 13, 1999, that was routed among DB employees. On of the messages consists of extracts from a meeting of DB Private Banking's Management Committee. Regarding the BLIPS transactions, the minutes reflect DB's concern that its participation in the BLIPS transactions might be made public. Committee member PKS (Peter K. Scaturro) "represented PB [Private Banking] Management's views on reputational risk and client suitability." A person named John Ross reportedly "approved the product, however insisted that any customer found to be in litigation be excluded from the product, the product be limited to 25 customers and that a low profile be kept on these transactions." As apparently an additional secrecy measure, KJT (Committee Chairman Kenneth J. Tarr) "suggests that the 25 customers be selected from different geographic areas."

12. Exhibit 8 (SE 29) is an e-mail string, including a message dated September 13, 1999, from John Larson (Presidio) to Jeffrey Eischeid (KPMG). The crux of the message is a description of how the participants plan to accommodate the flow of BLIPS participants that have already (within two months or so) been enlisted. Larson notes that they have "25-28 deals on our active list with another 25 or so on our 'highly likely' list." One of his solutions to the backlog involves working closely with DB. Larson stated, "as an experiment last week I spent a day working out of DB's New York office. I found that

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 5
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax: (206) 621-9686

being there I was able to trouble shoot very effectively. This made me think that a temporary Presidio outpost at the bank might be helpful. Conceivably, stationing someone knowledgeable from KPMG at the bank might also be good." Obviously, at this point DB was working quite closely with the other defendants.

13. Attached at Exhibit 9 (SE 5) is an e-mail message dated April 4, 1999, from Larry DeLap of KPMG to Jeffrey Zyslik of KPMG, with copies to others. In the message, DeLap provides extensive commentary on the contrived engagement letter and the tax opinion letter that KPMG fashioned for the BLIPS clients. The message gives some insight into KPMG's own concerns about the legitimacy of the BLIPS transaction. For example, in challenging a basic premise of BLIPS, that the investor can invest a small amount and claim a large loss, DeLap states: "I would think the IRS would advance the argument that the borrower is the partnership, and the investor's cash contribution to the partnership was $1.8 million, not $151.8 million. If that argument were successfully pursued, the rest of the analysis would be academic." On the second page of the message, DeLap queries the propriety of DB's involvement in a KPMG-hatched scheme. "There are several parenthetical references to Deutsche Bank. Will other banks be participating as lenders under similar terms? In either case, we need to get clearance from DPP-Assurance that Deutsche Bank's participation does not constitute an alliance or joint venture that would impact our independence with Deutsche Bank (which is a KPMG audit client)."[1]

14. Exhibit 10 (SE 13) further illustrates KPMG's internal concern over the legality of the BLIPS transaction. This exhibit is an e-mail string dated August 4, 1999. In the first message, Mark T. Watson of KPMG states, "I feel it is important to again note

---

[1] Compare this view with that found in Exhibit E to the Declaration of Duncan C. Turner in Opposition to All Defendants' Motions to Dismiss. In that Exhibit E, KPMG discusses creation of a "virtual firm" through an alliance with Brown & Wood, Presidio, and "and financial institutions [*i.e.*, banks] with a strong tax product orientation."

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 6
C03-1252 P

BADGLEY ~ MULLINS
Law Group
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax: (206) 621-9686

that I and several other WNT [KPMG's Washington National Tax office] partners *remain skeptical that the tax results* purportedly generated by a BLIPS transaction *would actually be sustained by a court* if challenged by the IRS. We are particularly concerned about the economic substance of the BLIPS transaction, and our review of the BLIPS loan documents has increased our level of concern." In the reply message, Steven Rosenthal of KPMG wrote: "I share your concerns .... *I continue to be seriously troubled by these issues....*"

15. Exhibit 11 (SE 64) further illustrates KPMG and Presidio's early understanding of the fraudulent nature of the BLIPS transaction as well as some insight into DB's control over the "investment" vehicle employed. The exhibit is an e-mail string that was written between May 4, 1999, and May 10, 1999. In the May 4 installment, Mark T. Watson of KPMG-WNT confided to Larry DeLap

