

03-CV-01252-DECL Ex. 1 - 8

Ex. 1

# PRESIDIO ADVISORS, LLC

333 Hayes Street, Suite 200
San Francisco, CA 94102

Telephone (415) 284-7333
Facsimile  (415) 284-7284

| | | | |
|---|---|---|---|
| **Date** | April 20, 1999 | | Page 1 of 1 |
| **To** | John Rolfes | | |
| **Company** | Deutsche Bank | cc | Nancy Donohue |
| **Tel** | | Tel | 7888 |
| **Fax** | | Fax | |
| | | cc | John Larson, Bob Pfaff |
| **From** | Amir Makov | Tel | |
| | | Fax | |
| **Subject** | **BLIPS friction costs** | | |

John, further to our Friday phone conversation, I would like to describe the necessary financing steps the BLIPS program will require.

Day 1: Investor's LLC borrows a $100MM principal amount for 7 years at a 16% annual (or semi – lets discuss) coupon. The price of the loan (the cash amount) is to be determined after a 7 day grace period. *x 7 day grace warning*

Day 7: Grace period is over and a cash value is determined based on the 7-year swap rate for day 7. In today's rate environment, the price is approximately $162MM. Once cash value is determined, Investor's LLC contributes cash subject to loan liability to Partnership. Investor is assumed to have borrowed that amount starting on day 1, and having invested the proceeds ($162MM) at an account with Deutsche Bank [see friction costs #1].

At the exact time the cash value for the loan is determined, partnership enters a fixed to floating swap with Deutsche Bank Securities, where partnership receives a fixed 16% annual (or semi, depending on the loan – lets discuss) and pays a Libor plus a spread [x] floating coupon. X is calculated such that the value of the swap is zero. The notional amount of the swap would be roughly equal to $138MM (to be discussed). The difference between the yield received on the cash deposited with Deutsche Bank Securities and the yield paid would be friction costs #2.

On day 60, Investor exits partnership and unwinds all trades in partnership. There is an amount due to the bank based on accrual interest derived from the sum of friction costs 1 and 2. On

The information contained in this facsimile message is privileged and confidential information intended solely for the use of the addressee listed above.  If you are neither the intended recipient nor the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of the telefaxed information is strictly prohibited.  If you have received this telefax in error, please immediately notify us by telephone (call collect to the number listed above) to arrange for the return of the original document to us.



Page 2
April 20, 1999

average these costs should be approximately 18-20 annual basis points on the cash amount ($162MM). For example, assuming the above transaction, at end of 60 days, partnership will pay $48,000 in total friction costs to Deutsche Bank and Deutsche Bank Securities.

In addition to "actual" friction costs, a loan origination fee and a breakage fee will be charged to Investor LLC and partnership. This fee should approximately be 100 basis points of the premium. In our above example, Deutsche Bank will earn a fee or $620,000.

Both Bob and I will be in New York this coming Friday. We would like to further discuss the loan / swap hedging and costs issues. I will call you tomorrow.

Amir.

**2**

Ex. 2

# New Product Committee Overview Memo:
# BLIPS Transaction

This product has been developed with KPMG and Presidio Advisors.  In simple terms, for the Blips project, Deutsche Bank will act as lender, transaction executor, foreign exchange trader, and Know Your Customer Screener.  KPMG will distribute the product to its clients.  Presidio has structured the product and will act as the investment advisor.

Presidio Advisors

There are 3 main partners at Presidio

Robert Pfaff
John Larson
Amir Makov

Bob and John built their careers at KPMG as tax attorneys and members of the 6,000 person tax accounting group. Amir was recently at Sentinel, where he worked on the Dos Equis trades with DB. The Dos Equis trades, after all expenses, generated about $10-15 mm USD in fees to DB in 1998.

Amir left Sentinel to join Presidio in early 1999.  Amir's original connection to Presidio was made through David Kelley and Roberto Marsella, formerly heads of the Deutsche Bank Structured Products Group.  Kelley and Marsella will play no official role in the Blips transaction.

Presidio is a well-known client to DB in the Private Bank, Special Products Group and the Equity Derivatives Group (Frankfurt).  Last year, through the OPIS program, which involved a large program of equity derivative trades, OPIS generated fees to DB in the excess of $35 mm, and net of expenses, the number was approx. $33 mm.

Presidio, in conjunction with ICA, has developed a new product called BLIPS. BLIPS will be marketed to client end users through KPMG mainly by John Larson and KPMG's high net worth advisory practice.  Amir Makov will take responsibility for executing and managing the capital market transactions for BLIPS.

## BLIPS TRANSACTION

BLIPS will be marketed to High Net Worth Individual Clients of KPMG.

It is envisioned that BLIPS will be a large program, covering over a 6 month period of time over 40 separate accounts / counterparties.

4

Permanent Subcommittee on Investigations
**EXHIBIT #70**

DB BLIPS 01059

Loan Balances over time could be as large as $5 billion in par amounts + $3 bn in premium. Fees to DB are estimated to be in the 1.25% of premium range ($30+ mm usd).