> I am not comfortable issuing a more-likely-than-not opinion letter wrt [with respect to] this product for the following reasons:
>
> - Based on Presidio's own admission, the probability of actually making a profit from this transaction is remote (possible, but remote);
> - The bank will control how the "loan" proceeds are invested via a veto power over Presidio's investment choices; and
> - It appears that the bank wants the "loan" repaid within approximately 60 days (and thus, the reason for the three investment stages).
>
> Thus, I think it is questionable whether a client' representation that he or she believed there was a reasonable opportunity to make a profit is a reasonable representation. Even more concerning, however, is whether a loan was actually made. If the bank controls how the loan proceeds are used and when they are repaid, has the bank actually made a bona fide loan?
>
> *I will no doubt catch hell for sending you this message.*

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 7
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax: (206) 621-9686

This exhibit raises another significant point. KPMG in its motion to dismiss has suggested that the client's representations in its Engagement Letter somehow insulate it from liability. It is clear from this exhibit that (i) KPMG authored the representations and (ii) KPMG knew in advance that they were false.

16. Exhibit 12 hereto (SE 65) is another KPMG e-mail string that was created between May 5 and May 14, 1999. The earlier message in the string is identical to the portion of Exhibit 10 quoted above. Larry DeLap commented on Mark Watson's misgivings by stating that "I don't believe a PFP product should be approved when the top PFP technical partner in WNT believes it should not be approved." On May 10, 1999, Philip J. Wiesner gave a very long response that addresses, among other things, the tax opinion letter KPMG plans to employ with the BLIPS transactions. He wrote:

> We viewed our role [in editing the opinion letter] as a positive one, ie, we would work very hard to achieve, if possible, the desired level of opinion and suggest improvements, in particular, to limit the risks which the Firm is assuming by issuing the letter.
>
> * * *
>
> [W]e have been dealing with a true prototype opinion where the facts keep evolving. The real "rubber meets the road" will happen when the transaction is sold to the investors, what the investors' actual motive for investing in the transaction is and how the transaction unfolds. *Our opinion will be worth little (but we will be protected from risk if properly caveated) is [sic, should be "if"] the actual facts bear little relation to the assumed facts in the opinion.*
>
> * * *
>
> Third, our reputation will be used to market the transaction. This is a given in these types of deals. Thus, we need to be concerned about who we are getting in bed with here. In particular, do we believe that Presidio has the integrity to sell the deal on the facts and representations that we have written our opinion on?! We have had past experience in the foreign stock redemption and the OPUS transactions which shows how difficult it is to keep the facts in line.

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 8
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax: (206) 621-9686

Weisner's e-mail eventually called for a decision on KPMG's going forward with BLIPS based on the following criteria: (i) whether the opinion letter and engagement letter had sufficient risk-limiting language to protect KPMG, (ii) whether the marketing would be limited to sophisticated investors who "are made aware of the risk and properly advised by their own tax and investment advisors",[2] and (iii) whether KPMG was "being paid enough to offset the risks of potential litigation resulting from the transaction." On the third point he added, "My own recommendation is that we should be paid a lot of money here for our opinion since the transaction is clearly one that the IRS would view as falling squarely within the tax shelter orbit."[3]

17. Exhibit 12 also gives additional insight into the coordination between DB and Presidio. In a May 13, 1999, e-mail authored by Barbara McConnachie, she describes a meeting of the "BLIPS task force" notes that "Deutsche Bank is dedicating resources necessary to complete their documentation. In fact, at the end of this month, Jeff Eischeid will be attending a meeting in Frankfurt to address the issue of expanding capacity at Deutsche Bank given our expectation regarding the substantial volume expected from this product."