If DB proceeds with the BLIPS program, it will involve the following:

1- HNW individuals will be introduced to the DB Private Bank by Presidio/KPMG for Know Your Client Review.

2- The "LLC" (HNW Individual is the single member of a Delaware LLC) will receive a nominal 7 year loan from the DB Private Bank. The Loan will be a high coupon loan (16%) and the loan amount will be delivered to the HNW Individual in the form of a par amount (100) and a premium amount (estimated at 60). The loan/premium amounts will be priced by Global Markets off the US Interest Rate Swap Curve.

For tax and accounting purposes the Loan Liability for the LLC/HNW Individual will be the par amount only (100), not the premium. The LLC will also be obligated for the above market interest rate for the term of the loan. The Loan Proceeds (Par + Premium) will be held in custody in a DB Pledged Account in cash or near cash. Loan will include a prepayment clause with provisions to require repayment of unamortized premium in addition to principal. Loan conditions will be such as to enable DB to, in effect, force (p)repayment after 60 days at its option.

3- After a 7 to 10 day holding period, the LLC will transfer all Loan Proceeds to a Company/Partnership ("Company"). The Company will also have 3% of par amount Equity Capital contributed by the HNW Individual and an additional .3% Equity Capital contributed by the Manager of the Company, Presidio. (In our example here the Company will have 100 Par amount + 60 mm Premium + 3 mm HNW Equity Capital + .3 mm Presidio Equity Capital for a total of 163.3 mm USD). The entire amount of funds in the Company will be held in custody at a DB Global Markets Margin Account.

4- Monitoring of the Collateral will be handled by the Global Markets group, as it will be executing all transactions on behalf of the Company. Presidio will act as the Investment Adviser to the Company.

5- The Company will enter into an Interest Rate Swap to convert its Loan Liability from Fixed into Floating.

6- The Company will enter into a series of FX transactions, all approved by DB and all executed by DB. Typical trades will be in the 2 month forward FX market, Long USD/Short HKD, Long USD/Short Argentine Peso, Long Euro/Short Danish Krone.

2

DB BLIPS 01060

7- The Company's trades will typically have negative carry and will be designed to make $ for the Company in the event of a global markets crisis. In addition there will be negative carry for the Company on the Loan Interest that it owes vs. the interest on the funds that it holds in the Global Markets Custody Account.

8- The appropriate amount of Equity Capital in the Company will be determined by Global Markets Credit.

9- The holding period / life of the Company will be 45 to 60 days. At the end of this time period, the Company will likely unwind all transactions, repay the loan par amount and premium amount. For tax and accounting purposes, repaying the premium amount will "count" like a loss for tax and accounting purposes.

10- At all times, the loan will maintain collateral of at least 101% to the loan + premium amount. If the amount goes below this limit, the loan will be unwound and the principal + premium repaid.

11- DB will have the right to terminate the Company and its activities as it will retain the right to approve/disapprove all trading activity in the Company. This will allow DB to effectively force the closure of the Company and the repayment of its loan to DB. However, it is not believed this right will be exercised due to "12" below.

12- It is imperative that the transaction be wound up after 45-60 days and the loan repaid due to the fact that the HNW individual will not receive his/her capital loss (or tax benefit) until the transaction is wound up and the loan repaid. This is in addition to the *de facto* "put" DB will have on the loan.

13- No loans are expected to go over year end 1999 due to DB constraints as well as the capital loss issue mentioned in "12" above.

14-At no time will DB Private Bank provide any tax advice to any individuals involved in the transaction. This will be further buttressed by signed disclaimers designed to protect and "hold harmless" DB.

15-DB has received a legal opinion from Shearman & Sterling which validates our envisaged role in the transaction and sees little or no risk to DB in the trade. Furthermore opinions have been issued from KPMG Central Tax department and Brown & Wood attesting to the soundness of the transaction from a tax perspective.

## WHO IS INVOLVED SO FAR AT DB

The following people have been working on the transaction.  Those from the Private Bank and Global Markets will be responsible for the ongoing running of the trade.

| | |
|---|---|
| Private Bank | John Rolfes, Presidio Relationship Manager |
| | NN to come from DB/Bankers Trust Structured Credit |
| | Rick Stockfon, Account Manager |
| | |
| Global Markets | Nancy Donohue, global market sales |
| | Steve Cohen, structured product credit |
| | Francesco Piovanetti, structured products |
| | |
| Accounting | Rob Arnig, KPMG as advisor to the Bank |
| | Linnae Latessa Controlling, *for treatment to the bank's* |
| | *capital vis a vis loan principal and premium* |
| | |
| Tax | Joe Cassidy, DB NA Tax |
| | |
| Legal | Michelle Cenis , DB |
| | Alvin Knott, Shearman & Sterling |
| | Gerry Rokoff, Shearman & Sterling |

nb: Shearman & Sterling worked with DB on OPIS and Dos Equis transactions.