18. Exhibit 13 hereto (SE 106) is an e-mail and attached Powerpoint presentation sent from Viktoria Antoniades to Brian J. McGuire of Deutsche Bank's New York office. The Powerpoint presentation is entitled Structurerd Transaction Group, North America, ["STG"] and apparently describes a DB working group that went by that name. On the slide entitled "Client Environment," it is noted that the Group deals with "Select Sophisticated Co. – execute tax driven deals" and "Private clients/Private Co    gain mitigation." Gain Mitigation is a euphemism for generating tax losses to offset gains. On

---

[2] In fact, KPMG made their clients sign non-disclosure agreements and prohibited them from seeking outside advice.
[3] Wiesner here suggests that an untruthful opinion should cost more that a truthful one because the false opinion-giver might be caught.

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 9
C03-1252 P

BADGLEY ~ MULLINS
Law Group
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone (206) 621-6566
Fax (206) 621-9686

the slide entitled "Post-Acquisition Strategy," one of STG's strengths noted in the "Gain Mitigation" area is "relationship with 'promoters'," with a specific reference to "BLIPS". The remainder of the Powerpoint presentation describes a transaction between DB and ENRON.

19. Exhibit 14 hereto (SE 17) is another KPMG e-mail string created between August 4 and 5, 1999. The string starts with an e-mail from Philip J. Wiesner to a number of other KPMG members. Wiesner announced WNT's completion of its review of the BLIPS loan documents and agreements. He stated that, "we believe that, while it is a *close call*, a 'more-likely-than-not' federal tax opinion with respect to the transaction is, on balance, appropriate." In further analysis, Wienser emphasized that the opinion would only be applicable if supported by the actual facts, e.g., "the client believes that there is a reasonable opportunity to earn a reasonable pre-tax profit in excess of the transaction costs."[4] Wiesner's opinion was circulated as the string indicates. Paul M. Kearns on August 5, 1999, wrote " 'a close call' to get to 'more likely than not' is not good enough for me to sell to a client." Bill Goldberg replied to Kearns that is was "for this firm, an aggressive strategy," but "I have no problem telling a client that we regard this as a 51% strategy and not a 52% strategy and let them decide where to go from there." Kearns on the same day cleared the air with this comment: ***"Just so we are clear, I personally view it no greater than 15%."***

20. Exhibit 15 (SE 18) is a brief e-mail circulated among KPMG offices regarding BLIPS. It candidly states that "A number of people are looking at doing BLIPS transactions to generate Y2K (year 2000) losses. We currently have bank capacity to have $1 billion of loans outstanding at 12/31/99. This translates into approximately $400 million of premium."

---

[4] *Cf.* Exhibit 10 ("Based on Presidio's own admission, the probability of actually making a profit from this transaction is remote.")

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 10
C03-1252 P

BADGLEY ~ MULLINS
Law Group
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone (206) 621-6566
Fax (206) 621-9686

21.  Exhibit 16 (SE 33) is a KPMG Peat Marwick memorandum dated June 17, 1998 to the "CaTS Team" from Gregg W. Ritchie regarding "June 11 OPIS Conference Call." OPIS was an earlier tax shelter scheme that has, like BLIPS, been disallowed by the IRS. This document indicates how closely KPMG, Presidio, Brown & Wood and Deutsche Bank were working as early as one year before Swartz' BLIPS transaction was executed. On page 2 of the document, Ritchie notes: "Presidio is working with Brown & Wood and other lawyers in the drafting of the required legal documents. Furthermore, they are in the process of working with Deutsche Bank (and their outside counsel) in drafting the required loan documents." The memorandum also describes a practice that the defendants continued into 1999: "Sample tax opinion letters will not be made available to clients or their advisors prior to execution of the strategy."

22.  Exhibit 17 (SE 34) is another KPMG e-mail, this one from Mark T. Watson to Richard H. Smith and Philip J. Wiesner with the subject line "BLIPS – Economic Substance Issue." In the first paragraph, Watson clearly outlines why the transaction lacks economic substance by writing, "it seems very unlikely that the *rate of return* on the investments purchased with the loan proceeds *will equal or exceed the interest charged on* the loan and the fees incurred by the borrower to secure the loan." In later analysis, Watson explains that in order to overcome the transactional costs, the investment would need to generate an annual return of 240% from some "very safe investments." Watson indicates that there are other (unrelated) problems with the scheme but "wanted to confirm that you [Smith and Wiesner] are still comfortable with the economic substance of the transaction" before he submitted the other concerns to Presidio.