## DIVISION OF RESPONSIBILITY

John Rolfes in Private Banking is presently the RM for Presidio and has taken joint responsibility with Doug Lemmonds for overseeing the BLIPS transaction. Private Banking will be responsible for:

Know Your Client for all HNW Names
Sourcing from Treasury the Loan proceeds
The Private Bank will be booking the Loans
Account Opening and maintenance of accounts
Relationship Management of the HNW customers to the deal

Nancy Donohue can act as the RM for Presidio in the
Global Markets arena. Global Markets will be responsible for:

Setting up ISDAs for 40 accounts

.4

Setting up Margin Accounts for 40 accounts
Pricing the Loan on the US Swap Curve
Executing and Settling the Interest Rate Swap and FX Trades
Monitoring, Daily, the value of the LLCs vs. Equity Balances

**Approvals received already from the following DB departments/divisions:**

**Global Markets: Shamil Chandaria, Managing Director, Co-Head Structured Transactions Group**

**Audit/Accounting: Rob Arning (KPMG Partner in charge of DB Americas audit)**

**DBNA Tax: Joseph Cassidy, Managing Director and Head of DBNA Tax**

**DBNA Legal: Michelle Cenis, Responsible for DBNA Legal Structured Products**

**Formal Approval is expected from DBNA New Products Committee this Thursday May 20.**

DB BLIPS 01963



Ex. 3



francesco.piovanetti@db
.com

To: william.boyle@db.com
cc:
Subject: Re: Risk and Resources Committee Paper

Sent: 07/26/1999 10:34 AM

---

Let's talk...

---------------- Forwarded by Francesco Piovanetti on 07/26/99 09:33 AM

From: Mick Wood on 07/15/99 06:44 PM GMT

To:    Francesco Piovanetti
cc:
Subject:  Re: Risk and Resources Committee Paper   (Document link not converted)

As discussed - we will not present this tomorrow.

In any event, I dont think this would be ready to present as is.

You need to spell out very clearly what the issue is that you feel requires
input from the RRC. What you have here is an explanenation of a deal
structure.
If this structure involves us taking risk on private clients, then we may
need to involve the Private Client Credit Unit. That may not be necessary if
it involves risk on an SPV, or is structured on a limited or non recourse
basis, but we may then have to involve the market risk guys to ensure we have
picked up the optionality elements.
If you intend to include this deal structure paper, I would strongly suggest
that it requires significant amendment and some additions. Please take this
in the spirit that it is intended because it is in nobody's interests to have
a paper rejected, just because people could not understand it. I personally
spent some time going through it and felt it was missing a lot of quite basic
bits of information without which it was impossible to address the risks (for
example,. how and in what form is the client investment made! What further
commitments exist!, what is the purpose of the structure (if, indeed we
care!). Some of the gaps I could build in by guess work, but it is dangerous
to expect people to have to do that. It also conveys a bad impression of
those presenting the business. I was under no pressure when I read it, and
was reading it as an interested party. Others may not be so tolerant. There
are also details which I believe must be wrong, and some terminology is used
which is out of context. Alone, some of these are very petty details, but
combined with the other aspects, they could be the sort of thing could kill
the proposal; simply because people get irritated with the presentation.
Unfortunately, I cannot get involved in assisting you to draft the
presentation, for a number of reasons. What I would suggest is you give it
somebody else who has never seen the deal before, and ask them to describe it
back to you based only on the information in this presentation.

Again, please take my comments in this last paragraph in the spirit they are
intended. (one reason I have not copied anybody else).

Mick

Francesco Piovanetti@DBNA
13/07/99 17:27

Permanent Subcommittee on Investigations
**EXHIBIT #67**

To:   Mick Wood/DMGCM/DMG UK/DeuBa@DMG UK
cc:   PAUL MCHUGH; NANCY DONOHUE; William Boyle; Ivor Dunbar/DMGSF/DMG
      UK/DeuBa@DMG UK; Paul Glover
Subject:  Risk and Resources Committee Paper

(Embedded
image moved    (Embedded image moved to file: pic23982.pcx)
to file:
pic06517.pcx)

Dear Mick,

Attached please find the paper that will be presented to the Risk and Resources
Committee this coming Friday.  Please call me to discuss the document before you
forward it to other members of the committee.

You can reach me at 212-469-7318.

Regards,

Francesco Piovanetti
Structured Transactions Group

(See attached file: BLIPS Transaction Global.ppt)

- pic06517.pcx

- pic23982.pcx

- BLIPS Transaction Global.ppt

July 14, 1999



# Bond Linked Indexed Premium Strategy "BLIPS"

## Global Markets

### Structured Transactions Group
### Relative Value Group

*Confidential and Proprietary Product Overview for Review by the*
*Risk & Resources Committee*

Deutsche Banc Alex. Brown



Deutsche Bank



Strictly private and confidential

# BLIPS Overview

BLIPS will be marketed to High Net Worth Individual Clients of KPMG by Presidio Advisors ("Presidio"). Presidio has structured a foreign exchange investment program with significant pre-tax profit potential for US investors.

Presidio has approached Deutsche Bank Securities ("DBSI") for the execution of foreign exchange and interest rate derivative transactions, and financing of the BLIPS program.