23.  In defending the RICO claim asserted in this case, the plaintiff has alleged that there is an ongoing risk of racketeering activity by the defendants. Exhibit 18 hereto (SE 38) is a draft (May 18, 2001) Business Plan for KPMG's Innovative Strategies practice

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 11
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax (206) 621-9686

group. This memorandum contains a history of KPMG's involvement in what it refers to a the *"loss generator business"* dating back to 1997. The history describes KPMG's development and marketing of strategies that have since been roundly discredited by the IRS including FLIP, OPIS, BLIPS and SOS. These were very profitable for KPMG, with the practice group generating $52 million in revenue in 2000 mostly from BLIPS. The memorandum identified a next-generation "loss generator" product (POPS) and predicted that KPMG would earn $27 million in revenue from such products in 2002.

24. Exhibit 19 hereto (SE 105) indicates that DB, also, was looking forward to future participation with KPMG and Presidio in the implementation of other tax shelter schemes. This document is a DB e-mail dated June 20, 2000, from William Boyle to John T. Wadsworth at Bankers Trust (acquired by DB) that describes an "expanded version of BLIP's [sic]" that was being developed by Presidio and KPMG. The e-mail describes steps recommended so that DB could implement the new BLIPS.

25. Exhibit 20 hereto (SE 110) is a KPMG e-mail string dating between March 20 and 28, 2000. In it various KPMG members discuss DB's role in crafting the language of the BLIPS documents. The text also indicates that DB knew that the transaction was not an ordinary one as compared with industry standards.

26. Exhibit 21 hereto (SE 126) is a Presidio memorandum dated April 18, 2000, Subject: Year 2000 Strategic Plan. Among other significant features, the memorandum describes DB's critical role in the tax shelter business and its involvement in the development of future tax shelter products.

> There are only a handful of banks with the requisite size, experience, and interest to lend into our structures and execute our trading strategies. Histsorically, we have used Deutsche Bank as our lead bank for the financing and execution of products. In our initial discussions with Deutsche Bank, they have indicated that their preliminary thoughts on deal capacity in 2000 is $3 billion.

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 12
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax (206) 621-9686

\* \* \*

> Both Deutsche Bank and KPMG have requested that we replace our existing BLIPS product with a new product in 2000.

KPMG also requested that another bank be involved "which is not an audit client."

27. Exhibit 22 hereto (SE 16) is a KPMG e-mail from Jeffrey Eischeid to Michael S. Coomer dated July 21, 1999. The text of the message begins with "The following is a draft 'product pitch' similar to the one you forwarded to me last month." The "pitch," in discussing BLIPS, describes the scheme as "a turnkey investment program that integrates the services of various parties including the investment advisor, legal/drafting, banking and KPMG tax opinion. The all-in cost of the program, assuming a complete loss of investment principal, is 7% of the targeted tax loss (pre-tax). The tax benefit of the investment program, which ranges from 20% to 45% of the targeted tax loss, will depend upon the taxpayer's effective tax rates. \*\*\* Fee: BLIPS is priced on a fixed fee basis which should approximate 1.25% of the tax loss." Again, this demonstrates the defendants' view that they were acting in concert with the intent of simply generating tax losses.

28. I swear under penalty of perjury that the foregoing is correct to the best of my knowledge and belief.

DATED this 3d day of DECEMBER, 2003.

_____
Duncan C. Turner, WSBA # 20597

SECOND TURNER DECL. IN OPP. TO
MOTIONS TO DISMISS- 13
C03-1252 P

BADGLEY ~ MULLINS
LAW GROUP
5100 Washington Mutual Tower
1201 Third Avenue
Seattle, Washington 98101
Telephone: (206) 621-6566
Fax: (206) 621-9686