DBSI has received a legal opinion from Shearman & Sterling that validates DBSI's role in the transaction as a lender and FX execution provider, and sees no risk to DBSI in its involvement in the BLIPS program. Furthermore, KPMG and Brown & Wood will issue opinions to the investors in the transactions attesting to the soundness of the structure from a tax perspective. At no time will DBSI provide any tax advice to any of the investors involved in the transactions; *DBSI will only execute FX and interest rate transactions, and finance the BLIPS structure.* Disclaimer letters designed to protect DBSI from any tax and reputational risk will be executed by investors to further reinforce DBSI's position.

Stringent collateral requirements are in place under the Credit Agreement. The ISDA, which will cover all foreign exchange and interest rate transactions, is cross-defaulted to the Credit Agreement.

For presentation purposes we will use the following sample trade:
- A newly created LLC will receive a seven year loan from DBSI-STG. The loan will carry a high coupon rate (16%) and will be delivered to the LLC in the form of a par amount ($100MM) and a premium amount ($60MM). The loan will be collateralized with a cash contribution of approximately 7.7% ($4.6MM) of the premium amount.



Deutsche Bank

*Strictly private and confidential*



# BLIPS Step 1 - Margin Account

Deposit loan and premium proceeds into a DBSI Margin Account where the funds will be held-in-custody.

| DBSI Loan |
|---|

$ 100MM Loan
60MM Premium
**4.6MM Equity Capital**

| $164.6MM deposit in Global Markets |
|---|

Deutsche Banc Alex. Brown

 Deutsche Bank

Strictly private and confidential

# BLIPS Step 2 - Loan / Swap

The LLC will enter into an Interest Rate Swap with DBSI-NY Swaps desk to effectively convert the loan from a fixed rate into a floating rate Libor based obligation:



DBSI Loan → 16% Fixed on $100MM → LLC

16% Fixed on $100MM → DBSI Swaps Desk

3m USD Libor on $160MM → LLC

**Loan Details**

7yr
Fixed Rate Approximately 16%
Quarterly Coupon Payments

**Swap Details**

7yr
Fixed Rate to Match Exact Loan Coupon
Floating 3month Libor on $160MM

- The loan and swap will be priced simultaneously on the USD Libor curve.

- The loan and swap will *always* net off against each other at each point in time to value $160MM, plus Libor accrued interest.

- The swap will have two elements to create a small basis to the loan. This risk will be borne by the LLC:
  - Seven day timing mismatch on the start date
  - Cap on 3m Libor payments, at 9%, for first two years of swap

- DBSI-STG will enter into a offsetting swap with the DBSI-NY Swaps desk, creating a Libor based loan.

Deutsche Banc Alex. Brown

 Deutsche Bank

Strictly private and confidential



# BLIPS Step 3 - FX Transactions

1. Sell HKD / Buy USD
2. Sell ARS / Buy USD
3. Sell SAR / Buy USD
4. Sell EGP / Buy USD
5. Sell DKK / Buy EUR

Typical Investment Program

$164.6MM in
Global Markets
Margin account

In compliance with the terms of the Credit Agreement, all trades must be approved by DBSI for maturity and notional size.

Trades will typically be 2 and 3 month forward trades.

Un-pegged currency forwards will typically be hedged for down-side moves with put option purchases.

- Sell HKD / Buy $35MM USD
- Sell ARS / Buy $15MM USD
- Sell SAR / Buy $ 5MM USD
                  $55MM USD

- In all emerging market trades, the LLC will short the local currency and go long the USD.

Deutsche Banc Alex. Brown

 Deutsche Bank

Strictly private and confidential

# BLIPS Step 4 - Synthetic USD Deposit

- A key part of Presidio's FX investment program will be to hold the loan and equity proceeds in a non-USD currency.

- This will be constructed as a synthetic USD deposit using FX spot and forward trades.

- For example:
  - Day 1: Sell $160MM USD/buy EUR for value Day 1 and buy USD/sell EUR for value Day 60
  - Day 1-60: Earn Eurolibor based deposit rate

Deutsche Banc Alex. Brown



Deutsche Bank

Strictly private and confidential

# BLIPS Summary

- Expected Swap/Loan/FX/Depo holding period is estimated to be 45-90 days per account.

- Managing the counterparty credit risk entails real time monitoring of LLC Equity Value versus two key risks:

1. Depo/Swap Basis Risk:    Interest earned in margin account/synthetic USD depo vs. interest due on interest rate swap

2. FX Market Risk:    Expected and actual MTM on fx trade

- Present "trial run" calculations estimate the risks as being equal to:

1. Depo/Swap Basis Risk:    25bps of premium amount

2. FX Market Risk:    25bps of premium amount

- 7.7% of premium amount will be held, in full, by DBSI until the LLC account is closed and DBSI has a legal claim on that amount in the Credit Agreement.
- The 7.7% will cover market risks, transaction costs, and DBSI fees.

Deutsche Banc Alex. Brown

 Deutsche Bank

4

Ex. 4

Deutsche Bank @

**MEMORANDUM**

**Structured Transactions Group**

| | |
|---|---|
| **To** | Mick Wood |
| **cc** | Ivor Dunbar, Stuart Bray, Paul Glover, Francesco Piovanetti |
| **From** | William Boyle |
| **Subject** | GCI Risk and Resources Committee - BLIPS Transaction |
| **Date** | July 29, 1999 |

The GCI Structured Transactions Group has been approached by Presidio Advisors *Suggest a few lines somewhere on who Presidio are.* with the opportunity to lend money to, and execute foreign currency and interest rate transactions on behalf of *are you dealing "on behalf of", or "with",* a U.S. limited liability company *are the fx deals with the same LLC to whom we lend, or it is the sub LLC* which is implementing the Bond Linked Indexed Premium Strategy (the "BLIPS Strategy"). The BLIPS Strategy will be marketed as a foreign exchange investment program to high net worth individual clients of KPMG by Presidio Advisors. The BLIPS Strategy involves taking short positions in certain foreign currencies pegged to the U.S. dollar (e.g. Hong Kong dollar and Argentina Peso) and a long position in U.S. dollars. *You should be ready to address the question as to how you deal with the negative carry that this strategy implies.* Deutsche Bank ("DB") will not market the transaction nor provide any tax or investment advice to the participants in the transaction. DB will obtain representation letters from Presidio Advisors, KPMG and the individual investor which document DB's role as a lender and market maker of foreign currency and interest rate transactions and not as a marketer of the BLIPS strategy or a provider of tax or investment advice regarding implementation of the BLIPS Strategy.

Transaction Structure - DB will have the opportunity to lend, on average, $160 million to each of approximately 25 limited liability companies (the "Investor LLC's) on a non-recourse basis *I don't think you mean "non-recourse" I think you mean "limited recourse". (see below).* The loans will take the form of seven year fixed high coupon yielding $100 million notes. (the "Notes")*Do you mean that we don't actually make a loan, but buy notes at a premium? If so you need to be ready to address the accounting implications for us* The Investor LLCs will be owned by U.S. individuals who presumably inject the capital of around US$5mm *see below.*

After a period of seven to ten days, the Investor LLCs are expected to contribute *what form does this contribution take? This is the linked to how the benefits of the investment strategy get passed back upstream to the Investor LLC,* and thus to the equity value of the Investor approximately $165 million, (i,e the proceeds of the [loan/note purchase] by DB and the capital injection) [subject to the Note], to a *(single?)* second LLC (the "Investment LLC") which will execute the BLIPS Strategy*(for all Investor LLCs).* Presidio Advisors, who will manage and advise on the BLIPS Strategy, will contribute approximately $500,000 to the Investment LLC In exchange for an equity interest in Investment LLC. DB will enter into a separate swap transaction *presumably with the Investor LLC* which has the effect of converting the cash flow obligations of the Investor LLC under the Note into the cash flows equivalent of a $160 million Libor based loan. DB expects to *(why is there a question about this?)* enter into the swap with the Investor LLC. Similar to the Note*(First mention of this?),* an assignment and assumption of the swap will be entered into by the Investment LLC*(you need to clarify what this*

Permanent Subcommittee on Investigations
**EXHIBIT #102**

means; presumably that all obligations to DB of the various Investor LLCs includiong under each note and swap, will be assumed by the Investment LLC. Between the Note and the swap, DB will receive repayment of the $160 million advanced to the LLC Again you need to be ready to talk in terms of credit exposure and book value of the combination. The entire amounts contributed to the second LLC will overcollateralize the Note (first mention of collateral – you probably need to mention that all assets of the Investment LLC will be held by DB and pledged to DB to secure its obligations, also that the Investment LLC will incur no other obligations (except tax etc) other than to DB – this is relevent in view of the synthetic short strategy to be adopted).

Should the collateral value of the assets to the obligations due fall below 1.0125:1.0, DB may immediately liquidate the collateral and apply the proceeds to repay amounts due under the Note and the swap. Based upon the type of investments permitted under the credit agreement and the period the loan is expected to be outstanding, the LLC should meet the collateral value ratio test. Please, review attached RVG discussion regarding the adequacy of the collateral. You should mention whether DB has any right to restrict/control investments (I would expect not if we are to distance ourselves from management). More important, you need to be ready to address how the "collateral" will be valued, and its liquidity, particularly bearing in mind the size of positions and the very slim threshold.

Benefits of the Transaction - The Note has a seven year term. If the Note remains outstanding for the entire term, DB will earn Libor plus 75 bps annually on a fully collateralized basis. Should the individual choose to exit the BLIPS Strategy at any time during the first six months, DB will earn Libor for the period the loan is outstanding plus an amount equal to 37.5 bps of loan proceeds advanced. In addition, DB will receive a custody fee equal to 9.375 bps (per annum?) of the loan proceeds advanced.

Review of BLIPS Transaction - In structuring DB's potential involvement in the BLIPS transactions, the Structured Transactions Group has worked very closely with the following groups: Relative Value, Private Banking, Tax, Legal, Credit, Compliance, and our outside legal advisor Shearman & Sterling.

Tax -- The tax department has closely reviewed our anticipated involvement in the transactions and the tax opinions we expect to receive (expect questions on why you say "expect to receive" – also be aware you will get no clean sign off from RRC without a clean opinion – expect us to define who has to satisfy themselves as to how clean is clean) from Shearman & Sterling and believes that the tax reputational risk to DB should not preclude DB's involvement in the transactions. The tax department believes that DB should not experience any negative tax implications from our involvement in the transactions and that any tax reputational risk can be managed properly by the Structured Transactions Group. This is wooly! Their conclusion is supported by the limited number of transactions, the involvement of DB in the transaction in their ordinary role as a lender and market maker of foreign currency and interest rate transactions, the marketing role of Presidio and KPMG, and the tax advice provided by KPMG and Brown & Wood to the individuals.

The tax reputation risk will be cleared with the Americas CEO This is a strong plus point – (John Ross's views are certainly respected by me at least) prior to execution of the first transaction.

Credit – The Structured Transactions Group has worked closely with the NY credit department and Shearman & Sterling to ensure that the payment of interest and principal to DB is secured. The LLC will be overcollateralized and should the value of the collateral drop below a 1.0125:1.0 ratio, DB may liquidate the collateral immediately and apply the proceeds to repay amounts due under the Note and swap agreements. The Structured Transactions Group and the Relative Value Group will work with Credit Risk Management to closely monitor the value of the collateral assets to ensure that DB's principal and accrued interest is protected. *In view of the thin cover, this should be shown to be full real time cover, including intraday and holiday cover. Presumably New York Exposure Management Team in CRM is closely involved.*

Legal – The Structured Transactions Group has worked very closely with Michelle Cenis of the Legal Department and Shearman & Sterling in structuring and drafting the Credit Agreement and related legal documents. Subject to reviewing the final documents, the legal department is expected to sign-off.

Risk Weighted Assets – Based upon discussions with David Hogarth, of Product Controllers, and David Thomas regarding the current structure, we expect to receive a zero risk weighted asset allocation to the transaction.

Compliance – Based upon discussions with Mary Owens and receiving the appropriate sign-offs from the tax, credit and legal departments, compliance will sign-off on the transaction.

Private Bank – The Private Bank will provide the white gloves review of the individuals and open accounts on behalf of the LLC. Based upon the Structured Transactions Group receiving the appropriate sign-offs, the Private Bank is comfortable participating in the transaction. *Who runs risk? Who gets profit*

New Products Committee - Dr. Alfred (Ted) Dengler, Chair of the New York New Products Committee, has been consulted about the transaction. Consistent with the Vorstand product approval guidelines for Structured Transactions Group transactions, Dr. Dengler has concluded that it is not necessary for the BLIPS program to undergo New Products Committee review.

Risk and Resources Committee Sign-off - Based upon the potential number and size of lending transactions, we request the GCI Risk and Resources Committee to provide clear authorization to Harry Olsen that he may provide credit approval to the aforementioned LLC's owned by U.S. individuals solely upon the credit quality of the transaction.

STG will notify the Tax department of each new transaction prior to execution and the Tax department, together with STG, will assume responsibility for monitoring material changes in the reputation risk associated with these deals and will bring such changes, if any, to the attention of senior management.

5

Ex. 5



francesco.piovanetti@db
.com

To: william.boyle@db.com
cc:
Subject: Re: Risk & Resources Committee Paper - BLIPS

Sent: 07/29/1999 08:07 PM

_____ Forwarded by Francesco Piovanetti on 07/29/99 07:07 PM

From: Mick Wood on 07/29/99 09:28 PM GMT

To:   Francesco Piovanetti
cc:   William Boyle; Ivor Dunbar; Paul Glover; Stuart Bray; NANCY DONOHUE
Subject:  Re: Risk & Resources Committee Paper - BLIPS  (Document link not
    converted)

Francesco/Bill

I think the problem here is that the paper skirts round the basic issue rather
than addressing it head on (the tax reputational risk) . I can understand why
you have adopted that approach. I would have thought you could still ensure that
the issues are highlighted by ensuring that the papers are prepared, and all
discussion held, in a way which makes them legally privileged. (Francesco - you
may remember that was one of my original suggestions).

I Havev a number of queries on that front which it might be best to discuss this
with the lawyers present, which might preclude it for tomorrow's RRC.

In any event, I have looked throught the technical aspects of the trade and made
a nuymber of comments on the paper. I still dont think it sets out the structure
clearly (although it is a lot better than it was). However, I dont think the
structure itself is the basic issue.

Mick


(See attached file: r&rpaper.doc)



Francesco Piovanetti@DBNA
29/07/99 19:59

To:  Mick Wood/DMGCM/DMG UK/DeuBa@DMG UK
cc:  William Boyle; Ivor Dunbar/DMGSF/DMG UK/DeuBa@DMG UK; Paul Glover; Stuart
    Bray/DMGGM/DMG UK/DeuBa@DMG UK; NANCY DONOHUE
Subject: Risk & Resources Committee Paper - BLIPS

(Embedded
image moved  (Embedded image moved to file: pic10939.pcx)
to file:
pic17950.pcx)


**Permanent Subcommittee on Investigations**
**EXHIBIT #103**

DB    BLIPS    6556

Dear Mick,

Attached please find the final version of the Risk & Resources Committee paper that reflects your suggested changes and additional comments. Please advise us if we are scheduled to meet with the Committee tomorrow.

Also, we have attached a copy of an email written by Nancy Donohue (RVG-New York) regarding the management of the transactions by RVG's desk.

If you have any comments please call us as 212-469-5773 (Bill) or 212-469-7318 (Francesco)

Regards,

Bill / Francesco


(See attached file: r&rpaper.doc)

---

From: Nancy.Donohue@db.com on 07/29/99 05:46 PM GMT

To:   william.boyle@db.com; Francesco Piovanetti
cc:
Subject:  Comments on Blips Collateral and Credit Terms


For Blips, the challenge at hand is to balance DB's high standards for Credit and Collateral with the unique requirements of a structured deal.  DB's standard business in FX for leveraged accounts is to collect initial and variation margin, and to deal with recourse entities.

The Blips LLC entity will not be posting variation margin, nor will the entity provide DB with recourse.  To compensate for that, a number of protective credit and collateral measures have been put in place including

-The ratio of Equity Capital to FX notional in the each deal will be between 8-9%.  This equates to a pool of capital of that stands as a proxy for Initial and Variation margin.  DB also has an ability to influence FX notional amounts and currency selection.

-The FX trades selected typically have assymetric payouts, for example shorting pegged currencies like the HKD and Argentina Peso. A repeat of the emerging market / credit crisis of 1998 will actually lead to a situation where the LLC makes money, not loses money. And in the case of local currency rallies (where DB has credit exposure) the FX price levels in the market to hit our collateral value trigger and to deplete equity capital have never been seen in the history of the market in the past decade.

-The Credit Exposure Management Team in NY run by Steve Brawer has run VAR numbers on the selected currency trades and they are generated VAR numbers in the range of less than 1% or less in the Explicitly pegged (HKD, ARS ) currencies, in the range of 1-2% for the Implicitly pegged currencies (Saudi, Egypt etc), and in the range of 7-8% for the G3 currencies (in which case the client will likely be putting in stop loss orders and / or purchasing puts).

**6**

Ex. 6



Ivor Dunbar@DMG UK

Sent: 07/30/1999 05:43
AM

To: Mick Wood/DMGCM/DMG UK/DeuBa@DMG UK
cc: Francesco Piovanetti/NewYork/DBNA/DeuBa@DBNA, William Boyle,
    Paul Glover, Stuart Bray/DMGGM/DMG UK/DeuBa@DMG UK,
    NANCY DONOHUE, Arnd Sieling/DMGCON/DMG
    UK/DeuBa@DMG UK, John T Wadsworth
Subject: Re: Risk & Resources Committee Paper - BLIPS

Our approach is as follows:

1. STRUCTURE: A diagramatic representation of the deal may help the Committee's understanding - we
can prepare this.

2. PRIVILEDGE: This is not easy to achieve and therefore a more detailed description of the tax issues is
not advisable.

3. REPUTATION RISK: In this transaction, reputation risk is tax related and we have been asked by the
Tax Department not to create an audit trail in respect of the Bank's tax affaires. The Tax department
assumes prime responsibility for controlling tax related risks (Including reputation risk) and will brief senior
management accordingly.  We are therefore not asking R&R Committee to approve reputation risk on
BLIPS.  This will be dealt with directly by the Tax Department and John Ross.

I hope this is helpful.

Permanent Subcommittee on Investigations

EXHIBIT #104

B    BLIPS    6554

**7**

Ex, 7

Ken Tarr

To: John Rolfes/NewYork/DBNA/DeuBa@DBNA
cc: paul.w.higgins@db.com
Subject: Re: BLIPS

Sent: 10/13/1999 01:02 PM

Hello John,
Let's try to clear this up so we can move forward. Thx.
KJT

———— Forwarded by Ken Tarr on 10/13/99 12:01 PM ————

From:    Peter Sturzinger on 10/13/99 12:40 PM

To:      Ken Tarr
cc:      paul.w.higgins@db.com; kenneth.mcgloin@db.com; allan.cuttle@db.com; Michael Lowengrub
Subject: Re: BLIPS 📄

The following is an extract from the minutes of the Management Committee Meeting of August 4, 1999.

## Deutsche Bank Private Banking, Management Committee Meeting

Wednesday, August 4, 1999

Present:    Kenneth J. Tarr (Chairman)
            Michel J. Baresich
            Paul W. Higgins
            Michael C. Lowengrub
            Peter K. Sceturro
            H. Peter Sturzinger (minutes)
            Nicolai von Engelhardt (by phone)

Guest:      Leo Grohowski

Absent:     Jeanne Kausch
            Kenneth J. McGloin

## 1.    BLIPS Product

PKS reports that a meeting with John Ross was held on August 3, 1999 in order to discuss the BLIPS product. PKS represented PB Management's views on reputational risk and client suitability. John Ross approved the product, however insisted that any customer found to be in litigation be excluded from the product, the product be limited to 25 customers and that a low profile be kept on these transactions. PB will execute the white glove treatment and KYC. John Ross also requested to be kept informed of future transactions of a similar nature. The volume is now expected to come in at USD 4.5bn resulting in revenues to the bank of approx. USD 30MM. PB's share would amount to approx. USD 5MM. KJT suggests that the 25 customers be selected from different geographic areas. PKS will ensure that written agreements be prepared.

H. Peter Sturzinger

Permanent Subcommittee on Investigations
EXHIBIT #113

DB   BLIPS   6520

revenues to the bank of approx. USD 30MM.  PB's share would amount to approx. USD 5MM.  KJT
suggests that the 25 customers be selected from different geographic areas.  PKS will ensure that written
agreements be prepared.


H. Peter Sturzinger
Deutsche Bank Private Banking, New York
Telephone (212) 469-2977

————————————— Message History —————————————

**From:**    Ken Tarr on 10/13/99 10:43 AM

**To:**      John Rolfes/NewYork/DBNA/DeuBa@DBNA
**cc:**      paul.w.higgins@db.com; kenneth.mcgloin@db.com; allan.cuttie@db.com; Peter
             Sturzinger/NewYork/DBNA/DeuBa@DBNA
**Subject:** BLIPS

John,
I have not received any confirmation from you or anybody else that John Ross has approved an increase
in the number of Blips transactions that could be booked. Please follow-up immediately on this since we
had been limited to 25 (I have asked Peter Sturzinger to research the various minutes to confirm what was
our understanding).
KJT

————————— Forwarded by Ken Tarr on 10/13/99 10:38 AM —————————

**From:**    allan.cuttie@db.com on 10/12/99 11:33 PM GMT

**To:**      John Rolfes
**cc:**      paul.w.higgins@db.com; Ken Tarr; kenneth.mcgloin@db.com; Alice Masters; Marius Marijosius
**Subject:** BLIPS


John,

Just to confirm our conversation from this morning, you are going to pull
together a full set of KYC's as well as all the related disclosure
documentation for each of the deals done to date and forward them to my
attention.  I would also like to obtain the same for all the remaining
deals as they are completed......

Also, something we did not discuss today, but think would be a good idea to
solidify the review process around these types of transactions and just in
case Audit or the Regulators come asking. Going forward, (for the
remaining deals) please supply Alice Masters with a copy of the signed
client disclosures when submitting the KYC for her approval...

If you should have questions give me a call

Thanks and regards,

Allan

DB    BLIPS    6521

8

EX, 8

Unknown

| | |
|---|---|
| **From:** | Eischeid, Jeffrey A |
| **Sent:** | Monday, September 13, 1999 6:05 AM |
| **To:** | 'John Larson'; Eischeid, Jeffrey A; Bickham, Randall S |
| **Cc:** | bob pfaff; kbratton@presidioadv.com |
| **Subject:** | RE: BLIPS - managing deal flow |

I'm in basic agreement with all of your comments.  Kerry, are you available for today's KPMG Innovative Strategies conference call at 5 p.m. EST to discuss your flowchart and improvements to the KPMG side of the process?

-----Original Message-----
**From:**  John Larson [SMTP:jlarson@presidioadv.com]
**Sent:**  Saturday, September 11, 1999 9:48 PM
**To:**  eischeid@kpmg.com; rbickham@kpmg.com
**Cc:**  bob pfaff; kbratton@presidioadv.com
**Subject:**  BLIPS - managing deal flow

Jeff/Randy-

As you know, we have until 10/15 at the latest to close loans and 10/22 to activate the FX trading etc. (the 60 day countdown).  Currently we have approximately 25- 28 deals on our active list with another 25 or so on our "highly likely" list.  Hence the total expected backlog is at least 50 deals.  I know that your count gives a slightly higher number, perhaps indicating a backlog of 80.  As of Friday, we had closed only 3 loans.  This gives us only 5 weeks to complete all the closings.

We think it is possible to complete all the backlog in the available time if everything proceeds according to the closing schedules that Kerry developed.  I am, however, very concerned about adding more deals to the already huge backlog.  Therefore, my suggestion is to cut back on the sales effort, without closing the door on a few more significant deals.  Accordingly, I propose that we raise the limit on new sales solicitations to deals of $50 or greater effective this Monday.  I also suggest that we inform everyone that the limit will be raised again in 10 days or so to $100 (?).

I know this change will upset some KPMG partners who are still trying to set up more meetings.  I also suspect that they will be even more upset if they sell a new deal now that we are unable to deliver.  Those are the two choices I see.

Apart from limiting the addition of new deals, there are other incremental process changes that we have made and will continue to make.  While this is really a subject for a more detailed discussion, I will note two ideas that I have discussed with Randy, Steve, and Kerry.  First, we need to get key KPMG people in certain areas to liase very closely with Presidio and the clients/investors in their area.  We have been experiencing problems with slow and incomplete turnaround of information requests and signature pages that could be mitigated by much closer local monitoring.

Second, as an experiment last week I spent a day working out of DB's New York office.  I found that being there I was able to trouble shoot very effectively.  This made me think that a temporary Presidio outpost at the bank might be helpful.  Conceivably, stationing someone knowledgeable from KPMG at the bank might also be good.

John L.

1

**Proprietary Material
Confidentiality Requested**

Permanent Subcommittee on Investigations
**EXHIBIT #29**

KPMG 0005588