# EXHIBIT 1

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

9

THEODORE C. SWARTZ,

10

                  Plaintiff,

Case No.  C03-1252 P

11

vs.

12

DEUTSCHE BANK AG; DEUTSCHE
BANK SECURITIES, INC.; DEUTSCHE

THIRD AMENDED COMPLAINT

13

BANK OF NEW YORK; BANKERS
TRUST COMPANY; PRESIDIO

14

ADVISORY SERVICES, LLC; PRESIDIO
ADVISORY SERVICES, INC.;PRESIDIO

15

GROWTH, LLC; PRESIDIO
RESOURCES, LLC; PRESIDIO

16

VOLATILITY MANAGEMENT;
PRESIDIO FINANCIAL GROUP;

17

MORLEY, INC.; HAYES STREET
MANAGEMENT SERVICES, INC.;

18

NORWOOD HOLDINGS, INC.;
HOLLAND PARK; PREVAD, INC.; JOHN

19

M. LARSON, individually; ROBERT A.
PFAFF, individually; DAVID AMIR

20

MAKOV, individually; STEVEN BUSS,
individually; GRANT THORNTON

21

INTERNATIONAL; GRANT
THORNTON, LLP; WALTER,

22

CONSTON, ALEXANDER & GREEN,
P.C.; HOLLAND & HART, LLP; and their

23

respective marital communities, if any; and
Does 1 through 50,

24

25

                  Defendants.

26

THIRD AMENDED COMPLAINT - Page 1 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

1

2

3      Plaintiff Theodore C. Swartz alleges as follows:

4                              **INTRODUCTION**

5      1.    Plaintiff Theodore C. Swartz ("Swartz") brings this action against Defendants for

6  damages he suffered as a result of purchasing an investment program from Presidio

7  Resources, LLC ("Presidio"), known as "BLIPS (Bond Linked Issue Premium Structure),"

8  which consisted of investing $1.4 million with Deutsche Bank Securities Inc., and

9  obtaining a loan pursuant to a Credit Agreement with Deutsche Bank AG, which was

10  managed by the Presidio Defendants ("Presidio") and by the Deutsche Bank Defendants

11  ("Deutsche Bank").

12      2.    Presidio represented in its offering prospectus that the Deutsche Bank loan was an

13  integral part of the investment program.  Plaintiff did not find out until after he had lost his

14  entire investment that the Deutsch Bank loan was a sham, which meant that the entire

15  investment program lacked economic substance.

16      3.    Presidio and Deutsche Bank concealed from Swartz the fact that they were

17  partners in a secret joint venture conspiracy to defraud investors by designing, promoting,

18  marketing, selling and implementing illegal, abusive tax shelters, disguised as legitimate

19  investment programs.

20      4.    In particular, Deutsche Bank knew that Presidio had represented to Swartz, and to

21  other prospective investors, that the Deutsche Bank loan was integral to the investment

22  program.  Deutsche Bank knew the loan was a sham and it knew, based on Presidio's

23  misrepresentation, that Swartz did not know this.  As a result of Deutsche Bank's special

THIRD AMENDED COMPLAINT - Page 2 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

inside information regarding the truth about the BLIPS loan, Deutsche Bank can not claim that there was only the typical arm's length relationship of lender and borrower between itself and Swartz and, therefore, that it had no duty to disclose the truth about the loan to Swartz. Because Deutsche Bank possessed special knowledge that was integral to the investment program and to Swartz' decision to invest, Deutsche Bank had a fiduciary duty to disclose the truth about the loan to Swartz. Deutsche Bank breached its fiduciary duty to Swartz by not disclosing the sham loan and by representing to Swartz that Deutsche Bank acted independently and not as a fiduciary of Swartz.

5. Deutsche Bank was the fiduciary of Swartz for other reasons, as well. Deutsche Bank had absolute control of the purported investment funds, which were supposedly deposited into a discretionary trading account. The nature of the discretionary account created a fiduciary relationship between Deutsche Bank and Swartz. There is evidence that the funds were never deposited and that no investments were ever made for the benefit of Swartz, in breach of Deutsche Bank's fiduciary duty.

6. All of the Defendants were fiduciaries of Swartz. KPMG and Brown & Wood, who have since been dismissed, were also fiduciaries of Swartz. They were all partners in the same joint venture to design, promote, market, sell and implement BLIPS and other illegal, abusive tax shelters. When each of the Defendants entered into their respective fiduciary relationships with Swartz, they represented to Swartz that they did so to render independent professional services for his benefit when, in fact, they all knew that the investment program that Swartz had purchased and thought was legitimate was a fraudulent scheme that all of the Defendants had a hand in designing, promoting,

THIRD AMENDED COMPLAINT - Page 3 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

marketing, selling and implementing.  All of the Defendants have reaped the profits of their joint venture conspiracy, at Swartz' expense.

7.    The joint venture conspiracy that existed between the Defendants was revealed in 2003 as a result of an investigation conducted by the United States Senate Permanent Subcommittee on Investigations of the Committee of Governmental Affairs ("Senate Subcommittee") into the development, market, and implementation of abusive tax shelters, including BLIPS.  The Senate Subcommittee found that there was a close collaboration exist between accounting firms, law firms, investment advisory firms, and banks, regarding the aggressive marketing, development of generic tax products and implementation of BLIPS supports Plaintiff's allegations and is further evidence of the existence of the joint venture among Defendants in this case, as alleged herein.

8.    Specifically, the 2005 Senate Subcommittee Report found that:

A)  The sale of potentially abusive and illegal tax shelters is a lucrative business in the United States, and some professional firms such as accounting firms, banks, law firms, and investment advisory firms have been major participants in the development, mass marketing, and implementation of generic tax products sold to multiple clients.

B)  During the period 1998 to 2003, KPMG devoted substantial resources and maintained an extensive infrastructure to produce a continuing supply of generic tax products to sell to clients, using a process which pressured its tax professionals to generate new ideas, move them quickly through the development process, and approve, at times, illegal or potentially abusive tax shelters.

C)  KPMG used aggressive marketing tactics to sell its generic tax products by turning tax professionals into tax product salespersons, pressuring its tax professionals to meet revenue targets, using telemarketing to find clients, developing an internal tax sales force, using confidential client tax data to find clients, targeting its own audit clients for sales pitches, and using tax opinion letters and insurance policies as marketing tools.

D)  KPMG was actively involved in implementing the tax shelters which it sold to its clients, including by enlisting participation from banks [including Deutsche Bank and HVB], investment advisory firms [including Presidio], and tax exempt organizations;

THIRD AMENDED COMPLAINT - Page 4 of 131

preparing transactional documents; arranging purported loans; issuing and arranging opinion letters; providing administrative services; and preparing tax returns.

E) KPMG took steps to conceal its tax shelter activities from tax authorities, including by claiming it was a tax advisor and not a tax shelter promoter, failing to register potentially abusive tax shelters, restricting file documentation, imposing marketing restrictions, and using improper tax reporting to minimize detection by the IRS or others.

F) Sidley Austin Brown & Wood, through its predecessor firm Brown & Wood, provided legal services that facilitated the development and sale of potentially abusive or illegal tax shelters, including by providing design assistance, collaboration on allegedly independent tax opinion letters, and hundreds of boilerplate tax opinion letters to clients referred by KPMG and others, in return for substantial fees.

G) Deutsche Bank, HVB Bank, and UBS Bank provided billions of dollars in lending critical to transactions which the banks knew were tax motivated, involved little or no credit risk, and facilitated potentially abusive or illegal tax shelters, including BLIPS.

H) Some investment advisors, including Presidio Advisory Services and the Quellos Group, helped develop, design, market, and execute potentially abusive or illegal tax shelters, including BLIPS.

9. The Senate Subcommittee investigation revealed that the Defendants, and each of them, were partners in a joint venture conspiracy along with other banks, investment advisors, accountants and lawyers, including KPMG and Sidley, Austin, Brown & Wood, whose common purpose and interest it was to design, promote, market and implement abusive tax shelters, including the investment program sold to Plaintiff, referred to as BLIPS.[1]

10. Following the Senate Investigation, several criminal indictments were filed against individuals and firms for their participation in the design, promoting, marketing, selling and implementation of abusive tax shelters.

---

[1] Plaintiff has settled his claims against KPMG, Dale Baumann, Sidley Austin Brown & Wood, and Raymond J. Ruble.

THIRD AMENDED COMPLAINT - Page 5 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

11.  In September and October 2005, criminal indictments were filed in U.S. District Court for the Southern District of New York against nineteen individuals, including some of the individually named Defendants herein, namely: John Larson, Robert Pfaff, D. Amir Makov, and J.R. Ruble.  The criminal indictments charge that the Defendants (a) concocted tax shelter transactions and false and fraudulent factual scenarios to support them; (b) prepared false and fraudulent documents, including engagement letters, transactional documents, representation letters, and opinion letters; (c) prepared and provided to their clients false and fraudulent representations that the clients were required to make in order to obtain opinion letters that purported to justify using the phony tax shelter losses to offset income or gain; and (d) prepared and caused to be prepared tax returns that were false and fraudulent because they incorporated the phony tax losses and therefore substantially understated the tax owed by the clients.

12.  In August 2005, KPMG agreed to pay $456 million as part of a deferred prosecution agreement relating to its development, promotion, marketing, and implementation of certain fraudulent tax shelters, including BLIPS.

13.  On May 23, 2007, Sidley Austin LLP agreed to pay a civil tax shelter promoter penalty of $39.4 million.  The penalty stems from the firm's promotion of abusive tax shelters and its failure to comply with tax shelter registration requirements.

14.  Bayerische Hypo und Vereinsbank (HVB) is a German bank, which was involved in arranging BLIPS financing with Presidio as was Defendant Deutsche Bank.  HVB participated in 29 KPMG BLIPS transactions during 1999 and 2000, providing credit lines totaling about $2.2 billion and generating millions of dollars in bank fees.  Based on information contained in the Senate Report, the credit documents for the BLIPS

THIRD AMENDED COMPLAINT - Page 6 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

transaction which were used by HVB were patterned after the documents developed by Deutsche Bank.

15.  In August 2005, the co-head of HVB's financial group in New York, Domenick DeGiorgio, pleaded guilty to two counts of conspiracy to defraud the IRS.  In connection with that plea, DeGiorgio admitted that in the course of HVB's participation in BLIPS from 1999 to 2001 he knowingly participated in HVB's making sham loans in which no money left the bank, that the loans were never funded, that false paperwork was created, and that he knew that BLIPS was falsely described as a long-term, leveraged transaction when in fact, it was a short-term, unleveraged transaction.

16.  In February 2006, HVB entered into a deferred prosecution agreement, agreeing to pay nearly $30 million in fines, restitution, and penalties in relation to its participation in the implementation of fraudulent tax shelters.

17.  Deutsche Bank provided the purported loan proceeds in the Swartz investment program.  Plaintiff is informed and believes that no criminal indictments have been filed against Deutsche Bank yet but there is a criminal investigation pending.  On February 24, 2006, an article was published in the New York Times by Lynnley Browing, entitled "Deutsch Bank Said to Seek Settlement on Tax Shelters."  The article states that Deutsche Bank in talks with the Justice Department in an effort to settle a criminal investigation over the bank's role in questionable tax shelters.  The article states:

> "In the past, Deutsche Bank has described the transactions it arranged for tax shelters, including ones known as BLIPS and Cobra, as regular and ordinary.  But Deutsche Bank has been unable to provide to federal prosecutors in Manhattan paper documents detailing some transactions for these shelters, according to the people briefed on the case."

* * *

THIRD AMENDED COMPLAINT - Page 7 of 131

"The documents, if they exist, would detail, among other things, loans, trades and swaps of stock and derivatives and accounting records, frequently through offshore entities set up in the Cayman Islands."

\* \* \*

"With Deutsche Bank, a lack of documents would raise questions about whether the transactions were ever executed at all."

18. The issue of whether the loans in a BLIPS tax shelter were intended to be used to facilitate Presidio's investment plan was considered by the United States District Court for the Eastern District of Texas in a related case, *Klamath Strategic Investment Fund, LLC v. United States of America*, 472 F.Supp. 2d 885 (2007), (hereinafter "*Klamath*"). See attached as Exhibit 1. In *Klamath*, the Court held that the loans, as found by the court, were not loans at all because, notwithstanding the terms of the documents, Presidio and Nat West understood that the loan proceeds would never be used to facilitate Presidio's investment plan.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over the subject matter of this action pursuant to (a) Section 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337 because of the securities fraud claims for violation of Section 10(b) of the Securities Exchange Act and the SEC's Rule 10b-5 raises a federal question; and (b) 28 U.S.C. § 1367 because the remaining state law claims are so related to the securities fraud claim that they form part of the same case or controversy.

20. This Court also has original jurisdiction of this action based on diversity of citizenship, in that Swartz is a citizen of the State of Washington, whereas Defendants Deutsche Bank Securities, Inc., Deutsche Bank of New York, Presidio Growth, Presidio

THIRD AMENDED COMPLAINT - Page 8 of 131

Advisory Services, Presidio Resources, Hayes Street Management Services, Inc.,  Presidio Volatility Management, Presidio Financial Group, Holland Park, Norwood Holdings, Prevad, Inc., Morley, Inc., Grant Thornton International, Grant Thornton, LLP, Walter, Conston, Alexander & Green, P.C., Holland & Hart, LLP, John M. Larson, Robert A. Pfaff, David Amir Makov and Steven Buss are citizens of states other than Washington, and Defendant Deutsche Bank AG is a citizen or subject of a foreign state and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  28 U.S.C. § 1332(a)(1), (2), and (3).

21.  This court has personal jurisdiction over Defendants Deutsche Bank AG, Deutsche Bank Securities, Inc., Deutsche Bank of New York, Presidio Growth, Presidio Advisory Services, Presidio Resources, Hayes Street Management Services, Inc.,  Presidio Volatility Management, Presidio Financial Group, Holland Park, Norwood Holdings, Prevad, Inc., Morley, Inc., Grant Thornton International, Grant Thornton, LLP, Walter, Conston, Alexander & Green, P.C., Holland & Hart, LLP, John M. Larson, Robert A. Pfaff, David Amir Makov and Steven Buss because said Defendants purposefully availed themselves of the forum of Washington by participating in the investment strategy called "BLIPS" that was marketed and sold to Swartz, a citizen of Washington, in Washington.  Said Defendants, and each of them, purposefully directed their activities to Swartz in Washington, and Swartz's injuries arise out of those activities.

22.  This court has personal jurisdiction over Defendants Walter, Conston, Alexander & Green, P.C. and Holland & Hart, LLP, because said Defendants purposefully availed themselves of the forum of Washington by participating with Defendants Deutsche Bank AG, Deutsche Bank Securities, Inc., Presidio Growth, Presidio Advisory Services,

THIRD AMENDED COMPLAINT - Page 9 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

Presidio Resources, Hayes Street Management Services, Inc.,  Presidio Volatility Management, Presidio Financial Group, Holland Park, Norwood Holdings, Prevad, Inc., Morley, Inc., Grant Thornton International, Grant Thornton, LLP, John M. Larson, Robert A. Pfaff, David Amir Makov and Steven Buss by issuing a legal opinion to Swartz, a citizen of Washington, residing in Washington, as part of the marketing of a tax advantaged investment strategy called "BLIPS" in Washington to Swartz, which marketing took place in Washington. Swartz did not seek out Defendants Walter, Conston, Alexander & Green, P.C. and Holland & Hart, LLP, but rather, it was Defendants Walter, Conston, Alexander & Green, P.C. and Holland & Hart, LLP's association with the other Defendants that lead to Defendants Walter, Conston, Alexander & Green, P.C. and Holland & Hart, LLP services being directed to Washington and to a Washington citizen.

23.  This court also has personal jurisdiction over Defendants Deutsche Bank AG, Deutsche Bank Securities, Inc., Presidio Growth, Presidio Advisory Services, Presidio Resources, Hayes Street Management Services, Inc.,  Presidio Volatility Management, Presidio Financial Group, Holland Park, Norwood Holdings, Prevad, Inc., Morley, Inc., Grant Thornton International, Grant Thornton, LLP, Walter, Conston, Alexander & Green, P.C., Holland & Hart, LLP, John M. Larson, Robert A. Pfaff, David Amir Makov and or Steven Buss through "conspiracy personal jurisdiction," because Defendants, as alleged below, conspired together to defraud Swartz and because one or more of said Defendants who conspired in said conspiracy are subject to this court's personal jurisdiction.

24.  This court also has personal jurisdiction over Defendants Deutsche Bank AG, DBNY and Deutsche Bank Securities, Inc., because this court has general jurisdiction over them based on their ties to Washington through various financial transactions, including

THIRD AMENDED COMPLAINT - Page 10 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

relationships with other Washington citizens who are customers of the bank. Further, they have purposefully availed themselves of the forum of Washington in this instance through their participation with the remaining Defendants in the BLIPS transactions that are the subject of this lawsuit.  More specifically, Defendants Deutsche Bank AG, DBNY and Deutsche Bank Securities, Inc., provided the financing that facilitated the transactions which were marketed to Swartz, a citizen of Washington, residing in Washington, by Defendants. Through their affiliation with the other Defendants, Defendants Deutsche Bank AG, DBNY and Deutsche Bank Securities, Inc.'s loan products were knowingly directed to the State of Washington, thereby providing grounds for specific jurisdiction. Further, Defendants Deutsche Bank AG and Deutsche Bank Securities, Inc. were compensated for the loan services through payment of fees by Plaintiff, a Washington citizen.

25.  Venue is proper in this District pursuant to 28 U.S.C. § 1965(a) because the Defendants are all found, reside and/or transact affairs in this District; pursuant to 18 U.S.C. § 1965(b) because the ends of justice require that the parties residing in any other district be brought before this Court; pursuant to 28 U.S.C. § 1291(b) because a substantial part of the events or omissions giving rise to this action occurred in this District; and/or pursuant to 28 U.S.C. § 1391(a)-(b) because one or more of the Defendants is found in and is subject to personal jurisdiction in this District.

26.  The following is a list of contacts with and activities within Washington State by Foreign State Defendants, showing additional facts in support of jurisdiction of this Court over Defendants.

THIRD AMENDED COMPLAINT - Page 11 of 131

27.  Undated Deutsche Bank "Know Your Customer" Client Profile for Individuals (Gascoyne LLC and TC Swartz) mailed to Gascoyne, LLC and T.C. Swartz in Seattle, Washington.

28.  A letter from Deutsche Bank Securities (Rolfe; Stockton) dated 9/15/99 mailed to Swartz in Seattle, Washington regarding Deutsche Bank Cayman Islands and its affiliates marketing involvement and performance guarantees.

29.  September 30, 1999 ISDA Schedule to the Master Agreement between Deutsche Bank AG, New York and Gascoyne Ventures LLC mailed to Gascoyne and T.C. Swartz for signature in Seattle, Washington (Address for Notices to Party B (Gascoyne) is 2025 First Avenue, Seattle, WA, 98121).

30.  September 30, 1999 ISDA Schedule to the Master Agreement between Bankers Trust and Gascoyne Ventures LLC mailed to Gascoyne and T.C. Swartz for signature in Seattle, Washington (Address for Notices to Party B (Gascoyne) is 2025 First Avenue, Seattle, WA, 98121).

31.  September 30, 1999 Credit Agreement between Gascoyne Ventures LLC and Deutsche Bank, AG Cayman Islands Branch showing mailed to Gascoyne and Swartz for signature in Seattle, Washington (Address for Gascoyne Ventures LLC is 2025 First Avenue, Suite 450, Seattle, WA, 98121, and Seattle Telephone Numbers are 206 577-7329 and 206 727-7309).

32.  September 30, 1999 Account Control Agreement between Gascoyne Ventures LLC and Deutsche Bank AG, Cayman Islands Branch mailed to Gascoyne and Swartz for signature in Seattle, Washington (showing the Address for Gascoyne Ventures LLC is

THIRD AMENDED COMPLAINT - Page 12 of 131

2025 First Avenue, Suite 450, Seattle, WA, 98121, and Seattle Telephone Numbers are 206 577-7329 and 206 727-7309).

33.   Gascoyne Ventures LLC Consent of Sole Member dated September 7, 1999 (Document 7B to the Gascoyne Ventures LLC and Deutsche Bank Closing Documents, September 30, 1999) mailed to Swartz and Gascoyne for signature (showing the address of the Company's principal office as Attn:  TC Swartz, 2025 First Avenue, Suite 450, Seattle, WA  98121).

34.   Form UCC-1 identifying mailed to Gascoyne and Swartz in Seattle Washington for signature.  Secured Party is identified as Deutsche Bank AG, Cayman Islands.  (Document 13 to the Gascoyne Ventures LLC and Deutsche Bank Closing Documents, September 30, 1999)

35.   Request for Taypayer Identification Number and Certification by Gascoyne Ventures LLC mailed to Gascoyne and Swartz in Seattle, Washington for signature. (Document 15 to the Gascoyne Ventures LLC and Deutsche Bank Closing Documents, September 30, 1999)

36.   A letter from Deutsche Bank AG, Cayman Island Branch (Boyle) dated 10/12/99 and mailed to Gascoyne and Swartz in Seattle, Washington regarding Notice of Interest Rate Determination.

37.   Deutsche Bank transmittal of annual 1099 Form for tax year 2000 mailed to Gascoyne Ventures LLC in Seattle, Washington.

38.   March 2000 Deutsche Bank Account Statement for Gascoyne Ventures mailed to Gascoyne Ventures LLC at 2025 First Avenue, Seattle, Washington.

THIRD AMENDED COMPLAINT - Page 13 of 131

39.  May 2000 Deutsche Bank Account Statement for Gascoyne Ventures mailed to Gascoyne Ventures LLC at 2025 First Avenue, Seattle, Washington.

40.  June 2000 Deutsche Bank Account Statement for Gascoyne Ventures mailed to Gascoyne Ventures LLC at 2025 First Avenue, Seattle Washington.

41.  December 22, 1999 letter from Holland & Hart LLP mailed to TC Swartz in Seattle, Washington enclosing executed documents related to Gascoyne Ventures LLC.

42.  A letter from KPMG (Baumann) dated 9/1/1999 mailed to Swartz in Seattle, Washington regarding Engagement and Confirmation of Acceptance.

43.  Facsimile communication from KPMG (Baumann) dated 9/3/1999 and faxed to Miller (Swartz) in Seattle, Washington regarding 30 pages of documents.

44.  Facsimile communication from KPMG (Baumann) dated 9/3/1999 and faxed to Miller (Gascoyne) in Seattle, Washington regarding 20 pages of documents.

45.  Facsimile communication from KPMG (Baumann) dated 9/3/1999 and faxed to Miller (Swartz) in Seattle, Washington regarding 56 pages of documents.

46.  Email communication from KPMG (Baumann) dated 11/29/1999 to Miller in Seattle, Washington regarding attachments T.C. Swartz Info and Annex A.

47.  An invoice from KPMG dated 12/14/1999 mailed to Swartz and Miller in Seattle, Washington regarding professional fees for services rendered $250,000.

48.  Email communication from KPMG (Baumann) dated 12/21/1999 to Miller (Swartz) in Seattle, Washington regarding basis calculations, target capital loss, and Microsoft stock sale.

THIRD AMENDED COMPLAINT - Page 14 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

49.  A letter from KPMG (Baumann) dated 12/31/1999 and mailed to Gascoyne (Swartz) in Seattle, Washington regarding opinion on U.S. federal income tax consequences of certain investment transactions.

50.  Email communication from KPMG (Baumann) dated 3/27/2000 to Miller in Seattle, Washington regarding preparation of basis calculation.

51.  Email communication from KPMG (Baumann) dated 3/30/2000 to Miller in Seattle, Washington regarding finished basis calculation to be faxed.

52.  KPMG basis calculation and 11 pages of opinion letter mailed to T.C. Swartz in Seattle, Washington March 30, 2000.  See 3/30/00 email from Baumann.

53.  Facsimile communication from KPMG (Baumann) dated 3/30/2000 and faxed to Miller (Swartz) in Seattle, Washington regarding 14 pages of documents.

54.  Email communication from KPMG (Baumann) dated 4/18/2000 to Miller in Seattle, Washington regarding signed representation letter.

55.  KPMG representation letter mailed to T.C. Swartz (Miller) in Seattle, Washington. See 4/18/00 email from Baumann.

56.  Email communication from KPMG (Baumann) dated 5/18/2000 to Miller in Seattle, Washington regarding B&W opinion letter to Swartz.

57.  Brown & Wood opinion letter sent to T.C. Swartz in Seattle, Washington via Federal Express from KPMG (Baumann).

58.  Email communication from KPMG (Bauman) dated 9/29/2000 to Miller (Swartz) in Seattle, Washington regarding meeting request.

59.  Email communication from KPMG (Baumann) dated 10/02/2000 to Miller(Swartz) in Seattle, Washington regarding meeting confirmation.

THIRD AMENDED COMPLAINT - Page 15 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

60. Email communication from KPMG (Liston) dated 10/12/2000 to Miller (Swartz) in Seattle, Washington regarding Swartz's W-2.

61. A letter from KPMG (Baumann) dated 10/16/2000 mailed to Swartz in Seattle, Washington regarding reaffirmation of more-likely-than-not tax opinion.

62. A letter from KPMG (Liston) dated 10/16/2000 mailed to Swartz and Miller in Seattle, Washington regarding engagement to review Swartz's federal individual income tax return for the year ending 12/31/1999.

63. Email communication from KPMG (Baumann) dated 10/24/2000 to Miller (Swartz) in Seattle, Washington regarding closing Swartz's account.

64. Email communication from KPMG (Liston) dated 12/07/2000 to Miller (Swartz) in Seattle, Washington regarding KPMG billing details.

65. Email communication from KPMG (Liston) dated 12/12/2000 to Miller (Swartz) in Seattle, Washington regarding confirmation of teleconference to discuss KPMG billing details.

66. A letter from KPMG (Eischeid) dated 2/4/2002 and mailed to Gascoyne and TCS Expeditions (Swartz) in Seattle, Washington regarding IRS Announcement 2002-2.

67. A letter from KPMG (Baumann) dated 2/21/2002 and mailed to Swartz in Seattle, Washington regarding IRS Announcement 2002-2 and Voluntary Disclosure.

68. A letter from KPMG (Baumann) dated 3/25/2002 and mailed to Swartz in Seattle, Washington regarding Voluntary Disclosure under Announcement 2002-2.

THIRD AMENDED COMPLAINT - Page 16 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

69. A letter from KPMG (Baumann) dated 7/31/2002 and mailed to Swartz in Seattle, Washington regarding agreement to retain KPMG LLP by Sutherland Asbill & Brennan LLP to assist Swartz with legal representation.

70. Presidio Growth, LLC's "Investor Questionnaire" sent to T.C. Swartz via facsimile and showing Seattle, Washington address for Gascoyne Ventures LLC ("Gascoyne") and Swartz.

71. Presidio's "Information Required to Form Borrower LLC" form sent by facsimile to T.C. Swartz in Seattle, Washington from Presidio Advisory Services, LLC. (Seattle, Washington address for Gascoyne and Swartz.)

72. A facsimile letter dated 9/15/99 from Presidio Advisory Services, LLC (Bratton) faxed to Swartz in Seattle, Washington regarding forming of Gascoyne and borrowing funds from Deutsche Bank.

73. A facsimile letter dated 9/24/99 from Presidio Advisory Services, LLC (Bratton) faxed to Swartz in Seattle, Washington regarding Deutsche Bank account for Gascoyne is open and instructions to wire $1,400,000 to same.

74. A facsimile letter dated 9/27/99 from Presidio Advisory Services, LLC (Bratton) faxed to Swartz in Seattle, Washington regarding Deutsche Bank account can accept funds for Gascoyne and wire instructions.

75. A Fed Ex air bill slip dated 9/29/99 from Presidio Advisory Services, LLC (Bratton) to Swartz in Seattle, Washington.

76. A letter dated 9/29/99 from Presidio Advisory Services, LLC (Bratton) mailed to Gascoyne and Swartz in Seattle, Washington regarding transmittal of documents for subscription to Longs.

THIRD AMENDED COMPLAINT - Page 17 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

77.  A letter dated 10/07/99 from Presidio Advisory Services, LLC (Buss) mailed to Swartz in Seattle, Washington regarding subscription to Longs and wire transfer instructions.

78.  A facsimile letter dated 10/19/99 from Presidio Advisory Service, LLC (Buss) faxed to Swartz and Gascoyne in Seattle, Washington regarding contribution to Longs by Gascoyne.

79.  A facsimile letter dated 11/23/99 from Presidio Advisory Services, LLC (Bratton) faxed to Swartz and Gascoyne in Seattle with an investment summary for Gascoyne to Longs.

80.  A letter dated 11/30/99 from Presidio Advisory Services, LLC (Bratton) sent via Federal Express to Gascoyne (Swartz) in Seattle, Washington transmitting documents for Gascoyne transactions.

81.  Acknowledgement of Withdrawal Request sent to Gascoyne Ventures LLC (Swartz) in Seattle, Washington on 11/30/99 via Fed Ex from Presidio Advisory Services, LLC (Bratton).

82.  DBS Limited Trading Authorization sent to Gascoyne Ventures LLC (Swartz) in Seattle, Washington on 11/30/99 via Fed Ex from Presidio Advisory Services, LLC (Bratton).

83.  A Fed Ex air bill slip dated 11/30/99 from Presidio Advisory Services, LLC (Bratton) to Swartz in Seattle, Washington.

THIRD AMENDED COMPLAINT - Page 18 of 131

84.  A facsimile letter dated 12/13/99 from Presidio Advisory Services, LLC (Bratton) faxed to Gascoyne (Swartz) in Seattle, Washington regarding the value of Gascoigne's Class A interest and instructions for a distribution from Longs to Gascoyne.

85.  A facsimile letter dated 12/21/99 from Presidio Advisory Services, LLC (Bratton) to Deutsche Bank with a courtesy copy faxed to Swartz in Seattle, Washington regarding sell of Microsoft stock from Gascoyne account at Deutsche Bank Securities.

86.  A facsimile letter dated 12/27/99 from Presidio Advisory Services, LLC (Bratton) faxed to Gascoyne (Swartz) in Seattle, Washington regarding Deutsche Bank's confirmation of sale of Microsoft stock in Gascoyne account.

87.  A facsimile letter dated 12/28/99 from Presidio Advisory Services, LLC (Buss) to Deutsche Bank with a courtesy copy faxed to Gascoyne (Swartz) regarding transfer of funds from Gascoyne to KPMG account at Mellon Bank.

88.  A facsimile letter dated 1/3/00 from Presidio Advisory Services, LLC (Buss) to Deutsche Bank with a courtesy copy to faxed Swartz (Gascoyne) in Seattle, Washington regarding transfer of all account value from Gascoyne account at Deutsche Bank Securities to Commerce Bank of Washington in Seattle, Washington.

89.  A letter from Presidio Growth, LLC (Buss) dated 3/22/00 mailed to (Gascoyne) Swartz in Seattle, Washington enclosing 1999 K-1 for Longs Strategic Investment Fund, LLC.

90.  A Fed Ex air bill slip dated 3/23/00 from Presidio Advisory Services, LLC (Bratton) to Swartz in Seattle, Washington.

THIRD AMENDED COMPLAINT - Page 19 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

91.  Certificate of Formation of Gascoyne Ventures LLC dated September 7, 1999 by Harvey Bagg, Jr. of Walter Conston Alexander & Green PC mailed to Gascoyne and T.C. Swartz in Seattle, Washington.

92.  September 23, 1999 letter from Walter Conston Alexander & Green PC to TC Swartz in Seattle, Washington enclosing documents pertaining to the Gascoyne – Deutsche Bank Credit Agreement transaction.

93.  February 24, 2000 letter from Walter Conston Alexander & Green PC to TC Swartz in Seattle, Washington regarding Gascoyne Ventures LLC transaction documents.

## PARTIES

94.  Plaintiff Theodore Swartz ("Swartz") is a United States citizen who resides in Seattle, King County, Washington.

95.  Gascoyne Ventures, LLC ("Gascoyne") was a Delaware Limited Liability Company and is now defunct.  At all relevant times herein, Plaintiff Swartz was the owner and sole member of Gascoyne.  Swartz is the assignee of all right, title and interest in any and all claims by Gascoyne against Defendants herein.

96.  Defendant Deutsche Bank AG is a corporation organized under the laws of the Federal Republic of Germany.  On information and belief, Defendant Deutsche Bank Securities, Inc. is a subsidiary of Deutsche Bank AG organized under the laws of the United States and one or more states.   Defendants Deutsche Bank Securities, Inc. assigned to Defendant Deutsche Bank of New York (DBNY) all of their rights and delegated to DBNY all of their duties under the Account Control Agreement referred to herein. Deutsche Bank AG's principal place of business is in Germany; however, it has branches all over the world including New York and the Cayman Islands.

THIRD AMENDED COMPLAINT - Page 20 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

97. Upon information and belief, Defendant Bankers Trust Company ("Bankers Trust"), New York Branch, has its offices located in New York, New York. Upon information and belief, Deutsche Bank AG acquired Bankers Trust in June 1999.

98. Collectively, Defendants Deutsche Bank AG, Deutsche Bank Securities, Inc., Deutsche Bank of New York and Bankers Trust Company are referred to herein as "Deutsche Bank."

99. Upon information and belief, Defendant Grant Thornton International is an accounting and consulting firm, headquartered in London, England. Upon information and belief, Grant Thornton International consists of accounting and consulting member firms, and is the umbrella organization for Defendant Grant Thornton, LLP, located in the United States. Grant Thornton International is the largest public accounting firm outside of the Big Four (Deloitte Touche Tohmatsu, Ernst & Young, KPMG, and PricewaterhouseCoopers) and operates in 113 countries in 521 offices worldwide.

100. Upon information and belief, Defendant Thornton, LLP is a Limited Liability Partnership with headquarters in Chicago, Illinois and with approximately 50 offices in the United States. Grant Thornton LLP encompasses the US operations of Grant Thornton International.

101. Upon information and belief, Defendant Walter, Conston, Alexander & Green, P.C. is a professional service corporation law firm with its principal offices in New York. Walter, Conston, Alexander & Green acted as special legal counsel to their client, Gascoyne Ventures, LLC.

102. Upon information and belief, Defendant Holland & Hart, LLP, is a Colorado Limited Liability Partnership law firm, with its main office located in Denver, Colorado.

THIRD AMENDED COMPLAINT - Page 21 of 131

103. Upon information and belief, Defendant Presidio Advisory Services, LLC ("Presidio") is a Delaware limited liability company with offices in San Francisco, California. Upon information and belief, Presidio Advisory Services, LLC is the parent of Presidio Growth, LLC and Presidio Resources, LLC.  Presidio is the Manager of Presidio Growth, LLC.

104. Upon information and belief, Defendant Presidio Advisory Services, Inc., is a Delaware corporation with offices in San Francisco, California.  Upon information and belief, Defendant Presidio Advisory Services, Inc. merged into Defendant Presidio Advisory Services, LLC.

105. Upon information and belief, Defendant Presidio Growth, LLC ("Presidio Growth") is a Delaware Limited Liability Company with offices in San Francisco, California.  Upon information and belief, at all relevant times herein, Presidio Growth, LLC was a registered investment advisor under the Registered Investment Advisors Act of 1940, and is an affiliate or subsidiary of Presidio Advisory Services, LLC.

106. Upon information and belief, Defendant Presidio Resources, LLC ("Presidio Resources") is a Delaware Limited Liability Company with offices in San Francisco, California. Upon information and belief, Presidio Resources LLC is an affiliate or subsidiary of Presidio Advisory Services, LLC.

107. Defendant Morley, Inc. is a company of unknown origin and, if a corporation, the state of incorporation is unknown to Plaintiff.  Upon information and belief, Defendant Morley, Inc. is the sole member of Presidio Advisory Services, LLC.  Upon information and belief, Defendant Steven Buss is Vice President and Assistant Treasurer of Morley, Inc.

THIRD AMENDED COMPLAINT - Page 22 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

108. On information and belief, Defendant Hayes Street Management Services, Inc. ("Hayes Street") is a corporation, the state of incorporation of which is unknown to Plaintiff. Hayes Street Management Services, Inc. is a Member of Presidio Growth LLC, owning a 70% interest in Presidio Growth, LLC.

109. On information and belief, Defendant Norwood Holdings, Inc. ("Norwood Holdings") is a corporation, the state of incorporation of which is unknown to Plaintiff. Upon information and belief, Norwood Holdings, Inc., is a Member of Presidio Growth LLC, owning a 30% interest in Presidio Growth, LLC.

110. On information and belief, Defendant Presidio Volatility Management ("Presidio Volatility") is an entity organized under the laws of the State of California. On information and belief, one or more of the Presidio Defendants have an ownership and/or management interest in Presidio Volatility.

111. On information and belief, Defendant Presidio Financial Group ("Presidio Financial") is an entity organized under the laws of the State of California. On information and belief, one or more of the Presidio Defendants have an ownership and/or management interest in Presidio Financial.

112. On information and belief, Defendant Holland Park ("Holland Park") is an entity organized under the laws of the State of California. On information and belief, one or more of the Presidio Defendants have an ownership and/or management interest in Holland Park.

113. On information and belief, Defendant Prevad, Inc. ("Prevad") is an entity organized under the laws of the State of California. On information and belief, one or more of the Presidio Defendants have an ownership and/or management interest in Prevad.

THIRD AMENDED COMPLAINT - Page 23 of 131

114. On information and belief, Defendants Steven Buss ("Buss"), John Larson ("Larson"), D. Amir Makov ("Makov") and Robert Pfaff ("Pfaff") are all individuals and, on information and belief, are residents of the State of California and at all relevant times, were principals and agents of Defendants Presidio, Presidio Growth, Presidio Resources, Hayes Street Management Services, Inc., Norwood Holdings, Inc., Holland Park, Prevad, Inc., Presidio Financial Group, Morley, Inc. and Presidio Volatility Management.

115. Collectively, the entities consisting of Defendants Presidio Growth, Presidio Advisory Services, Presidio Resources, Hayes Street Management Services, Inc.,  Presidio Volatility Management, Presidio Financial Group, Holland Park, Norwood Holdings, Prevad, Inc., Morley, Inc., and the individuals consisting of Defendants Larson, Pfaff, Makov and Buss are referred to herein as the "Presidio Defendants."

116. All Presidio Defendants are engaged in the business of advising others as to the value of securities and the advisability of investing in, purchasing or selling securities and are investment advisors under the Registered Investment Advisors Act of 1940.

117. On information and belief, Presidio, Presidio Growth, Presidio Resources, Hayes Street Management Services, Inc., Norwood Holdings, Inc., Holland Park, Prevad, Inc., Presidio Financial Group, Morley, Inc., and Presidio Volatility Management are mere shell companies, owned, operated and controlled by Defendants Buss, Larson and Makov. On information and belief, said companies have received and/or are in possession of income or other assets of the Presidio Defendants.  On information and belief, the sole purpose of all or some of the entities that comprise the Presidio Defendants is to hide the income or other assets of other Presidio Defendants and thereby secret them from their creditors.  The corporate or other business entity of such Presidio Defendants should be

THIRD AMENDED COMPLAINT - Page 24 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

disregarded and, in the interest of justice and equity, any judgment entered in this action against any of the Presidio Defendants, should be entered against all Presidio Defendants, jointly and severally.

118. On information and belief, all or some of the Presidio Defendants, including but not limited to Presidio, Presidio Growth, Presidio Resources, Hayes Street Management Services, Inc., Norwood Holdings, Inc., Holland Park, Prevad, Inc., Presidio Financial Group, Morley, Inc., and Presidio Volatility Management are mere shell companies, owned, operated and controlled by the individual Presidio Defendants Buss, Larson and Makov.  The Strategic Investment Funds Confidential Memorandum states that Larson, Makov and Pfaff "or trusts under their control are principals of the parent of the Managing Member, and Mr. Makov will be portfolio manager of each Fund." Plaintiff is informed and believes that all of the Presidio Defendants are principals of the parent of the Managing Member.

119. In committing the acts and omissions alleged herein, each of the Presidio Defendants was acting as the agent and principal and with the knowledge and permission of each of the remaining Presidio Defendants and each of said Presidio Defendants are jointly and severally liable for the acts and omissions of the remaining Presidio Defendants.

120. On information and belief, the Presidio Defendants have received and/or are in possession of income or other assets of the other Presidio Defendants.  On information and belief, a primary purpose of each of the Presidio Defendants is to hide the income or other assets of other Presidio Defendants and thereby secret them from and thereby defraud their creditors and Plaintiff herein.  Therefore, in the interest of justice and equity, the corporate

THIRD AMENDED COMPLAINT - Page 25 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

or other business entity of such Presidio Defendants should be disregarded, each Presidio Defendant should be held jointly and severally liable for the acts and omissions of each of the other Presidio Defendants and any judgment entered against any Presidio Defendant should be likewise entered against each of the other Presidio Defendants should be entered against all Presidio Defendants.

121. The true names and capacities of Defendants named herein as Does 1 through 50 are unknown to Plaintiff, who, therefore, sues said Doe Defendants by such fictitious names. Plaintiff will amend the complaint to show the true names and capacities of such Doe Defendants when they have been ascertained. Upon information and belief, Does 1 through 50 are responsible in some manner for the acts and transactions hereinafter alleged, and are liable to Plaintiff therefore.

## FACTUAL BACKGROUND

**Defendants Misrepresent Facts in Order to Induce Swartz to Enter Into BLIPS Transaction.**

122. In 1999, Swartz had realized profits of approximately $18 million from the sale of his business, TCS Expeditions. Mike O'Neil, Swartz's broker at Hambrecht & Quest, knew of the sale of TCS Expeditions. Mike O'Neil contacted Dale Baumann at KPMG and gave him Swartz's contact information. Dale Baumann contacted Swartz to sell him the BLIPS program. Based on information and belief, Mike O'Neil was paid as a Finder for the BLIPS investment program.

123. Before revealing any aspect of the investment program to Swartz, KPMG required Swartz to sign a nondisclosure agreement forbidding Swartz from disclosing the strategy to any person, which Swartz signed. The nondisclosure agreement represents to Swartz that

THIRD AMENDED COMPLAINT - Page 26 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

"KPMG has developed an initiative which it believes may result in substantial potential tax savings for T.C. Swartz."

124. On September 1, 1999, KPMG sent a letter to Swartz, which Swartz signed and returned, confirming that Swartz had engaged KPMG "to provide tax consulting services with respect to participation in an investment program involving investments in foreign currency positions."

125. The KPMG engagement letter further states:

> "KPMG understands that Client intends to engage Presidio Advisors, LLC, a registered investment advisor, to provide Client with investment advisory services and trading strategies with respect to the foreign exchange contracts entered into pursuant to the Investment Program. … Presidio will assist Client in structuring the requisite financing package by advising clients as to the structure of the financing arrangement and suggesting alternative financial institutions to provide such financing."

126. The KPMG engagement, p. 2, KPMG states:

> "Client has independently determined that there is a reasonable opportunity for Client to earn a reasonable pre-tax profit from the Investment Program in excess of all associated fees and costs, and this determination has been confirmed by Presidio and/or other investment advisors."
>
> * * *
>
> "The conclusions in our opinion letter will be based on the facts, representations and assumptions that you and Presidio submit to us and we will not independently gather, verify, audit or investigate the accuracy or completeness of this information."
>
> * * *
>
> "Any tax opinion issued by KPMG . . . would provide that with respect to the tax consequences described in the opinion, there is a greater than 50 percent likelihood (i.e., it is "more likely than not") that those consequences will be upheld if challenged by the Internal Revenue Service. "

127. The representations that the representations in the opinion letter would be true and accurate were material representations. All of the parties knew that KPMG could not issue a "more likely than not opinion" which would allow Swartz to be entitled to a capital

THIRD AMENDED COMPLAINT - Page 27 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

loss deduction if there was no reasonable opportunity to earn a profit or it there was an understanding that the loan proceeds would never be used to facilitate Presidio's investment plan.

128. The representation that there was a reasonable opportunity to earn a profit was also a material representation. KPMG and Presidio knew that Swartz would not have invested $1.4 million with Presidio and Deutsche Bank Securities if he knew that there was no reasonable opportunity to earn a profit. Deutsche Bank AG, Deutsche Bank Securities, and Presidio also knew that Swartz would not enter into a credit agreement if he knew that Presidio and Deutsche Bank understood that the loan proceeds would never be used to facilitate Presidio's investment plan as promoted in the prospectus prepared by Presidio.

129. In order to induce Swartz to enter into the BLIPS investment plan, KPMG, Presidio, and Deutsche Bank represented that the Deutsche Bank loan proceeds would be used to facilitate Presidio's investment plan. KPMG, Presidio, and Deutsche Bank failed to disclose to Swartz the existence of an understanding that the Deutsche Bank loan proceeds would not be used to facilitate Presidio's investment plan. They failed to disclose that Swartz would have no opportunity to earn a profit because over a 60-90 day period in excess of $1 million in fees would be charged against his account at Deutsche Bank by Presidio and Deutsche Bank.

130. In their engagement letter dated September 1, 1999, KPMG LLP made the following statement as to the role that Presidio would fullfill in the BLIPS investment program:

THIRD AMENDED COMPLAINT - Page 28 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

"We understand that Presidio has advised Client that the utilization of a high degree of leverage is integral to the Investment Program. We also understand that Presidio will assist Client in structuring the requisite financing package by advising Client as to the structure of the financing arrangement and suggesting alternative financial institutions to provide such financing.

We understand that Client and two limited liability companies owned or controlled by Presidio intend to invest in a newly created limited partnership. We further understand that Presidio will act as Investment Advisor to the limited partnership and, in such capacity, will facilitate the purchase of foreign currency contracts and other foreign currency-based financial instruments. The purchase of such foreign currency contracts and other financial instruments will involve full economic risk to Client in the foreign currency markets with priced movements (up or down) in the purchased securities. Client may realize either profits or losses based upon the price movement of the foreign currency contracts and other financial instruments."

131. KPMG introduced Swartz to Presidio Growth LLC, a registered investment advisor. In August 1999, Presidio Growth provided Swartz with a Strategic Investment Funds Confidential Memorandum ("Presidio Memorandum"), which purports to lay out the investment plan.

132. Presidio gave Swartz a Prospectus (Investment Memorandum) which offered investment advice and described Presidio's rationale for utilizing a high degree of leverage in the BLIPS investment program. The Presidio Prospectus represented that Presidio's investment plan consisted of investment funds and that each "Fund" is an investment pool and that the fund manager "seeks to provide investors with a high total return." The Presidio Prospectus represented that "the Managing Member" has structured a three-stage, seven-year investment program, with Stage I expected to last 60 days, Stage II 120 days and Stage III approximately 6.5 years. The Presidio Memorandum represented that the investment program "seeks to exploit trading opportunities in the markets for foreign debt securities and currencies," particularly emerging market currencies that were tied, or "pegged," to the currencies of major developed countries, such as the United States dollar;

THIRD AMENDED COMPLAINT - Page 29 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

that the investment strategy can best be achieved through a "long-term investment horizon"; that the trading strategy would include trying to identify and take positions in those pegged currencies that were likely to be devalued when the peg broke; that the utilization of a high degree of "leverage" was "integral" to the investment program; that a "premium loan," that is, one with an above-market interest rate, would be employed to produce the desired "leverage" for the investment program; and that the investment program was reasonably expected to produce a profit for the investors, exclusive of interest and costs.

133. On September 15, 1999, Presidio acted on behalf of Deutsche Bank and mailed the Deutsche Bank AG Credit Agreement to Swartz. On September 30, 1999, Swartz signed the Credit Agreement with Deutsche Bank AG, Cayman Islands Branch. The Bank agreed to make available to the Borrower on the Borrowing Date Dollars in an amount equal to $53,300,000 (the "Funding Amount"), in exchange for a duly executed and delivered promissory note payable to the Bank . . ."

134. The Definitions and Principles of Construction, section of the Credit Agreement stated (1) that the "Commitment shall mean the commitment of the Bank to make the Funding Amount available to the borrower in the amount of $53,300,000, (2) that the "Stated Principal Amount shall mean $33,300,000, (3) that the "Initial Unamortized Premium Amount shall mean $20,000,000, and (4) that the "Maturity Date shall mean the seventh anniversary of the Borrowing Date. Swartz was without knowledge that Deutsche Bank did not intend to allow the funding amount to be used to further Presidio's investment plan.

THIRD AMENDED COMPLAINT - Page 30 of 131

135. To implement the investment program, Presidio engaged the law firm of Holland & Hart to prepare and review various organizational and banking documents on behalf of Swartz and Gascoyne, LLC.

136. On August 24, 1999, Presidio formed Longs Strategic Investments LLC (Longs) as a Delaware Limited Liability Company.  Longs elected to be treated as a partnership for federal tax purposes and was the vehicle through which Swartz participated in the investment program, as instructed by Presidio.

137. On September 7, 1999 Holland & Hart organized Gascoyne Ventures, LLC, a Delaware Limited Liability Company, owned entirely by Swartz.  Gascoyne was a single member LLC, which is treated as a disregarded entity for tax purposes and its activities are reported directly on Swartz' tax return.

138. On September 24, 1999, Gascoyne Ventures LLC opened an Investment Account, Account No. 1116800 (the "Investment Account"), with Deutsche Bank AG, New York Branch, in the name of Gascoyne Ventures LLC.  This was also a discretionary account, under the sole dominion and control of Deutsche Bank AG and, therefore, Deutsche Bank AG was the fiduciary of and owed the duties of a fiduciary to Gascoyne Ventures and Swartz, the sole member and assignee of the rights and interests of Gascoyne.

139. On September 24, 1999, Kerry Bratton of Presidio Advisory Services, LLC sent a letter to T.C. Swartz of Gascoyne Ventures LLC and Dale Baumann of KPMG confirming the Deutsche Bank account for Gascoyne Ventures LLC is now open and can accept funds, advised T.C. Swartz to wire in $1,400,000 to the account no later than Wednesday, September 29, 1999. Account information is set forth below:

Deutsche Bank New York

THIRD AMENDED COMPLAINT - Page 31 of 131

ABA #026-003780
A/C Deutsche Bank Private Banking
A/C #10-045708-0008
For further Credit to:
DBS A/C Name Gascoyne Venture LLC
DBS A/C Number – 1116800

140. To fund Longs, Presidio and KPMG instructed Swartz to make two distinct contributions. First, on September 30, 1999, through Gascoyne, Swartz contributed $1.4 million to Longs. Second, on September 30, 1999, Gascoyne entered into a non-recourse secured loan transaction with Deutsche Bank AG. Gascoyne Ventures LLC entered into a Credit Agreement with Deutsche Bank AG, Cayman Islands Branch in which the Bank agreed to make available to Gascoyne LLC an amount equal to $53 million. The "Maturity Date" referred to therein was defined as the seventh anniversary of the Borrowing Date. As a condition of the Credit Agreement, Gascoyne LLC was required to make a $1.4 million equity contribution of the account at Deutsche Bank New York and the $53 million Deutsche Bank credit facility.

141. Through the transaction with Deutsche Bank, Longs received $53 million. The $53 million, referred to as the "Funding Amount" in the Credit Agreement with Deutsche Bank, was comprised of $33 million denominated as "Stated Principal Amount" and $20 million denominated as an "Initial Unamortized Premium amount ("premium"). To facilitate the transaction with Deutsche Bank, Gascoyne executed a Credit Agreement dated September 30, 1999 and a Note dated October 1, 1999. Swartz did not know at the time that both of these loans were shams.

142. On September 30, 1999, Gascoyne Ventures LLC entered into (a) an International Swaps and Derivatives Association, Inc. (ISDA) Master Agreement and Schedule with

THIRD AMENDED COMPLAINT - Page 32 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

Banker Trust Company and (b) an International Swaps and Derivatives Association, Inc. (ISDA) Master Agreement and Schedule with Deutsche Bank, New York Branch.

143. On September 30, 1999, Gascoyne Ventures LLC entered into a Pledge and Security Agreement ("Pledge and Security Agreement") with Deutsche Bank AG, Cayman Islands Branch for its own account and as agent for Banker Trust Company and Deutsche Bank AG, New York Branch. Under the Pledge and Security Agreement, DBNY was given the right at any time in its discretion and without notice to Gascoyne Ventures LLC to transfer or to register any of the assets in the account in the name of Deutsche Bank AG or any of its nominees or pledge any or all of the Pledged Collateral. Therefore, having discretionary powers under the account, DBNY was the fiduciary and owed the duties of a fiduciary to Gascoyne Ventures and Swartz, the sole member and assignee of the rights and interests of Gascoyne.

144. On September 30, 1999, under the Pledge and Security Agreement, Gascoyne Ventures LLC instructed Deutsche Bank AG, and Deutsche Bank AG agreed to deposit the Entire Funding Amount into Investment Account No. 1116800 and immediately following the transfer to close and terminate the Funding Account.

145. On September 30, 1999 Gascoyne Ventures LLC and Deutsche Bank AG entered into an Account Control Agreement which appointed Deutsche Bank Securities, Inc. as the securities intermediary over Investment Account 1116800, the "Collateral Account." As long as the obligations of Gascoyne Ventures LLC under any Credit Document remained outstanding, Gascoyne Ventures LLC was required to maintain the Investment Account with Deutsche Bank Securities, Inc. in the name of Gascoyne Ventures LLC, but under the sole dominion and control of Deutsche Bank AG.  In the Collateral Control Agreement,

THIRD AMENDED COMPLAINT - Page 33 of 131

Deutsche Bank Securities Inc, as Account Control Intermediary, was required to comply with entitlement orders or other directions given by Deutsche Bank AG, without further consent by Gascoyne LLC or any other person, including, without limitation, entitlement orders directing the liquidation or whole or partial transfer to a third party.

146. The Deutsche Bank Collateral Account Agreement gave Deutsche Bank Securities complete control over the Investment Account. The Agreement provided that Deutsche Bank Securities would have control over Investment Account 1116800 in order to perfect the Bank's security interest in the Investment Account and the cash, financial assets, investment property and other property from time to time held or credited thereto. This provision gave Deutsche Bank Securities complete control over the investment account which superseded both Gascoyne LLC and Presidio Investment Advisors. The Collateral Account was a discretionary account, under the sole dominion and control of Deutsche Bank AG and Deutsche Bank Securities, Inc., Deutsche Bank AG's appointed intermediary and, therefore, Deutsche Bank AG and Deutsche Bank Securities were the fiduciaries of and owed the duties of a fiduciary to Gascoyne Ventures and Swartz, the sole member and assignee of the rights and interests of Gascoyne. Given these provisions, the Collateral Account constituted a security.

147. The Pledge of the Funding Account in exchange for the funding amount in the credit agreement constituted the sale of a security. It was a condition precedent of Deutsche Bank AG, Cayman Islands to the making available of the Funding Amount to Gascoyne Ventures LLC as Pledgor under the Credit Agreement that Gascoyne Ventures LLC was required to grant a pledge and assignment of a security interest in the Funding

THIRD AMENDED COMPLAINT - Page 34 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

Account and the Investment Account, collectively the ("Collateral Accounts") to Deutsche Bank AG.

148. Deutsche Bank AG produced an account statement dated October 1, 1999 under Account Number 675348, issued to Presidio Advisory Services showing a transfer of $53,000,000 to account in favor of Gascoyne Ventures, Bank Reference 100114166. Account Number 675348 is the Funding Account for Gascoyne Ventures LLC, which was under the sole dominion and control of Deutsche Bank AG. As of October 1, 1999, Gascoyne LLC had not entered into an advisory contract with Presidio Advisory Services.

149. Deutsche Bank AG produced an account statement under Funding Account 675348 under the name of Presidio Advisory Services, which was dated October 2, 1999 to October 12, 1999 under Finding Account 675348 showing a transfer of $53,000,000 from Gascoyne Ventures, LLC to Longs Strategic Investment Fund, LLC.

150. The Pledge and Security Agreement of September 30, 1999 made by Gascoyne and Deutsche Bank AG, Cayman Islands Branch, constitutes a security. By its terms, it states that in order to induce Deutsche Bank AG, Cayman Islands to enter into the credit agreement and make the Funding Amount available to Gascoyne Ventures LLC, Gascoyne Ventures LLC agreed to pledge and assign and grant a security interest to Deutsche Bank AG, New York Branch in and to the Pledged Collateral.

151. On October 8, 1999 Presidio Advisory Services, LLC adopted a resolution that Presidio Growth, as the managing member of the "Fund," "be and hereby is authorized to, and any officer of the Company, on behalf of the Company in its capacity as the manager of Presidio Growth, hereby are, and each of them acting singly hereby is, authorized, empowered and directed to:

THIRD AMENDED COMPLAINT - Page 35 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

"(a) cause the Fund to assume, and become solely obligated with respect to, $33,300,000 in stated principal amount of indebtedness for borrowed money owed by an investor becoming a Class A Member of the Fund to Deutsche Bank AG and certain of its affiliates (collectively, the "Bank"), on the terms specified in the documents referenced below in this resolution and in connection with the initial capital contribution of the Class A Member to the Fund; and

(b) in connection with such assumption of the Class A Member's indebtedness by the Fund, (i) enter into an Assignment Agreement among such Class A Member, the Fund., Presidio Growth and the Bank (the "Assignment Agreement") and (ii) cause the Fund to enter into the Assignment Agreement and to assume the Class A Member's obligations under the Credit Agreement between the Class A Member and the Bank, the note issued under the Credit Agreement, the Pledge and Security Agreement between the Class A Member and the Bank, an Account Control Agreement between the Class A Member and the Bank, and the Master Agreements between the Class A Member and each of the Bank and Bankers Trust Company."

152. On October 8, 1999, Presidio Advisory Services, LLC, as the sole managing member of the Longs Strategic Investment Fund, LLC, was given exclusive authority under the purposes and powers provision of the Longs Agreement to manage the Investment Accounts at Deutsche Bank, subject to Deutsche Bank's Controlling Authority.

153. On October 12, 1999 the Agreement of Longs Strategic Investment Fund, LLC was executed between Presidio Growth LLC, as Managing Member and Gascoyne Ventures LLC. The agreement provided that the Net Profit and Net Losses from all sources shall be allocated among the Members as follows: 90% to Gascoyne as Class A Member; 9% to Presidio Growth as Managing Member; and 1% to Presidio Resources, LLC as Class B Member. The Members entered into an Agreement as to Initial Capital Contribution and Initial Capital Account Balances, whereby the initial Members of Longs Strategic Investment Fund, LLC agreed that each Member will make initial capital contributions as set forth below:

THIRD AMENDED COMPLAINT - Page 36 of 131

Managing Member:
    1) Name: Presidio Growth, LLC
    2) Initial Cash Contribution: $15,554
    3) FMV of encumbrance related to such assets: None
    4) Initial Capital Account balance: $15,554

Class A Member
    1) Name: Gascoyne Ventures LLC
    2) Initial Cash Contribution: $54,700,000
    3) FMV of encumbrance related to such assets: $53,300,000
    4) Initial Capital Account balance: $1,400,000

Class B Member
    1) Name: Presidio Resources, LLC
    2) Initial Cash Contribution: $140,000
    3) FMV of encumbrance related to such assets: None
    4) Initial Capital Account balance: $140,000

154. It was significant to Swartz, from an investment stand point, that the Presidio members also made cash contributions to Longs in accordance with their respective percentages of ownership. Presidio Growth contributed $15,554 and Presidio Resources contributed $140,000. This led Swartz to believe that Presidio also had money at risk and that a partnership existed between them. As partners, the Presidio Defendants are fiduciaries of Plaintiff and owe the duties of a fiduciary.

155. At the time of funding, the interest rate had not been determined. According to the Credit Agreement, the Interest Rate for the Stated Principal Amount was to be set at a later date by Deutsche Bank on the "Determination Date." The rate itself would be computed using a formula provided in the Credit Agreement. The parties intended the "Determination Date" to be the same date on which Gascoyne contributed the loan proceeds to Longs. This occurred on October 12, 1999, and on that date, Deutsche Bank notified Gascoyne that the interest rate on the Stated Principal amount would be 17.557%.

THIRD AMENDED COMPLAINT - Page 37 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

156. On October 12, 1999, Gascoyne contributed the proceeds from Deutsche Bank and its $ 1.4 million cash capital contributions to Longs, and, with Deutsche Bank's consent, assigned the loan to the partnership. The partnership then assumed the loan and entered into interest rate swap agreements with Deutsche Bank.  The swap agreement had a stated term of approximately seven years, and required a Final Fixed Payment (distinct from the "premium") of $ 20,000,000.

157. Presidio engaged Walter, Conston, Alexander & Green to review the Assignment Agreement of the Deutsche Bank credit facility to Longs Strategic Investment Fund. Walter Conston reviewed multiple contracts and provided various services necessary to complete the BLIPS transaction.

158. On September 7, 1999 Walter Conston Alexander & Green (Harvey M. Bagg, Jr., Esq.) executes a Certificate of Formation of Gascoyne Ventures, LLC.

159. On September 23, 1999 Walter Conston Alexander & Green transmits to T.C. Swartz, for signature, documents related to Gascoyne and Deutsche Bank Credit Agreement, specifically:  Credit Agreement; Pledge and Security Agreement; Account Control Agreement; Bankers Trust Master Agreement; Deutsche Bank Master Agreement; Certificate of Borrower; Notice of Borrowing; Promissory Note; and UCC-1 Financing Statement.

160. On September 30, 1999 Walter Conston Alexander & Green, as special counsel to Gascoyne Ventures LLC, submits an Opinion Letter to Deutsche Bank regarding the Credit Agreement and related documents.

161. On October 12, 1999 Walter Conston Alexander & Green, as special counsel to Gascoyne Ventures, LLC, Longs Strategic Investment Fund, LLC, and Presidio, submits

THIRD AMENDED COMPLAINT - Page 38 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

to Deutsche Bank an Opinion Letter regarding the Assumption Agreement and Assigned Documents.

162. On February 24, 2000 Walter Conston Alexander & Green transmits to T.C. Swartz transaction documents related to Gascoyne Ventures, LLC.

163. The law firm of Holland & Hart was engaged to review multiple documents and provided various services necessary to complete the BLIPS transaction.

164. On October 12, 1999, as special counsel to Longs Strategic Investment Fund, Holland & Hart issued to Deutsche Bank an Opinion Letter regarding the Assignment and Assumption Agreement, Credit Agreement and Note.

165. On October 25, 1999 Holland & Hart transmits to the Department of Financial Institutions the Notice of Sale on Form D, Company's Consent to Service of Process and the filing fee for Longs Strategic Fund, LLC.

166. On December 22, 1999, as special counsel to Longs Strategic Investment Fund and Presidio Growth, Holland & Hart issued to Deutsche Bank an Opinion Letter regarding the Deutsche Bank and Banker's Trust Master Agreements.

167. On December 22, 1999 Holland & Hart transmits to Theodore Swartz executed documents related to Gascoyne Ventures, LLC.

168. On February 4, 2000 Holland & Hart transmits to Presidio Advisory Services copies of Delaware Certificates of Cancellation for Tranche 1 and Tranche 2 deals related to Longs Strategic Investment Fund, LLC.

169. As a condition of the assignment between Gascoyne and Longs, Deutsche Bank remained in control of the transaction. Deutsche Bank Securities, Inc. then assigned to Deutsche Bank of New York all of its rights, and delegated to DBNY all of its duties and

THIRD AMENDED COMPLAINT - Page 39 of 131

obligations, under the Account Control Agreement and a "Replacement Account" was set up with the funds from the Investment Account.

170. Longs deposited the funds received from Gascoyne into an account controlled by Deutsche Bank.  The funds were used to purchase essentially very low risk contracts on US Dollars and the Euros. Deutsche Bank, in turn, paid interest to Longs on the deposit, similar to interest paid on more conventional time deposits, such as certificates of deposit.  The interest paid to Longs by Deutsche Bank, however, was lower than the interest that Longs was obligated to pay Deutsche Bank under the terms of the loan they had assumed from Gascoyne.  The partnership paid these costs out of the individual partners' original cash contributions, which were in addition to the Deutsche Bank proceeds.

171. Presidio caused the partnership to enter into various foreign currency trades. Longs made several small, short term, forward contract trades in the Argentina Peso and the Hong Kong Dollar.  Longs also engaged in Japanese Yen options trading against the U.S. dollar.

172. In addition to foreign currency trades, Presidio also caused the partnership to enter into other security transactions.  On December 8, 1999, Longs requested Deutsche Bank to purchase 425 shares of Microsoft stock for the Longs account.

173. On November 29, 1999, based on and in reasonable reliance on the direction of KPMG, Presidio and Deutsche Bank, Swartz requested the withdrawal of his capital account balance of Longs Strategic Investment Fund, LLC.  On November 30, 1999, Steven Buss, the Managing Director of Presidio Growth, LLC and Presidio Advisory Services, Inc. elected to dissolve Longs Strategic Investment Fund, LLC effective December 13, 1999, and to terminate the Deutsche Bank Line of Credit.

THIRD AMENDED COMPLAINT - Page 40 of 131

174. On or about December 13, 1999, the Deutsche Bank Line of Credit was liquidated at and in reasonable reliance on the instructions of the KPMG Defendants. The 425 shares of Microsoft stock were transferred from the Longs Account to Gascoyne's account at Deutsche Bank Securities.

175. On information and belief, Presidio engaged the accounting firm of Grant Thornton to prepare the accounting and income tax returns for Longs Strategic and Investment Fund. As a result of the investment of partnership interest of Longs Strategic Investment Fund, Grant Thornton reported a net loss of $1,098,196 on the Longs Strategic Investment Fund tax return for tax year 1999. According to the partnership tax return, Grant Thornton reported a purported loss, which consisted of a management fee paid to Presidio of $550,000 and various fees paid to Deutsche Bank and the related Deutsche Bank entities, including loan breakage fee of $117,334, bank fee of $49,312, guaranteed payment fee of $16,539, short-term capital loss of $187,790 and interest expense on investments of $678,460. The purported income as reported by Grant Thornton on the partnership tax return consisted of interest income of $500,976 and Equities/Euros gains of $263.

176. Grant Thornton used its standing and reputation as an accounting firm to validate the BLIPS investment program and tax opinion letters related to the BLIPS investment program. On November 22, 1999 Grant Thornton issued a "Report of Independent Certified Public Accountants" wherein they recalculated the management fees payable to Presidio Growth LLC by "Agreeing that the "fair market value" of all assets of the Longs Strategic Investment Fund, LLC, on the date of initial capital contribution to Deutsche Bank statements" and by "Multiplying the initial capital contribution of $54,855,554

THIRD AMENDED COMPLAINT - Page 41 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

determined in 2a above by the management fee of 1.003% per the Agreement, which totaled a management fee of $550,201.

177. Additionally, Grant Thornton represented by there was a capital loss of $20,956,969 in their preparation of the schedule K-1 for Gascoyne, LLC attached to the Partnership Tax Return for Longs Strategic Investment Fund.

178. On December 31, 1999, Swartz received opinion letters from KPMG and Brown & Wood. These are the opinion letters that KPMG promised Swartz before he invested in the investment program he would receive and which KPMG represented would, with respect to the tax consequences described in the opinion, state that there is a greater than 50% likelihood (i.e., it is "more likely than not") that those consequences will be upheld if challenged by the Internal Revenue Service.

179. These opinion letters, the expected receipt of which were the inducement for Plaintiff's decision to participate in the investment plan, contain material misrepresentations and conceal of material facts. If, prior to the time of entering into the investment, Plaintiff had known that the opinion letters he eventually would receive from KPMG and Brown & Wood contained material misrepresentations from Presidio and Deutsche Bank, which were negotiated in advance with KPMG, he would not have invested in the investment plan.

**The Joint Venture Conspiracy to Defraud Swartz.**

180. At all times mentioned herein, Defendants, and each of them, concealed from Plaintiff and falsely denied the fact that Defendants, and each of them, and other persons who remain unknown to Plaintiff at this time, and who Plaintiff therefore designates as "DOES 1 through 50," were partners in a joint venture conspiracy (hereinafter referred to

THIRD AMENDED COMPLAINT - Page 42 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

alternately and collectively as "joint venture," "joint venture conspiracy" and/or "joint venture partners" and/or "co-conspirators"), the common purposes and community of interests of which were at all times mentioned herein known to each of the joint venture partners and co-conspirators, as follows:

A) To design, promote, market, and implement the BLIPS investment program to prospective and actual investors, including Plaintiff, (referred to collectively herein as "investor(s)") and provide to each investor the financial, accounting, investment advisory, legal and other services and prepare all products, loans, agreements, assignments, opinion letters and other documents and create any entities involved in the investment program, all of which had been designed ahead of time and agreed upon by the joint venture partners in the course and scope of the joint venture;

B) To make it appear by design and to misrepresent to investors that the BLIPS investment program was a legitimate investment programs with genuine economic substance with a reasonable opportunity to make a profit, when in fact the joint venture partners, including Defendants, and each of them, knew at all times that the investment program lacked economic substance and Defendants, and each of them, further knew at the time the investment program was sold to the investors and that the representations made by KPMG, Presidio and Deutsche Bank were negotiated in advance and concealed and misrepresented material facts.

C) To represent to prospective and actual investors in the investment programs, including Plaintiff, that the loans that were to be used as "leverage" to acquire

THIRD AMENDED COMPLAINT - Page 43 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

positions in foreign currencies and were supposedly "integral" to the investment program and were legitimate loans, when, in fact, this was a misrepresentation by the joint venture partners, including Defendants Deutsche Bank, because the loans to Plaintiff were sham loans in that the loan proceeds were never intended to be at risk by the lender, the loan proceeds were never to be made available to Plaintiff, Deutsche Bank was in complete control and had full discretion over all trades and other activity in the account and Deutsche Bank effectively had the right to terminate the investment program as it retained the right to approve or disapprove all trading activity in the investment account, which meant that the investment program lacked economic substance.

D) To conceal from prospective and actual investors in the investment programs, including Plaintiff, that the joint venture partners knew from the beginning, before Plaintiff purchased the investment program, that it was the joint venture partners' investment strategy in the design of the investment program to charge excessive fees.

E) To conceal from and deny to prospective and actual investors in the investment programs, including Plaintiff, the existence of the joint venture, the identities of the joint venture partners, the involvement of each joint venture partner in the design, promotion and marketing of the abusive tax shelters, and the fiduciary relationship of the joint venture partners to each other and to the investors;

F) To conceal from prospective and actual investors in the investment programs, including Plaintiff, that a special relationship, fiduciary in nature, existed

THIRD AMENDED COMPLAINT - Page 44 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

between the joint venture partners and between the joint venture partners and investors, including Plaintiff, by virtue of the fiduciary nature, purpose and scope of the joint venture enterprise, the financial, accounting, investment advisory, legal and other fiduciary services provided to the investor, including Plaintiff, by the joint venture partners pertaining to the investment program, and by virtue of the fiduciary nature of the products, loans, agreements, assignments, opinion letters and other documents associated with the investment program prepared and approved by all the joint venture partners and provided by the joint venture to the investor, including Plaintiff.

G) To conceal from and deny to prospective and actual investors in the investment programs, including Plaintiff, that the joint venture partners assumed and expected, even before any investors invested in the investment program, including Plaintiff, that there would be a complete loss of investment principal as a result of the excessive fees paid to the other principals of the joint venture.

H) To conceal from prospective and actual investors in the investment programs, including Plaintiff, that the joint venture partners expected each investor to lose the entire "initial capital contribution" in the investment program and further to conceal that the joint venture partners agreed to share the profits of the joint venture by dividing the investors' initial capital contribution among the joint venture partners based upon a pre-arranged allocation of "basis points" before the investor even agreed to enter into the investment program; and

I) To conceal from prospective and actual investors in the investment programs, including Plaintiff, that the joint venture partners agreed to divide the

THIRD AMENDED COMPLAINT - Page 45 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

investor's initial capital contribution among themselves even before the

investor paid the initial capital contribution.

181. Defendants, and each of them, committed the acts, misrepresentations, omissions

and concealment of facts as alleged in the preceding paragraph in furtherance of the

common purposes and interests of the joint venture conspiracy, as alleged in the preceding

paragraph, above, and in their capacities of joint venture partners and co-conspirators.

Despite the fiduciary and special relationship that existed between the joint venture

partners and Plaintiff, as alleged herein, the joint venture partners, including Defendants,

concealed from Plaintiff the existence of the joint venture and the acts and omissions of

the joint venture, as alleged herein, and misrepresented and concealed the fiduciary and

special relationship between the joint venture partners.  For example, KPMG represented

to Swartz that he was the client.  However, KPMG's internal "work papers" delineation of

the Swartz BLIPS transaction identify Presidio as the "Client" and T.C. Swartz as the

"Project."

182. The Defendants misrepresented material aspects of the BLIPS transaction in order

to deceive Plaintiff into believing that none of the Defendants herein, including Plaintiff's

accountants, investment advisors, banks and lawyers, had any undisclosed material

knowledge pertaining to the investment plan or any undisclosed special or fiduciary

relationship with any of the other Defendants or with Plaintiff, and concealed that the

Defendants had any undisclosed self-interest in the investment program, and conceal

conflicts of interest with Plaintiff and the Defendants duty to make any additional

disclosures of information that had not already been disclosed to Plaintiff and in order to

induce Plaintiff to invest in the investment program, not knowing what Defendants knew:

THIRD AMENDED COMPLAINT - Page 46 of 131

namely, that the investment program sold to Plaintiff was an abusive tax shelter and not a legitimate investment program.

183. The joint venture partners, including Defendants, and each of them, owed a duty to Plaintiff, as fiduciaries and on account of the special relationship that existed between Plaintiff and Defendants, owed a duty to disclose to Plaintiff all of the material facts regarding the investment program, especially those aspects of the investment program that caused it or might cause it to lack economic substance.

184. In committing the acts and omissions alleged herein, the Defendants, and each of them, were active participants in the joint venture scheme to defraud Plaintiff and other investors and said Defendants shared in the profits of the joint venture, described herein.

185. But for the misrepresentations, acts and omission of Defendants, and each of them, as alleged herein, in particular the misrepresentation that the investment program was legitimate, Plaintiff would not have invested in the investment program.

186. Plaintiff trusted and relied upon Defendants because of the fiduciary and contractual relationships that existed between them and because Plaintiff believed and relied on Defendants' reputations for honesty and integrity.  Plaintiff did not know that Defendants had misrepresented and concealed facts from Plaintiff regarding the legitimacy of the investment plan or that Defendants and their other joint venture partners had conspired together to defraud Plaintiff in order to induce Plaintiff to invest in the investment scheme that Defendants had designed and Plaintiff did not know that Defendants engaged in self-dealing at Plaintiff's expense and Plaintiff did not know that Defendants had conflicts of interest in their representation of Plaintiff.

THIRD AMENDED COMPLAINT - Page 47 of 131

187. If Plaintiff had known that the investment plan was an abusive tax shelter and if Defendants had not misrepresented the nature of the investment plan and if Defendants had not concealed their joint venture to defraud Plaintiff, Plaintiff would not have entered into any of the contracts with Defendants related to the investment plan, and would not have paid Defendants the fees and charges related to the investment plan.

**A JOINT VENTURE CONSPIRACY IS FORMED AND ALL DEFENDANTS ARE PARTNERS**

188. The Senate Subcommittee investigation revealed that the Defendants, and each of them, were partners in a joint venture conspiracy along with other banks, investment advisors, accountants and lawyers, including KPMG and Sidley, Austin, Brown & Wood, Presidio and Deutsche Bank, whose common purpose and interest it was to design, promote, market and implement abusive tax shelters, including the investment program sold to Plaintiff, referred to as BLIPS.

189. The Senate Subcommittee examined approximately 220 million documents produced by various accounting firms, banks, investment advisory firms, and law firms pertaining to the investigation of tax shelters. The evidence clearly indicates a high degree of abuse of tax shelters among some of the firms investigated and demonstrates the existence of the joint venture alleged herein. The limited documents made public by the Senate Subcommittee from the millions of documents produced, only some of which are referenced in this Complaint support the allegations in this complaint that the Defendants participated as partners in a joint venture to defraud Plaintiff and other unsuspecting investors. These documents also show how the Defendants shared a common purpose, a

THIRD AMENDED COMPLAINT - Page 48 of 131

community of interest, had the right to equal voice, equal control and shared in the profits of their enterprise.

190. The Defendants intended to form a joint venture to design, promote, market, sell and implement financial products. In a KPMG memorandum dated December 16, 1997, which was authored by Randall S. Bickham of KPMG and sent to Gregg Ritchie of KPMG, with a copy to defendant R.J. Ruble of Brown & Wood, the author states:

> "To date, we have strategic alliances with Quadra and Presidio…. The initial step is to further strengthen our existing alliance with Presidio and to look for additional sources of product development. Secondly, we need to negotiate a formal strategic alliance with Brown & Wood."

191. In order for KPMG to develop its tax products practice and compete with other firms offering similar products, Randy Bickham of KPMG wrote in an internal memorandum dated August 30, 1998, to Doug Ammerman, as follows:

> "The business model is based upon the simple concept of investing in the development of a portfolio of elegant, high-value tax products and then maximizing the return on this investment though the PFP distribution network. The associated business strategy is premised upon two integral concepts: the establishment of strategic alliances to develop and market products and capitalizing upon the existing PFP distribution network. The conclusion to externalize substantive functions through participation in strategic alliances is based upon the premise that this approach provides the most expeditious strategy for establishing a predominant position in the targeted market. Such alliances will allow us to greatly accelerate the process of establishing a branded image for both the Practice and its products, access technical expertise not available to us internally and establish market relationships that are critical to developing the Practice."

> **"The existing alliances with Deutsche Bank and Brown & Wood exemplify this approach. We have used the existing OPIS product as the mechanism for establishing close strategic relationships with Deutsche Bank and with Brown & Wood at both an institutional level and with key individuals within the organizations.** In that the product development focus is on products which require the use of relatively complex financial securities and third party financing, these relationships are critical to our future success. **The strategy is to co-develop products with Deutsche Bank and Brown &**

THIRD AMENDED COMPLAINT - Page 49 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

**Wood and sell into the $1 to $5 million market segment on a joint basis. I have discussed the strategy of joint development and marketing with both institutions. The respective participants from each institution have agreed to commit the resources to participate in our internal product development group as well as to become active participants in the marketing process. "** Emphasis Added.

192. On December 15, 1997, J.R. Ruble of Brown & Wood confirmed the approval of his law firm to participate with KPMG to develop and market tax products and share in the fees.

"This morning, my managing partner, Tom Smith, approved Brown and Wood, LLP, working with the newly conformed tax products group at KPMG on a joint basis in which we would jointly develop and market tax products and jointly share in the fees as you and I have discussed."

193. Three months later, an internal KPMG memorandum discussing an upcoming meeting between KPMG and Brown & Wood states that KPMG tax professionals intended to discuss "how to institutionalize the KPMG/B&W relationship."  Among other items, KPMG planned to discuss "the key profit-drivers for our joint practice," citing in particular KPMG's "Customer list" and "Financial commitment" and Brown & Wood's "Institutional relationships within the investment banking community."  The memorandum states that KPMG also planned to discuss "[w]hat should be the profit-split between KPMG, B&W and the tax products group Implementor for jointly-developed products," and suggesting that in "a 7% deal" KPMG, B&W and the "Implementor" should split the net profits evenly, after awarding a "finder's allocation" to the party who found the tax product purchaser.  Still other documents indicate that Sidley Austin Brown & Wood, through Mr. Ruble, was an active participant in the development of BLIPS, expending significant time working with KPMG tax professionals to author their respective opinion letters.

THIRD AMENDED COMPLAINT - Page 50 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

194. Deutsche Bank was a partner in the joint venture as well, but took great pains to keep a very low profile.  In an e-mail message dated April 4, 1999, from Larry DeLap of KPMG to Jeffrey Zyslik of KPMG, DeLap queries the propriety of Deutsche Bank's involvement in the joint venture, since Deutsche Bank is an audit client of KPMG:.  "There are several parenthetical references to Deutsche Bank.  Will other banks be participating as lenders under similar terms?  In either case, we need to get clearance from DPP [Department of Professional Practice] -Assurance that Deutsche Bank's participation does not constitute an alliance or joint venture that would impact our independence with Deutsche Bank (which is a KPMG audit client).  However, if only Deutsche Bank is participating as lender, I think we know what DPP-Assurance's reaction is likely to be."

**Deutsche Bank and Presidio Had Equal Voice and Control in the Joint Venture**

195. Deutsche Bank participated in more than 50 BLIPS transactions in 1999 and 2000 providing credit lines that totaled as much as $2.8 billion.  Deutsche Bank internal documents projected that the bank earned more than $33 million from OPIS and expected to earn more than $30 million for BLIPS.

196.  Presidio participated in the development, marketing, and implementation of OPIS and BLIPS transactions including the 186 BLIPS transactions related to 186 KPMG clients.

197.  Bank documentation indicates that a number of internal bank departments, including the tax, accounting, and legal departments, were asked to and did approve the bank's participation in BLIPS.  BLIPS was also brought to the attention of the bank's Chief Executive Officer John Ross who made the final decision on the bank's participation.

THIRD AMENDED COMPLAINT - Page 51 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

198. Minutes describing the meeting in which Mr. Ross approved the bank's participation in BLIPS state:

> "[A] meeting with John Ross was held on August 3, 1999 in order to discuss the BLIPS product. [A bank representative] represented [Private Banking] Management's views on reputational risk and client suitability. John Ross approved the product, however insisted that any customer found to be in litigation be excluded from the product, the product be limited to 25 customers and that a low profile be kept on these transactions.... John Ross also requested to be kept informed of future transactions of a similar nature."

199. Deutsche Bank was a BLIPS promoter in its own right. For example, a document indicates that, in 1999, the Structured Transactions Group was offering over a dozen sophisticated tax products to U.S. and European clients seeking to "execute tax driven deals" or "gain mitigation" strategies.

200. During the late 1990s and early 2000, Deutsche Bank was also involved, either directly or through Bankers Trust (which Deutsche Bank acquired in June 1999), in a number of tax-driven transactions with Enron Corporation, including Project Steele, Project Cochise, Project Tomas and Project Valhalla.

201. Internal bank documents indicate that Deutsche Bank was aggressively marketing its tax products to large U.S. corporations and individuals, and planned to close billions of dollars worth of transactions.

202. Other Deutsche Bank documents suggest that the bank may have been helping KPMG find clients or otherwise marketing the BLIPS tax products. A November 1999 presentation by the bank's "Structured Finance Group," for example, listed BLIPS as one of several tax products the group was offering to U.S. and European.

THIRD AMENDED COMPLAINT - Page 52 of 131

203. The presentation listed as the bank's "strengths" its ability to lend funds in connection with BLIPS and its "relationships with [the] 'promoters'" later named as Presidio and KPMG.

204. The Deutsche Bank Structured Transactions Group was a principal with Presidio and KPMG in the BLIPS transactions as opposed to being merely a lender.

205. Prior to the development of the BLIPS tax shelter, Presidio worked with KPMG and Deutsche Bank in the development, implementation, and promotion of the FLIPS and OPIS tax shelters. Presidio initiated the development of BLIPS in the fall of 1998. The idea for BLIPS originated in discussions involving Pfaff, Larson, and two San Francisco based attorneys. To develop the idea further, Presidio hired David Amir Makov, formerly with Deutsche Bank, to provide economic and investment expertise.

206. The Defendants wanted to design a "turn-key" investment product that could easily be sold to multiple clients. A working group was formed sometime in 1998 in order to develop BLIPS.

207. At a meeting in May 1999, Presidio described BLIPS to other joint venture partners as presenting only a remote probability of producing a profit for the clients who bought it, thereby causing several KPMG tax professionals to recommend against approving the product for sale to clients. KPMG subsequently determined to approve BLIPS sales despite the concern of its tax professionals, but only after also requiring Presidio and each BLIPS purchaser to represent in writing that BLIPS provided a reasonable opportunity to produce a profit. None of the BLIPS transactions executed by KPMG clients ever actually made a profit. Presidio knew, before selling the investment program to Swartz, that it lacked economic substance.

THIRD AMENDED COMPLAINT - Page 53 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

208.  Presidio represented itself to the prospective investor/purchaser of BLIPS that it was the investment advisor and would implement the transactions as part of the investment program, including forming partnerships, executing trades, and working with banks to secure client loans and develop the trading strategies for the tax shelter transactions.

209.  All of the joint venture partners knew that BLIPS lacked economic substance.  The joint venture partners also knew that Presidio did not believe there was a reasonable opportunity that the investment program would make money, and they all knew that the offering Memorandum and the later opinion letters from KPMG and Brown & Wood misrepresented that Presidio believed there was a reasonable opportunity for the investment program to make money.  All of the Defendants concealed this information from Swartz.

210. The Presidio Defendants misrepresented to prospective investors, including Plaintiff, in their offering Memorandum that Presidio believed there was a reasonable opportunity for the investor, including Plaintiff, to earn a reasonable pre-tax profit from the investment program.  In truth, Presidio representatives disclosed to other joint venture partners during the design phase of BLIPS that there was only a "remote" possibility that any investor would actually profit from the contemplated foreign currency transactions, and that the banks providing the financing planned to retain, under the terms of the contemplated BLIPS "loans," an effective "veto" over how the "loan proceeds" could be invested.

211. Presidio knowingly made false factual representations that formed an essential part of the basis of the KPMG and Brown & Wood opinion letters.  The opinion letters state "[t]he Investment Fund entered into by the Investor [as part of the BLIPS

THIRD AMENDED COMPLAINT - Page 54 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

transaction] was established by Presidio as an investment that sought to provide investors with a high total return."  In fact, the "Investment Fund" was established by Presidio to help create the appearance of economic substance in the BLIPS transaction, when in reality the probability that an "Investor" could achieve any positive return, much less a high one, was remote.

212. Presidio Defendants misrepresented to prospective investors, including Plaintiff, in their offering Memorandum and elsewhere, that the investment program would be 7 years in duration.  In truth, they knew that Deutsche Bank insisted that the investment program be unwound within 60 days.  In a memorandum dated 4/20/99, Amir Makov of Presidio stated to John Rolfes of Deutsche Bank, "On day 60, Investor exits partnership and unwinds all trades in partnership."  All of the joint venture partners knew that the loan (investment program) would be unwound in 60 days but they all concealed this fact from Swartz.

213. The BLIPS product was finally approved for sale in August 1999, after the transactional documentation required by the BLIPS transactions was completed.  BLIPS was eventually approved over the objections of the WNT technical reviewer.  Presidio played a key role in making client presentations to sell the product and in executing the actual BLIPS transactions.

214. Deutsche Bank exercised equal control in the joint venture to design BLIPS.  In an internal Deutsche Bank memorandum dated circa May of 1999 Presidio Advisors are described as "a well-known client of DB."  The second and third pages of the memorandum contain an outline of Deutsche Bank's critical role in the BLIPS transactions.  The author notes that "the Company [or the client] will enter into a series of FX [foreign

THIRD AMENDED COMPLAINT - Page 55 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

currency] transactions, all approved by DB and all executed by DB." Furthermore, "DB will have the right to terminate the Company and its activities as it will retain the right to approve/disapprove all trading activity in the Company." Items 12 and 13 on page 2 of the document note that "it is imperative that the transaction be wound up after 45-60 days and the loan repaid due to the fact that the HNW [high net worth] individual will not receive his/her capital loss (or tax benefit) until the transaction is wound up and the loan repaid."

215. Not only does the memorandum in the preceding paragraph indicate the degree of control exercised by Deutsche Bank in the joint venture, it is also evidence of the power and control Deutsche Bank wielded over the investment funds. Under these circumstances Deutsche Bank had a fiduciary duty to the Plaintiff. Deutsche Bank breached its fiduciary duty through its control of the investment fund by failing to inform Swartz of Deutsche Bank's intention to control all currency trade transactions and to terminate the investment program in sixty days instead of 7 years as represented in Presidio's Prospectus Memorandum.

216. Deutsche Bank was aware that its participation as a joint venture partner in the design, promotion, sale and implementation of BLIPS carried risk to its reputation if its participation were revealed. Deutsche Bank was aware that BLIPS, as designed, and represented to the investor, and implemented by Deutsche Bank was fraudulent.

217. A year after Deutsche Bank began executing BLIPS transactions, a key bank official handling these transactions wrote an email which acknowledged the reputational risk these transactions posed to the bank:

> "During 1999, we executed $2.8b. of loan premium deals as part of the BLIP's approval process. At that time, NatWest and [HVB] had executed approximately $0.5 b. of loan premium deals. I understand that we based our limitations on

THIRD AMENDED COMPLAINT - Page 56 of 131

concerns regarding reputational risk which were heightened, in part, on the proportion of deals we have executed relative to the other banks. Since that time, [HVB], and to a certain extent NatWest, have participated in approximately an additional $1.0-1.5 b. of grandfathered BLIP's deals.... [HVB] does not have the same sensitivity to and market exposure as DB does with respect to the reputational risk from making the high-coupon loan to the client.:.. As you are aware, the tax benefits from the transaction potentially arise from a contribution to the partnership subject to the high-coupon note and not from the execution of FX positions in the partnership, activities which we perform in the ordinary course of our business."

218. This effort to contain or conceal discussion that would expose Deutsche Bank's foreknowledge of the fraudulent nature of the BLIPS transaction and of Deutsch Bank's participation in the joint venture was echoed by other Deutsche Bank officials.  In another e-mail from Mick Wood to Francesco Piovanetti, dated July 29, 1999, Woods provided further comments on a BLIPS summary being prepared for consideration by Deutsche Bank's Risk and Resources Committee [RRC].  In this message, Wood explicitly addresses the issue of the risk of a negative impact to Deutsche Bank's reputation by participating in the BLIPS scheme.  Wood wrote:

> "I think the problem here is that the paper skirts round the basic issue rather than addressing it head on (the tax reputational risk).  I can understand why you have adopted that approach.  I would have thought you could still ensure that the issues are highlighted by ensuring that the papers are prepared, and all the discussion held, in a way which makes them legally privileged.  (Francesco – you may remember that was one of my original suggestions.)  I have a number of quiries [sic] on that front which it might be best to discuss this with the lawyers present, which might preclude it for tomorrow's RRC. "

Wood expressed his realization that the BLIPS transaction was probably unlawful and his desire to cloak any discussion of Deutsche Bank's participation with the attorney-client privilege for the purpose of avoiding later discovery of incriminating documents (such as the one described here).

THIRD AMENDED COMPLAINT - Page 57 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

219. Another Deutsche Bank e-mail, dated July 30, 1999, from Ivor Dunbar to Mick Wood echoed some of the concerns that Wood had noted in his own communications, including reputational risk and use of the attorney-client privilege to mask Deutsche Bank's internal discussions of BLIPS. Dunbar concluded that privilege "is not easy to achieve and therefore a more detailed description of the tax issues is not advisable." Going further, Dunbar notes that, "In this transaction, reputation risk is tax related and we have been asked by the Tax Department not to create an audit trail in respect to the Bank's tax affaires."

220. Given the extensive and high level scrutiny provided by Deutsche Bank regarding its participation in BLIPS, it is clear that the bank had evaluated BLIPS carefully and knew that it was in all likelihood an illegal transaction.

221. Close coordination and cooperation among the joint venture partners, including Defendants herein, ensured that they could execute a large number of the complex BLIPS transactions. An example of their close relationship was expressed in an e-mail message dated September 13, 1999, from John Larson (Presidio) to Jeffrey Eischeid (KPMG). The crux of the message is a description of how the participants planned to accommodate the flow of BLIPS participants that had already (within two months or so) been enlisted. Larson noted that they had "25-28 deals on our active list with another 25 or so on our 'highly likely' list." Larson stated, "as an experiment last week I spent a day working out of DB's New York office. I found that being there I was able to trouble shoot very effectively. This made me think that a temporary Presidio outpost at the bank might be helpful. Conceivably, stationing someone knowledgeable from KPMG at the bank might also be good."

THIRD AMENDED COMPLAINT - Page 58 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

222. The close coordination between the Defendants predated their involvement in BLIPS. OPIS was an earlier tax shelter scheme that has, like BLIPS, been disallowed by the IRS. A KPMG Memorandum dated June 17, 1998, from Gregg W. Ritchie indicates how closely KPMG, Presidio, Brown & Wood and Deutsche Bank were working as early as one year before Defendants sold the BLIPS investment plan to Swartz. On page 2 of the document, Ritchie notes: "Presidio is working with Brown & Wood and other lawyers in the drafting of the required legal documents. Furthermore, they are in the process of working with Deutsche Bank (and their outside counsel) in drafting the required loan documents."

223. In addition to its facilitation of the BLIPS transactions through providing purported "loans" to fund the transactions, Deutsche Bank also participated in the marketing and promoting of these same investment programs. A November 1999 presentation by the bank's "Structured Finance Group" listed BLIPS as one of several tax products the group was offering to U.S. and European clients. The presentation also listed as one of the bank's strengths, its "relationship with [the] promoters," later identified as Presidio and KPMG.

224. Deutsche Bank was aware that the BLIPS loans it would be providing were not standard investment account loan transactions. For example, Deutsche Bank refused the request of the KPMG's BLIPS National Deployment Champion, to sign a letter representing that the BLIPS loan structure, which included a multi-million dollar "loan premium'' credited to the borrower's account at the start of the loan, (a $20 million loan premium in Plaintiff's case) was consistent with "industry standards." The BLIPS National Deployment Champion had asked Deutsche Bank to make this representation to provide

THIRD AMENDED COMPLAINT - Page 59 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

"comfort that the loan was being made in line with conventional lending practices."  When Deutsche Bank declined to make the requested representation, the BLIPS National Deployment Champion tried a second time, only to report to his colleagues: "The bank has pushed back again and said they simply will not represent that the large premium loan is consistent with industry standards."  He tried a third time and reported: "I've pushed really hard for our original language. To say they are resisting is an understatement."  The final tax opinion letter issued by KPMG contained compromise language which said little more than the loan complied with Deutsche Bank's own procedures:  "The loan . . . was approved by the competent authorities within [the Bank] as consistent, in the light of all the circumstances such authorities consider relevant, with [the Bank's] credit and documentation standards."  This same representation made by Deutsche Bank is found in the opinion letter issued by Brown and Wood to Gascoyne, dated December 31, 1999. Even this watered-down version is a misrepresentation by Deutsche Bank.

225. Each of the banks that participated in BLIPS made factual representations that varied slightly from bank to bank, but did not vary at all for a particular bank.  In other words, Deutsche Bank and HVB attested to slightly different versions of the factual representations attributed to the bank participating in the BLIPS transactions, but every BLIPS opinion letter that, for example, referred to Deutsche Bank, contained the exact same boilerplate language to which Deutsche Bank had agreed to attest.

226. Deutsche Bank also promoted BLIPS by actively enlisting other banks, including HVB to participate in the scheme and by sharing with HVB documents that Deutsche Bank had developed along with lawyers.

THIRD AMENDED COMPLAINT - Page 60 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

227. HVB's Statement of Admitted Facts states that "DeGiorgio advised other HVB officers that another bank had financed a number of the same transactions, and that the other bank wanted additional financial services providers to participate in the program." "HVB obtained a set of form transaction documents from a New York law firm ("Law Firm No.1") that had prepared them for the other bank referred to…" Plaintiff alleges on information and belief that the bank referred to in the Statement of Admitted Facts is Deutsche Bank.

228.  HVB states in its Statement of Admitted Facts that certain of the banking practices and procedures HVB engaged in relative to BLIPS were a departure from HVB's ordinary practices and inconsistent with routine banking procedures.  Plaintiff is informed and believes that HVB followed the same blueprint prepared and given to it by Deutsche Bank.  Plaintiff alleges on information and belief that Deutsche Bank engaged in certain banking practices and procedures that were the same or similar to those of HVB and that these, too, were a departure from Deutsche Bank's ordinary practices and inconsistent with routine banking procedures.

229. DeGiorgio admits in his guilty plea that "the loan proposed and put in place by the promoters was a sham because among other things, as designed, no money ever left the bank and because HVB never set aside any of its own money or procured funds from the banking market in order to fund any of these loans."

230. Plaintiff is informed and believes that Deutsche Bank is guilty of the same conduct admitted to by DeGiorgio and HVB because the loan proposed and put in place by Deutsche Bank and the other promoters of BLIPS was a sham because among other things, as designed, no money ever left the bank and Plaintiff is informed and believes that

THIRD AMENDED COMPLAINT - Page 61 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

1  Deutsche Bank never set aside any of its own money or procured funds from the banking

2  market in order to fund any of these loans.

3      231. Notwithstanding the representations by Defendants, Deutsche Bank and the other

4  Defendants, as promoters of BLIPS, well knew and understood the true facts as admitted to

5  by DeGiorgio, which are equally applicable to these Defendants, namely, that the true

6  duration of the investment program and the attendant "loans" was not seven years.  The

7  joint venture partners and Deutsche Bank all knew among themselves that the transactions

8  of which the "loans" were a part would terminate in approximately 60 days.  The purported

9  "loans" of billions of dollars made by Deutsche Bank and HVB, which "loans" were

10  integral to the tax losses ultimately claimed by Plaintiff and the other investor participants

11  of BLIPS, were not *bona fide* "loans" because the "loan" funds had to be kept in accounts

12  at Deutsche Bank as full collateral for the "loans".  This is contrary to the statements and

13  representations made by Defendants as promoters of BLIPS as the "loan" did not provide

14  any leverage for, and was not otherwise connected to, the purported investment component

15  of the BLIPS transactions because the "loan" funds could not be employed in the purchase

16  of positions in foreign currencies pegged to the United States dollar.  The purchase of

17  positions in foreign currencies was the centerpiece of the purported "investment strategy"

18  underlying the BLIPS transactions and there was no reasonable expectation among any of

19  the Defendants that the purported investment component of the BLIPS transactions would

20  produce a profit, exclusive of fees and costs.  The joint venture partners of BLIPS

21  themselves acknowledged, the profit potential was, at best, "remote"; and Deutsche Bank

22  never set aside any of its own funds or procured funds from the banking market to actually

23  fund, or advance actual monies for, any of the sham BLIPS related "loans".

24

25

26

THIRD AMENDED COMPLAINT - Page 62 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

232. According to a public bulletin prepared by the U.S. Attorney's Office for the Southern District of New York, during his guilty plea, DeGiorgio admitted further that there were other false and misleading aspects of BLIPS that he recognized to be false and misleading at the time, including that:

> "BLIPS was falsely represented to be a three-stage, seven-year investment program, when in reality it was, as described by him and the promoters, a short-term transaction designed to create tax losses; and the BLIPS promoters falsely claimed that the "investment" component of the program was "leveraged," when it was not – the purported "loan" was not used in the relatively small trades relating to two foreign currencies (the Argentine Peso and the Hong Kong dollars). DeGiorgio stated in his plea that, in reality, those trades were all executed using and secured by cash that was advanced by the BLIPS clients. These Peso and Hong Kong dollar trades were not "secured" by the purported loan; in fact, the purported "loan" had nothing to do with those trades, according to DeGiorgio's plea."

233. Presidio and Deutsche Bank were both involved in the design of BLIPS and had an equal voice and control regarding design. Deutsche Bank even had control and a veto power over how the loan proceeds would be invested. At meetings held on April 30 and May 1, 1999 a number of KPMG tax professionals working on BLIPS, including Mark Watson, the chief reviewer of tax products and assigned to the review of BLIPS, attended a meeting with Presidio to discuss how the investments called for by the product would actually be carried out. At these meetings, the Presidio representative made a number of statements about how the BLIPS transactions would operate. On May 4, 1999, Watson wrote to Lawrence DeLap, the head of the Department of Practice and Professionalism, stating that:

> "Larry, while I am comfortable that WNT did its job reviewing and analyzing the technical issues associated with BLIPS, based on the BLIPS meeting I attended on April 30 and May 1, I am not comfortable issuing a more-likely-than-not letter [with respect to] this product [*i.e.*, BLIPS] for the following reasons:

THIRD AMENDED COMPLAINT - Page 63 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

... [T]he probability of actually making a profit from this transaction is remote (possible, but remote);

The bank will control how the "loan" proceeds are invested via a veto power over Presidio's investment choices; and

It appears that the bank wants the "loan" repaid within approximately 60 days....

Thus, I think it questionable whether a client's representation [in a tax opinion letter] that he or she believed there was a reasonable opportunity to make a profit is a reasonable representation. Even more concerning, however, is whether a loan was actually made. If the bank controls how the loan proceeds are used and when they are repaid, has the bank actually made a bona fide loan?

I will no doubt catch hell for sending you this message. However, until the above issues are resolved satisfactorily, I am not comfortable with this product."

234. Despite the above-alleged objections and reservations from the very individuals assigned to evaluate the legitimacy of BLIPS, the joint venture partners, including KPMG, Presidio, Brown & Wood, Deutsche Bank, and the other Defendants named herein, marketed, sold and implemented this investment program for a combined total of 186 clients in 1999 and 2000, including Plaintiff, for which Defendant Deutsche Bank did most of the loans.

235. Defendants, and each of them, deliberately traded on their reputations as respected accounting firms, banks, tax experts and law firms in selling abusive tax products as legitimate investment programs to corporations and individuals. As alleged above, Weisner, then head of KPMG's National Tax Practice, acknowledged that KPMG's "reputation will be used to market the [BLIPS] transaction. This is a given in these types of deals."

THIRD AMENDED COMPLAINT - Page 64 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

**AGREEMENT TO DIVIDE BASIS POINTS AMONG PRINCIPLES OF THE**

**JOINT VENTURE**

236. All of the joint venture partners shared in the profits of the joint venture.  The profits were allocated among the joint venture partners in advance by a system of basis points.  Unbeknownst to the investor, the total amount of fees the joint venture partners charged to the investor was 7% of the amount of tax loss the joint ventures calculated in advance  the investor would realize when the investment program lost money and was "unwound."  The investor was then told the amount of "Initial Capital Contribution" he was required to invest to participate in the investment program, which, unbeknownst to the investor was the same 7% figure.  In this way, the joint ventures knew that the investor was going to lose his Initial Capital Contribution, because the joint venture partners were planning on eating up the entire amount by the fees they would eventually charge.

237. Jeff Eischeid, the KPMG BLIPS National Deployment Champion wrote the following description of BLIPS and recommended that fees be set at 7% of the generated "tax loss" that clients were expected to achieve on paper from the BLIPS transactions and could then purportedly claim as an offset and shelter other income from taxation:

> "BLIPS ...  [A] key objective is for the tax loss associated with the investment structure to offset/shelter the taxpayer's other, unrelated, economic profits.  ...  The all-in cost of the program, assuming a complete loss of investment principal, is 7% of the targeted tax loss (pretax).  The tax benefit of the investment program, which ranges from 20% to 45% of the targeted tax loss, will depend on the taxpayer's effective tax rates.
>
> FEE: BLIPS is priced on a fixed fee basis which should approximate 1.25% of the tax loss.  Note that this fee is included in the 7% described above."

238. Another document, an email sent from Presidio to KPMG, provides additional detail on the 7% fee charged to BLIPS clients, ascribing "basis points" or portions of the

THIRD AMENDED COMPLAINT - Page 65 of 131

7% fee to be paid to various participants for various expenses.  All of these basis points, in turn, depended upon the size that the joint venture partner's expected the investor's tax loss should be.  The email states:

> "The breakout for a typical deal is as follows:
>
>> Bank Fees 125
>> Mgmt Fees 275
>> Guaranteed Pymt.  8
>> Net Int.  Exp.  6
>> Trading Loss 70
>> KPMG 125
>> Net return to Class A 91
>
> Please note that the Net Int. exp. Trading loss will vary from deal to deal.  This will cause some changes to the net return to Class A."

239. The 2003 Senate Report at page 103 states, "Virtually all BLIPS clients were charged this 7% fee."  Plaintiff's Exhibit 2, pg 103..

240. Plaintiff's "Initial Capital Contribution" amount was $1.4 million. The fees charged by KPMG were $250,000.  The management fees charged by Presidio were $550,000.   Using the above table, we know that $250,000 divided by the 125 basis points assigned to KPMG equals $2,000.  We also know that $550,000 divided by the 275 basis point allocated to Presidio as a management fee also equals $2,000.  Therefore we know that under the joint venture formula for sharing basis points among the participants, one basis point equals $2,000 in profits to the joint venture partners from Plaintiff's investment program.

241.The bank was to get its share of the profits, too, under the BLIPS scheme, equal to 125 basis points.  If the joint venture partners used the same formula to apportion their share of the profits in Plaintiff's Initial Capital Contribution, Deutsche Bank should have received a fee of $250,000 because 125 basis points are allocated to bank fees.  Consistent

THIRD AMENDED COMPLAINT - Page 66 of 131

1

2

with this prediction, the Deutsche Bank Structured Transaction Group charged an origination fee of $200,000 and a custody fee of $50,000 for a total fee of $250,000.

3

4

5

6

242. The fact that Deutsche Bank's fees were charged based on a percentage of the breakout for a typical deal is further proof that Deutsche Bank was a joint venture partner in the BLIPS transaction as opposed to being merely a lender and only charging interest in the transaction.

7

8

9

10

243. The representation in the table above that the joint venture partners allocated 70 basis points based on "trading losses" indicates that both the loan and the trades which were allegedly originated by Deutsche Bank were a sham.

11

**The Joint Venture Partner Defendants Used "Canned" Prototype Opinion Letters That Contained Misrepresentations.**

12

13

14

15

16

17

244. Tax opinion letters are intended to provide written advice explaining whether a particular tax product is permissible under the law and, if challenged by the IRS, the likelihood that the tax product would survive court scrutiny. A tax opinion letter provided by a person with a financial stake in the tax product being analyzed has traditionally been accorded much less deference than an opinion letter provided by a disinterested expert.

18

19

20

21

22

245. Presidio and KPMG purported to arrange the law firms of Brown & Wood, Holland & Hart and Walter, Conston, Alexander & Green to provide opinion letters regarding the investment program and represented to Plaintiff that these law firms were independent and did not have any conflicts of interest with Plaintiff.

23

24

25

26

246. Presidio and KPMG misrepresented to Plaintiff that Brown & Wood, Holland & Hart and Walter, Conston, Alexander & Green were independent and did not have any conflicts of interest with Plaintiff. In fact, Brown & Wood, Holland & Hart and Walter,

THIRD AMENDED COMPLAINT - Page 67 of 131

Conston, Alexander & Green are themselves partners in the joint venture along with

KPMG, Presidio and the other Defendants herein, to design, promote, market and

implement abusive tax shelters, including BLIPS.  Neither the authors of the opinion

letters nor any of their other joint venture partners disclosed to Plaintiff the facts, which

they all knew to be true, that they and the other Defendants named herein were partners in

the same joint venture, that they had conflicts of interest with Plaintiff, that they were not

truly independent counsel, that the opinion letters contained material misrepresentations of

fact, that the opinions expressed in the letters were phony, and that the investment plan

was an abusive tax shelter.

247. All of the joint venture partners, including Defendants herein, and each of them,

knew the form and substance of these opinion letters long before they were ever provided

to Plaintiff, even factual representations regarding events that had not yet occurred.

248. Plaintiff, on the other hand, did not know in advance what the opinion letters

would say, but KPMG had represented to Plaintiff before Plaintiff invested in the

investment plan that he would be provided with opinion letters that KPMG would provide

him "that addresses the U.S. Federal income tax consequences associated with

participation in the investment program based upon your unique facts and circumstances,"

and that "with respect to the tax consequences described in the opinion, there is a greater

than 50% likelihood (i.e., it is "more likely than not") that those consequences will be

upheld if challenged by the Internal Revenue Service."

249. Plaintiff decided to invest in the investment plan in reliance on the above

assurances that he would at some point in the future receive an opinion letter from KPMG

that would address the U.S. Federal income tax consequences associated with his

THIRD AMENDED COMPLAINT - Page 68 of 131

participation in the investment program, and that would be based on Plaintiff's "unique facts and circumstances," and that there would be "a greater than 50% likelihood" that those tax consequences will be upheld if challenged by the IRS.

250. Brown & Wood LLP and KPMG both issued separate opinion letters to Swartz, on December 31, 1999. These opinion letters, the expected receipt of which were the inducement for Plaintiff's decision to participate in the investment plan, contain material misrepresentations and conceal other material facts.

251. The joint venture Defendants misrepresented to Plaintiff that they were independent of each other. None of them disclosed the fact of their involvement in the joint venture or the conflict of interest that fact created. Brown & Wood, Holland & Hart and Walter, Conston, Alexander & Green were themselves partners in the joint venture alleged herein, but failed and refused to disclose that fact to Plaintiff.

252. In a memorandum dated July 23, 2000 from Kerry Bratton of Presidio regarding a meeting with KPMG, Presidio confirmed that investors could be given a choice between two law firms to "write" an opinion letter: Brown & Wood or Holland & Hart. Holland & Hart was also listed on HVB documents as the firm to go to for preparation of UCC-3 filings associated with BLIPS loans. Plaintiff's Exhibit 2, Senate Exhibit 124, "Back-End Process," undated.

253. According to a letter from Holland & Hart to Steven Buss of Presidio, dated February 4, 2000, Holland & Hart had been retained to file Certificates of Cancellation of the LLC in at least 22 other BLIPS deals.

254. As early as July 29, 1999, Walter, Conston, Alexander & Green was a member of the BLIPS Working Group List and was on the Distribution List to receive advance copies

THIRD AMENDED COMPLAINT - Page 69 of 131

and revisions to all of the transactions documents related to BLIPS. Walter, Conston, Alexander & Green was listed on a BLIPS Example Timeline, dated September 14, 1999, as the firm to forward Credit Documents to the investor and receive signed Credit Documents back from the investor. The Credit Documents facilitated Deutsche Bank making its sham loan to the Investment Fund.

255. All of the law firms possessed material facts about the investment program that they kept concealed from the Plaintiff. None of the joint venture partners were independent. All of the joint venture partners knew that Holland & Hart, Walter, Conston, Alexander & Green and Brown & Wood could not be relied upon to render an independent opinion pertaining to BLIPS, but Plaintiff did not know this and was not told this by any of the Defendants, including anyone from any of the law firms.

256. If, prior to the time of entering into the investment, Plaintiff had known that the opinion letters he eventually would receive from KPMG and Brown & Wood would contain material representations, he would not have invested in the investment plan.

257. In the case of factual representations attributed to Swartz, KPMG did not consult with Swartz beforehand, even for representations purporting to describe, in a factual way, Swartz' intention, motivations, or understanding of the tax product. The joint venture partners alone, without any input from Swartz whatsoever, wrote the representations attributed to Swartz and then KPMG demanded that Swartz attest to them by returning a signed letter to KPMG.

258. Key factual representations that the joint venture partners attributed to the investor in the BLIPS prototype letter that went out under the KPMG letterhead are false and misleading. For example, the letter states: "Investor has represented to KPMG…[that the]

THIRD AMENDED COMPLAINT - Page 70 of 131

Investor independently reviewed the economics underlying the [BLIPS] Investment Fund before entering into the program and believed there was a reasonable opportunity to earn a reasonable pre-tax profit from the transactions." The existence of a client motive and the existence of a reasonable opportunity to earn a reasonable pre-tax profit are central factors in determining whether a tax product like BLIPS has a business purpose and economic substance apart from its tax benefits. This client representation was repeated substantially verbatim in every BLIPS tax opinion letter the joint venture partners drafted and issued under the KPMG letterhead.

259. The opinions in both the KPMG and Brown & Wood opinion letters purport to be based on truthful representations made by Presidio and Deutsche Bank.  However, all of the joint venture partners, including KPMG, Brown & Wood, Presidio, Deutsche Bank and each of the Defendants herein, knew before Plaintiff invested in the investment program that the opinion letters would contain these representations and that certain of the representations were false, and that Plaintiff was induced to invest in the investment program in reliance on the assurances from Defendants, and each of them, that he would receive an honest, genuine opinion letter "that addresses the U.S. Federal income tax consequences associated with participation in the investment program based upon your unique facts and circumstances," and that "with respect to the tax consequences described in the opinion, there is a greater than 50% likelihood (i.e., it is "more likely than not") that those consequences will be upheld if challenged by the Internal Revenue Service.

**The Representations By Presidio And Deutsche Bank In KPMG Opinion Letters Were Negotiated In Advance of Swartz Entering Into BLIPS and Defendants Knew They Were False And Misleading**.

THIRD AMENDED COMPLAINT - Page 71 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

260. If Plaintiff had known that BLIPS was an abusive tax shelter and that the representations in the KPMG opinion that were negotiated in advance were false and misleading, Plaintiff would not have entered into any of the contracts with Defendants related to BLIPS and Plaintiff would not have paid Defendants the fees and charges related to BLIPS.

261. Before BLIPS was ever presented to Plaintiff, when it was still in its planning stages, Philip Weisner, National Tax Practice head of KPMG, one of the primary promoters of BLIPS, posed a cynical yet telling question to others in KPMG: "Are we being paid enough to offset the potential risks of litigation resulting from this transaction?" Despite knowing that BLIPS was an abusive tax shelter, Defendants decided to design, promote and sell it to Plaintiff and hundreds of other similarly innocent, unsuspecting investors.

262. Presidio initially brought the idea for BLIPS to KPMG, and was thoroughly involved in the development, marketing, and implementation of the product. From the beginning Presidio put pressure on KPMG tax professionals to quickly approve the new product for sale to clients even though there was unresolved debate among KPMG tax professionals over whether BLIPS was a legitimate investment program that met the technical requirements of federal tax law. The debate continued even after BLIPS was approved for sale.

> "Given the marketplace potential of BLIPS, I think a month is far too long – especially in the spirit of 'first to market'. I'd like for all of you, within the bounds of good professional judgment, to dramatically accelerate this timeline. … I'd like to know how quickly we can get this product to market."

THIRD AMENDED COMPLAINT - Page 72 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

263. On February 19, 1999, almost a dozen KPMG WNT tax experts held an initial meeting to discuss the technical issues involved in BLIPS.  Six major issues were identified, the first two of which posed such significant technical hurdles that, according to the technical reviewer, most participants left the meeting thinking the product was "dead." Some of the most difficult technical questions, including the question of whether the BLIPS transactions had economic substance, were assigned to two of KPMG's most senior tax partners.

264. On March 5, 1999 KPMG determined that their technical concerns had been resolved.  The KPMG senior tax partners continued to work on other technical issues related to the project.  Almost two months later, on April 27, 1999, the partners sent an email to the head of DPP stating that they would be comfortable issuing a more-likely-than-not opinion on BLIPS.

265. Three days later, at meetings held on April 30 and May 1, a number of KPMG tax professionals working on BLIPS attended a meeting with Presidio to discuss how the investments called for by the product would actually be carried out.  On May 1, 1999, prior to the final approval of BLIPS, Presidio representatives made a detailed presentation to KPMG tax professionals on how the company was planning to implement the BLIPS transactions.

266. During the presentation, Presidio representatives disclosed that there was only a "remote" possibility that any investor would actually profit from the contemplated foreign currency transactions, and that the banks providing the financing [Deutsche Bank] planned to retain, under the terms of the contemplated BLIPS "loans," an effective "veto" over how the "loan proceeds" could be invested.   These statements, among others, caused

THIRD AMENDED COMPLAINT - Page 73 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

KPMG's key technical reviewer in the Washington National Tax group to reconsider his

approval of the BLIPS product, in part because the partners felt they had "not been given

complete information about how the transaction would be structured."

267. On May 4, 1999, a KPMG technical reviewer wrote to a KPMG partner

expressing doubts about approving BLIPS:

> "Larry, while I am comfortable that WNT did its job reviewing and analyzing the technical issues associated with BLIPS, based on the BLIPS meeting I attended on April 30 and May 1, I am not comfortable issuing a more-likely-than-not opinion letter [with respect to] this product for the following reasons:...[T]he probability of actually making a profit from this transaction is remote (possible, but remote); The bank will control how the 'loan' proceeds are invested via a veto power over Presidio's investment choices; and It appears that the bank wants the 'loan' repaid within approximately 60 days….Thus, I think it is questionable whether a client's representation [in a tax opinion letter] that he or she believed there was a reasonable opportunity to make a profit is a reasonable representation.  Even more concerning, however, is whether a loan was actually made.  If the bank controls how the loan proceeds are used and when they are repaid, has the bank actually made a bona fide loan?  I will no doubt catch hell for sending you this message.  However, until the above issues are resolved satisfactorily, I am not comfortable with this product."

> Email dated 5/4/99, from Mark Watson to Larry DeLap, Bates KPMG 0011916.

268. The KPMG Partner responded:

> "It is not clear to me how this comports with your April 27 message [expressing comfort with BLIPS], but because this is a PFP product and you are the chief PFP technical resource, the product should not be approved if you are uncomfortable." The WNT PFP technical reviewer responded that he had learned new information about how the BLIPS investments would occur, and it was this subsequent information that had caused him to reverse his position on issuing a tax opinion letter supporting the product."

269. On May 7, 1999 the head of DPP forwarded the WNT PFP technical expert's

email to the leadership of the tax group and noted: "I don't believe a PFP product should

be approved when the top PFP technical partner in WNT believes it should not be

approved."  Email dated 5/7/99, from Larry Delap to three KPMG tax professionals, with

THIRD AMENDED COMPLAINT - Page 74 of 131

copies to John Lanning, Vice Chairman of the Tax Services Practice, and Jeffrey Stein, second in command of the Tax Services Practice, Bates KPMG 0011905.

270. On May 8, 1999, the head of KPMG's Tax Services Practice wrote: "I must say that I am amazed that at this late date (must now be six months into this process) our chief WNT PFP technical expert has reached this conclusion. I would have thought that Mark would have been involved in the ground floor of this process, especially on an issue as critical as profit motive. What gives? This appears to be the antithesis of 'speed to market.' Is there any chance of ever getting this product off the launching pad, or should we simply give up???"

271. On May 9, one of the senior WNT partners supporting BLIPS sent an email to one of the WNT technical reviewers objecting to BLIPS and asked him: "Based on your analysis…do you conclude that the tax results sought by the investor are NOT 'more likely than not' to be realized?" The technical reviewer responded: "Yes."

272. On May 10, the head of the WNT sent an email to five WNT tax professionals:

"Gentlemen: Please help me on this. Over the weekend while thinking about WNT involvement in BLIPS I was under the impression that we had sent the transaction forward to DPP Tax on the basis that everyone had signed off on their respective technical issues(s) and that I had signed off on the overall more likely than not opinion. If this impression is correct, why are we revisiting the opinion other than to beef up the technical discussion and further refine the representations on which the conclusions are based. I am very troubled that at this late date the issue is apparently being revisited and if I understand correctly, a prior decision changed on this technical issue?! Richard, in particular, jog my memory on this matter since I based my overall opinion on the fact that everyone had signed off on their respective areas?"

273. A few hours later, the head of WNT sent eight senior KPMG tax professionals, including the Tax Services Practice head, DPP head, and the WNT PFP technical reviewer, a long email message urging final approval of BLIPS. He wrote in part:

THIRD AMENDED COMPLAINT - Page 75 of 131

"Many people have worked long and hard to craft a tax opinion in the BLIPS transaction that satisfies the more likely than not standard.  I believed that we in WNT had completed our work a month ago when we forwarded the [draft] opinion to Larry…."

[T]his is a classic transaction where we can labor over the technical concerns, but the ultimate resolution - if challenged by the IRS - will be based on the facts (or lack thereof).  In short, our opinion is only as good as the factual representations that it is based upon. …The real 'rubber meets the road' will happen when the transaction is sold to investors, what the investors' actual motive for investing the transaction is and how the transaction actually unfolds. … Third, our reputation will be used to market the transaction.  This is a given in these types of deals.  Thus, we need to be concerned about who we are getting in bed with here.  In particular, do we believe that Presidio has the integrity to sell the deal on the facts and representations that we have written our opinion on?! ...

Having said all the above, I do believe the time has come to shit and get off the pot.  The business decisions to me are primarily two: (1) Have we drafted the opinion with the appropriate limiting bells and whistles ...  and (2) Are we being paid enough to offset the risks of potential litigation resulting from the transaction? ...  My own recommendation is that we should be paid a lot of money here for our opinion since the transaction is clearly one that the IRS would view as falling squarely within the tax shelter orbit.  ...."

274. The same day, the WNT PFP technical reviewer wrote to the head of the Tax Services Practice:

"John, in my defense, my change in heart about BLIPS was based on information Presidio disclosed to me at a meeting on *May 1*.  This information raised serious concerns in my mind about the viability of the transaction, and indicated that WNT had not been given complete information about how the transaction would be structured.  I want to make money as much as you do, but I cannot ignore information that raises questions as to whether the subject strategy even works.  Nonetheless, I have sent Randy Bickham four representations that I think need to be added to our opinion letter.  Assuming these representations are made, I am prepared to move forward with the strategy."

275. A meeting was held on May 10, to determine how to proceed.  The WNT head, the senior WNT partner, and the two WNT technical reviewers decided to move forward on BLIPS, and the WNT head asked the technical reviewers to draft some representations

THIRD AMENDED COMPLAINT - Page 76 of 131

that, when relied upon, would enable the tax opinion writers to reach a more likely than

not opinion.  The WNT head reported the outcome of the meeting in an email:

> "The group of Wiesner, R Smith, Watson and Rosenthal met this afternoon to
> bring closure to the remaining technical tax issues concerning the BLIPS
> transaction.  After a thorough discussion of the profit motive and who is the
> borrower issue, recommendations for additional representations were made (Mark
> Watson to follow up on with Jeff Eischeid) and the decision by WNT to proceed
> on a more likely than not basis affirmed.  Concern was again expressed that the
> critical juncture will be at the time of the first real tax opinion when the investor,
> bank and Presidio will be asked to sign the appropriate representations.  Finally, it
> should be noted that Steve Rosenthal expressed his dissent on the who is the
> investor issue, to wit, "although reasonable people could reach an opposite result,
> he could not reach a more likely than not opinion on that issue."

276. After receiving this email, the DPP head sent an email to the WNT PFP technical

reviewer asking whether he would be comfortable with KPMG's issuing a tax opinion

supporting BLIPS.  The WNT PFP technical reviewer wrote: "Larry, I don't like this

product and would prefer not to be associated with it.  However, if the additional

representations I sent to Randy on May 9 and 10 are in fact made, based on Phil Wiesner's

and Richard Smith's input, I can reluctantly live with a more likely-than-not opinion being

issued for the product."

277. BLIPS was approved over the objections of the WNT technical reviewer and

Presidio played a key role in making client presentations to sell the product and in

executing the actual BLIPS transactions.  One of the most important roles Presidio played

in BLIPS was as "managing member" of the participating Limited Liability Company in

each BLIPS transaction.  In connection with BLIPS, the members of Presidio created

Presidio Growth and Presidio Resources, to direct and control a "Strategic Investment

Fund" partnership specific to each BLIPS client.  The direction and control of each

"Strategic Investment Fund" was central to the entire BLIPS transaction as represented in

THIRD AMENDED COMPLAINT - Page 77 of 131

the Prospectus prepared by Presidio because these entities assumed control of the entire BLIPS investment and managed the Deutsche Bank credit agreement.

278. In each BLIPS transaction, a Presidio company acted as both an equity member of the "Strategic Investment Fund" and as the managing partner for the "Strategic Investment Fund." As a partner, Presidio had a fiduciary duty to the other member of the strategic investment fund. In order to become a member, Presidio contributed a small portion of the funds used in the BLIPS transaction to the "Strategic Investment Fund." Moreover, Presidio had a fiduciary duty as the Registered Investment Advisor to the fund.

279. Presidio also performed administrative tasks that, were critical to the success of the the tax product. For example, when BLIPS was just starting to get underway, Presidio took several steps to facilitate the transactions, including stationing personnel at one of the law firms preparing the transactional documents. "Presidio has 2 individuals permanently housed at Sherman & Sterling to assist in the necessary documentation." Sherman & Sterling prepared many of the key transactional documents for BLIPS transactions involving Deutsche Bank.

280. Over the course of 1999 and 2000, KPMG and Presidio sold BLIPS to 186 individuals and obtained more than $50 million in fees, making BLIPS one of its highest revenue-producing tax products to date. Presidio participated in the development, marketing, and implementation of OPIS and BLIPS transactions including the 186 BLIPS transactions related to 186 KPMG clients.

281. The events and communications leading to BLIPS' approval for sale are troubling and revealing for a number of reasons. First, they show that senior KPMG tax professionals knew the proposed tax product, BLIPS, was "clearly one that the IRS would

THIRD AMENDED COMPLAINT - Page 78 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

view as falling squarely within the tax shelter orbit." Second, they show how important "speed to market" was as a factor in the review and approval process.  Third, they show the interpersonal dynamics that, in this case, led KPMG's key technical tax expert to reluctantly agree to approve a tax product that he did not support or want to be associated with, in response to the pressure exerted by senior Tax Services professionals to approve the product for sale.

282. The email exchange immediately preceding BLIPS' approval for sale also indicates a high level of impatience by KPMG tax professionals in dealing with new, troubling information about how the BLIPS investments would actually be implemented by the outside investment advisory firm, Presidio.  Questions about this outside firm's "integrity" and how it would perform were characterized as questions of risk to KPMG that could be resolved with a pricing approach that provided sufficient funds "to offset the risks of potential litigation."

283. Moreover, the email exchange shows that the participants in the approval process, who were all senior KPMG tax professionals, knew they were voting for a dubious tax product that would be sold in part by relying on KPMG's "reputation."

284. The above aspects of the technical  review of BLIPS  were concealed and misrepresented in the BLIPS opinion letters. By plan and design, the BLIPS opinion letters concealed and misrepresented material facts in order to reach a "more likely than not" legal opinion. If the true facts had been presented, a "more likely than not" opinion would not have been rendered and Swartz would not have been induced to enter into the BLIPS transaction.

THIRD AMENDED COMPLAINT - Page 79 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

285. The BLIPS opinion letter, which was drafted and approved prior to the execution of any BLIPS transaction, falsely misrepresents the facts. The opinion letter fails to disclose the true series of transactions in BLIPS which were pre-planned by the promoters. Instead, the opinion letter falsely claims that the transactions were entered into according to Presidio's investment plan, which was to engage in a three-stage, seven year investment program and that in the midst of the transaction, the plan was abandoned by the investor. In truth, Presidio and Deutsche Bank collaborated to use economic pressure to force the termination of the investment and the credit agreement within 60-90 days after the initial investment without disclosing this to the investor.

286. The Credit Agreement was not intended to be used to facilitate foreign currency trades. Despite provisions in the written documents that might allow the funds to be used to invest in the high risk foreign currency transactions marketed by Presidio, Deutsche Bank and Presidio understood that the funding amount provided by Deutsche Bank would never be put to such uses. Deutsche Bank's protection comes from the limited scope of "Permitted Investments" and the Collateral Value" acceleration trigger. As to permitted investments, Deutsche Bank exercised full control, custody, and security over all investments allegedly managed by Presidio.

287. Although Presidio charged a fee of $550,000 for having a $53 million Deutsche Bank Credit facility under management, Presidio understood that the bank would hold the funding amounts in relatively risk-free time deposits for only 60 days and would not allow them to be used as leverage for high risk foreign currency trading. Deutsche Bank and Presidio failed to disclose a prearranged agreement that the parties would use economic

THIRD AMENDED COMPLAINT - Page 80 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

pressure to force the termination of the credit agreement within 60 days of the

commencement date.

288. The prearranged termination was concealed in the opinion letter.  If the

prearranged termination were disclosed in the opinion letter, KPMG could not have issued

a "more likely than not" opinion because the Presidio investment plan would have to

disclose that there was no reasonable expectation that the Presidio investment plan could

earn a profit after Presidio's fees of $550,000 over a 60 day period.

289. The fact that the conspirators drafted, but did not issue, an opinion letter prior to

executing any BLIPS transactions demonstrates that BLIPS was always intended to

consist of a series of preplanned events from commencement to termination.

**PRESIDIO AND DEUTSCHE BANK FAILED TO DISCLOSE THAT THE
REPRESENTATIONS THEY GAVE TO KPMG WHICH WERE USED IN THE
KPMG OPINION LETTER WERE NEGOTIATED IN ADVANCE OF SWARTZ
ENTERING INTO THE BLIPS TRANSACTION AND WERE FALSE AND
MISLEADING.**

290. The Senate Report clearly establishes that KPMG had independently negotiated

the representations contained in the opinion letter prior to September 1, 1999, the date

Swartz signed his engagement letter with KPMG.  Identical representations were given to

Brown & Wood and R.J. Ruble and used in an "independent" "more likely than not"

opinion in connection with the BLIPS strategy.  The Senate Report clearly established that

the "more likely than not" opinion was drafted by KPMG before Swartz entered into the

BLIPS Investment Strategy.

**PRESIDIO AS A PRIMARY PARTICIPANT IN THE FRAUDULENT
REPRESENTATIONS IN CONNECTION WITH THE PROMOTION OF BLIPS**

THIRD AMENDED COMPLAINT - Page 81 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

291. The facts set forth herein give rise to a strong inference that the Presidio Defendants acted with actual knowledge, or at the least, recklessness, in making false and misleading statements and omissions and in participating in the fraudulent tax shelter scheme, as shown by the following written representations made by Presidio in the KPMG opinion letter Dated December 31, 1999 and in the Brown & Wood opinion letter dated December 31, 1999:

1. Presidio believed there was a reasonable opportunity for Investor to earn a reasonable pre-tax profit, in excess of all associated fees and costs, and without regard to any tax benefits that may occur, by participating in the Investment Fund.

2. Presidio acted independently of, and at arm's length from, Investor and Deutsche Bank AG with respect to the transactions described herein.

3. Deutsche Bank AG did not, directly or indirectly, control or participate in the management or operations of Partnership.  [Partnership is referenced as Longs Strategic Investment Fund, LLC]

4. Deutsche Bank AG did not, directly or indirectly, control or direct the investments of Partnership apart from its rights under a. Pledge and Security Agreement, Credit Agreement, and Account Control Agreement.

5. All of Partnership's foreign currency transactions were conducted over the counter.  Therefore, Partnership did not undertake transactions on a national securities exchange registered with the Securities and Exchange Commission. Furthermore, Partnership did not undertake transactions on a domestic board of trade designated as a contract market by the Commodity Futures Trading Commission.

6. There did not exist at the time Investor or any assignee entered into trading strategies, within the range of Permitted Investments, an Event of Default under the terms of the Credit Agreement.

7. Neither the Investor nor any assignee entered into trading strategies, within the range of Permitted Investments, in a manner that results in or causes an Event of Default under the terms of the Credit Agreement.

8. The Loan collateral and covenants were not altered or amended upon assumption of the Loan by Partnership.

9. The descriptions of the Investment Fund and the economics of the financing arrangement used by Investor, as set forth in the Overview of Investment Program and the Investment Structure sections of this opinion letter, and in the Attachments hereto, are accurate.

THIRD AMENDED COMPLAINT - Page 82 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

10. Any amount due under the Note, other than the aggregate outstanding principal amount, any accrued but unpaid interest, and the unamortized premium is expected to be incidental (i.e., under all reasonably expected market conditions on the date of issuance of the Note, the potential amount of any such payment would be insignificant relative to the total expected amount of the remaining payments on the Note).

292. Presidio is an offshoot of KPMG. Formed by former KPMG tax partners Robert Pfaff and John Larson, Presidio received virtually all of its revenue from transactions involving KPMG and/or KPMG clients. According to the Senate Report, Pfaff and Larson left KPMG in order to participate in the adviser side of KPMG's tax shelter practice. The Senate Report states: "Presidio's principals also helped KPMG obtain lending and securities services from three major banks: Deutsche Bank, HVB, and NatWest, to complete OPIS and BLIPS transactions." It was Presidio that first presented the BLIPS concept to KPMG.

293. Presidio representatives acknowledged to KPMG, during meetings held on April 30 and May 1, 1999, that the banks providing the loans contemplated as part of the BLIPS transactions had an effective veto over the use of those loans, and acknowledged that KPMG's clients had no possibility of profiting from those transactions. Presidio was therefore clearly aware that BLIPS was an abusive tax shelter, or recklessly disregarded that fact.

294. Despite its knowledge, at KPMG's request, Presidio provided representations regarding the legitimacy of the transaction, representing that it "believed there was a reasonable opportunity for investor to earn a reasonable pre-tax profit, in excess of all associated fees and costs, and without regard to any tax benefits that may occur."

THIRD AMENDED COMPLAINT - Page 83 of 131

295. The representation that Presidio acted independently was also false and misleading. Presidio devised the BLIPS scheme in concert with KPMG, and KPMG discussed that scheme extensively with Deutsche Bank, which executed the transactions. Even the representation that the above representations were made by Presidio is misleading, in that Presidio developed those representations in concert with KPMG and Brown & Wood, and they reflect representations that KPMG and Brown & Wood needed to support their opinion letters, rather than reflecting the truth as known to Presidio.

296. In addition, Presidio failed to disclose that the representations it made were prepared in concert with KPMG, and were designed to support the fraudulent tax shelter scheme rather than to represent the truth. Presidio failed to disclose that its representations included in the KPMG opinion letter were in fact drafted together with KPMG. Presidio also failed to disclose that it did not believe that the BLIPS scheme would generate a profit, and did not believe that BLIPS would more likely than not survive a challenge by the IRS. Presidio did not disclose that it knew Brown & Wood was not independent, having itself worked with Brown & Wood to prepare documents necessary to the execution of BLIPS.

297. Presidio also actively participated in the marketing of BLIPS, and, according to the Senate Report, "played a key role in making client presentations to sell the product and in executing the actual BLIPS transactions." KPMG worked hand-in-hand with Presidio, with KPMG employees "assigned to Presidio to assist in expediting BLIPS transactions and paperwork," according to the Senate Report.

THIRD AMENDED COMPLAINT - Page 84 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

298. Presidio in fact utilized entities under its control, including but not limited to, Presidio Growth and Presidio Resources, to facilitate the BLIPS transactions. In each transaction, one or more of these entities held a managing interest in an LLC used to control the BLIPS investment program. Presidio's ownership in the LLC was a central aspect of each BLIPS transaction. The Presidio entity acted as managing partner for the vehicle, and performed administrative tasks essential to the implementation of BLIPS. As the manager of the vehicle (Longs Strategic Investment Fund), Presidio directed the BLIPS investment program.

## DEUTSCHE BANK AS A PRIMARY PARTICIPANT IN THE FRAUDULENT REPRESENTATIONS IN CONNECTION WITH THE PROMOTION OF BLIPS

299. The facts set forth herein give rise to a strong inference that the Deutsche Bank AG Defendants acted with actual knowledge, or at the least, recklessness, in making false and misleading statements and omissions and in participating in the fraudulent tax shelter scheme, as shown by the following written representations made by Presidio in the KPMG opinion letter Dated December 31, 1999 and in the Brown & Wood opinion letter dated December 31, 1999:

1. The Credit Agreement and associated exhibits contained therein (i.e., the Pledge and Security Agreement and the Account Control Agreement) and the Assignment and Assumption Agreement entered into between the Investors and Deutsche Bank AG have been approved in the ordinary course of business by the competent authorities within Deutsche Bank AG as consistent, in the light of all circumstances such authorities consider relevant, with Deutsche Bank AG credit and documentation standards which Deutsche Bank believes are consistent with industry standards.

2. Deutsche Bank AG acted independently of, and at arm's length from, Investor and the other participants in the Investment Program.

3. Deutsche Bank AG recorded for U.S. GAAP accounting purposes and U.S. regulatory purposes the Stated Principal Amount and the Initial Unamortized Premium Amount of the loan made pursuant to the Credit Agreement as follows: a

THIRD AMENDED COMPLAINT - Page 85 of 131

$33,000,000, seven year loan and a $20,000,000, unamortized premium amount, respectively.

4.  The Credit Agreement provides that the Maturity Date of the loan made thereunder is the seventh anniversary of the applicable Borrowing Date. Furthermore, Section 8 of the Credit Agreement sets forth the conditions upon which the principal of and any accrued interest in respect of the applicable Note, the applicable Prepayment Amount, if any, the applicable Breakage Fee, if any, and all other obligations owing under such Credit Agreement and the applicable Note may be declared to be, or become, due and payable prior to the applicable Maturity Date. Excepts as provided in such Credit Agreement, Deutsche Bank AG will not accelerate any stated principal or interest payment due under the Credit Agreement.

5.  While as part of the negotiation of the form of the Credit Agreement a form of Assignment and Assumption Agreement was negotiated and it was the expectation of Deutsche Bank AG that the Bank (as defined in the Credit Agreement) would be requested to give its consent to an assignment of the applicable Borrower's rights and obligation under the Credit Agreement pursuant thereto to the Presidio limited liability company used to effectuate the Investment Program, the Credit Agreement would not require the Borrower to assign the loan made thereunder to any Person and Deutsche Bank AG had no plan or intention to require such assignment.

300. These representations were false and misleading. Evidence obtained by the Subcommittee demonstrates that Deutsche Bank viewed BLIPS as an out-of-the-ordinary transaction.  In response to a request from KPMG that Deutsche Bank provide "comfort that the [BLIPS] loan was being made in line with conventional lending practices," Deutsche Bank refused to sign a letter representing that BLIPS was consistent with industry standards.  In fact, KPMG tried three times to have Deutsche Bank provide such "comfort," and, each time, Deutsche Bank refused to represent that the loans involved in BLIPS were consistent with industry standards.

301. The representation that Deutsche Bank acted independently was also false and misleading. Deutsche Bank was executing transactions designed by KPMG and by Presidio, and which it discussed extensively with KPMG and Presidio in advance.  Even the representation that the above representations were made by Deutsche Bank is misleading, in that Deutsche Bank developed those representations in concert with KPMG

THIRD AMENDED COMPLAINT - Page 86 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

and Brown & Wood, and they reflect representations that KPMG and Brown & Wood

needed to support their opinion letters, rather than reflecting the truth as known to

Deutsche Bank.

302. Evidence collected by the Subcommittee demonstrates that Deutsche Bank helped

implement the fraudulent tax shelter scheme with knowledge or reckless indifference to

the fact that it was participating in illegitimate tax-related transactions.  BLIPS was

presented as a seven year scheme, involving long-term loans from the banks for that

period.  However, in creating BLIPS, Defendants never intended for Swartz to actually

remain in the scheme for the full seven years.  In fact, Defendants intended that all

participants in the scheme would prepay the bank loans within approximately sixty days.

Deutsche Bank was aware that, notwithstanding the fact that they were ostensibly

providing seven year loans, those loans would be repaid within sixty days.  Thus,

Deutsche Bank had virtually no risk of loss on the loan, which lacked economic substance.

303. Senior Officers of Deutsche Bank believed that the sham loans made in

connection with BLIPS furthered its participation in the fraudulent tax shelter scheme and

posed a "reputation risk" to the bank."

304. To further avoid creating an "audit trail," Deutsche Bank, in its initial discussion of

whether to participate in BLIPS, determined to not obtain the approval of the bank

committee that normally evaluated the "reputational risk" to the bank posed by a

transaction.  A July 30, 1999 e-mail from Ivor Dunbar discusses these policies:

> 1.  STRUCTURE: A diagrammatic representation of the deal may help the
> Committee's understanding -- we can prepare this.

THIRD AMENDED COMPLAINT - Page 87 of 131

2.  PRIVILEDGE [sic]: This is not easy to achieve and therefore a more detailed description of the tax issues is not advisable.

3.  REPUTATION RISK: In this transaction, reputation risk is tax related and we have been asked by the Tax Department not to create an audit trail in respect of the Bank's tax affaires.  The Tax department assumes prime responsibility for controlling tax related risks (including reputation risk) and will brief senior management accordingly.  We are therefore not asking R&R Committee to approve reputation risk on BLIPS.  This will be dealt with directly by the Tax Department and John Ross."

305. Deutsche Bank's awareness of KPMG's role in the transactions is evidenced by its close interactions with that firm in the course of implementing OPIS.  Although KPMG was ostensibly acting simply as tax accountant to Plaintiffs and the Class Members, an August 1998 KPMG memorandum authored by Randall Bickham states that Deutsche Bank held meetings with Presidio and KPMG, apparently during July or August of 1998, to discuss the need for Deutsche Bank to "increase their internal deal capacity and of the need to effectively contract capacity from another financial institution" in order to facilitate the sale of additional OPIS transactions. Prior to these meetings, Deutsche Bank's limited capacity prevented KPMG from earning more than $ 10 million in fees. According to the memorandum, after Bickham "convinced" Deutsche Bank to increase capacity, KPMG was able "to generate approximately $ 25 million in KPMG fees."

306. Notwithstanding its knowledge of the true nature of the fraudulent tax shelter scheme, Deutsche Bank joined in that scheme and engaged in a course of conduct designed to further that scheme by providing millions of dollars in loans -- which it knew were not in line with conventional lending practices -- to facilitate the transactions necessary to implement the tax scheme.  Those loans essentially posed no risk to Deutsche Bank and lacked any economic substance. Deutsche Bank never disclosed to its clients

THIRD AMENDED COMPLAINT - Page 88 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

that KPMG had requested confirmation from it that those loans conformed to conventional lending practices, or that it had repeatedly refused to provide such confirmation.

## FIRST CLAIM
**(Joint Venture Conspiracy—
Against All Defendants)**

307. Plaintiff repeats, realleges, and incorporates by reference each and every allegation in Paragraphs 1 through 306, inclusive, as if fully set forth herein. In particular, Plaintiff repeats, realleges and incorporates by reference each and every allegation regarding Plaintiff's Second (Fraud) and Third (Breach of Fiduciary Duty) Causes of Actions, below.

308. At all times mentioned herein, Defendants, and each of them, were partners in a joint venture conspiracy, pursuant to an implied or express contract, and acted in concert with other partners in the same joint venture. The partners in the joint venture had common purposes and a community of interests, equal rights to a voice, accompanied equal rights to control. All of the joint venture partners shared in the profits of the joint venture conspiracy.

309. The writings of the parties indicate the existence of a joint venture. Documents indicate that the parties specifically referred to their agreement as a joint venture. Moreover, the intent of the parties to form a joint venture can be gleaned from their conduct, from the transactions between them, and from the surrounding circumstances.

310. The common purposes and community of interests of the joint venture were, generally, to design, promote, market, sell to Plaintiff and other investors and implement abusive tax shelters disguised as legitimate investment programs, including BLIPS.

THIRD AMENDED COMPLAINT - Page 89 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

311. It was also the common purpose and design of the joint venture to represent to Plaintiff that there was a reasonable opportunity for the investment program to earn a profit; that Deutsche Bank loan proceeds would be used to facilitate the investment plan; and that KPMG would provide Plaintiff with an opinion letter that addresses the tax consequences associated with participation in the investment program and would provide Plaintiff with an opinion that there is a greater than 50% likelihood (i.e., it is "more likely than not") that those consequences will be upheld if challenged by the Internal Revenue Service.

312. The partners in the joint venture, including Defendants, and each of them, knew that these representations were false at the time they were made. The joint venture partners knew that there was only a remote chance that the investment plan would make a profit. The joint venture partners also knew at all times mentioned herein that the Deutsche Banks loans were shams because they could not be used to further Presidio's Investment Plan. The joint venture partners knew that the representations in the canned opinion letter were false. The joint venture partners also knew that because the representations were false the "more likely than not" opinion would not be upheld if challenged by the IRS.

313. The joint venture partners owed a duty to Plaintiff, as fiduciaries and on account of the special relationship that existed between Plaintiff and the joint venture partners, to disclose to Plaintiff all of the material facts regarding the investment program and the existence of the joint venture conspiracy.

314. The joint venture partners, in committing the acts and omissions alleged here, acted with full knowledge and awareness that the scheme was designed to give the false

THIRD AMENDED COMPLAINT - Page 90 of 131

impression that a complex series of financial transactions were legitimate business investments, when in fact they were not.

315. The Defendants acted in their respective roles as described above according to a predetermined and commonly understood and accepted plan of action, all for the purposes of obtaining professional fees, commissions, interest payments and other transactional fees from investors, including Swartz.

316. The acts of the Defendants were contrary to numerous provision of law, as stated above.

317. Each of the Defendants is liable for the wrongful acts and omissions of each of the other Defendants as partners in the joint venture conspiracy, as described herein.

318. As a result of the acts and omissions of the joint venture and its partners, including Defendants, and each of them, as alleged herein, Swartz has suffered injury in his business and property in that he has paid Defendants fees and has incurred losses in excess of $2 million;  has incurred or will incur interest; has incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, and has foregone legitimate tax savings opportunities.

### SECOND CLAIM
### (Fraud and Misrepresentation—
### Against All Defendants)

319. Plaintiff repeats, realleges, and incorporates by reference each and every allegation in Paragraphs 1 through 318, inclusive, as if fully set forth herein. In particular, Plaintiff repeats, realleges and incorporates by reference each and every allegation regarding Plaintiff's First (Joint Venture Conspiracy) and Third (Breach of Fiduciary Duty) Causes of Actions.

THIRD AMENDED COMPLAINT - Page 91 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

320. In order to induce Swartz to enter into the investment plan, KPMG, Presidio, and Deutsche Bank represented that that there was a reasonable opportunity to earn a profit; that the Deutsche Bank loan proceeds would be used to facilitate Presidio's investment plan. The representations by Presidio and Brown & Wood in the KPMG and Brown & Wood opinion letters, which were negotiated in advance of Swartz entering into the investment plan, would be truthful and accurate can be inferred from the conduct and the understanding of the parties.

321. These representations were contained in the Memorandum from Presidio and the engagement letter from KPMG. Plaintiff relied on these representations before investing in the program, and it was reasonable that he did so.

322. Each of the Defendants is liable for the wrongful acts and omissions of each of the other Defendants as partners in the joint venture conspiracy, as described herein.

323. Defendants' intention to make false and misleading statements in a deliberate or reckless manner is evidenced by internal documents that contradict representations contained in the KPMG and Brown & Wood opinion letters. The Defendants prepared the representations contained in the opinion letters in advance of Swartz entering into the BLIPS transaction. Defendants knew they were false and misleading.

324. Defendants' representations in the opinion letters and the documents that show the representations were false when made follow:

**Presidio represented that they believed there was a reasonable opportunity for Investor to earn a reasonable pre-tax profit, in excess of all associated fees and costs, and without regard to any tax benefits that may occur, by participating in the Investment Fund.**

THIRD AMENDED COMPLAINT - Page 92 of 131

Merriam & Isaacson, P.S.
701 Fifth Avenue, Suite 5800
Seattle, WA 98104
Telephone: (206) 829-2500
Facsimile: (206) 829-2501

- KPMG's statement, "[g]entlemen, we have completed our review of the BLIPS loan documents. In general, these documents indicate that the loan proceeds will be invested in a very safe investments (e.g. money market instruments). Thus it seems very unlikely that the rate of return on the investments purchased with the loan proceeds will equal or exceed the interest charged on the loan and the fees incurred by the borrower to secure the loan" contradicts the representation that there was a reasonable opportunity for Investor to earn a reasonable pre-tax profit, in excess of all associated fees and costs, and without regard to any tax benefits that may occur, by participating in the Investment Fund. Plaintiff's Exhibit 2, Senate Exhibit 34, Email dated July1999.re: BLIPS-Economic Substance Issue.

- KPMG's statement, "[b]ased on Presidio's own admission, the probability of actually making a profit from this transaction is remote . . . Thus, I think it is questionable whether a client's representation that he or she believed there was a reasonable opportunity to make a profit is a reasonable representation," demonstrates that Presidio and Deutsche Bank were in control of the profits which could be generated from the BLIPS transaction and they intended that the borrower not be given the opportunity to earn a profit after their fees. Plaintiff's Exhibit 2, Senate Exhibit 64. KPMG email, May 1999, re: BLIPS- More Likely Than Not?

- KPMG's statement, that "before any fees are considered, the client would have to generate a 240% annual rate of return on the $2.5 million foreign currencies investment in order to breakeven. If fees are considered, the necessary rate of return to break even will be even greater," indicates that the economics of the

THIRD AMENDED COMPLAINT - Page 93 of 131

financing arrangement as set forth in the Investment Program are not accurate.
Plaintiff's Exhibit 2, Senate Exhibit 34, Email dated July1999, re: BLIPS-
Economic Substance Issue.

**Presidio acted independently of, and at arm's length from, Investor and Deutsche Bank AG with respect to the transactions described herein.**

- KPMG's statement, "[t]he bank will control how the 'loan' proceeds are invested via a veto power over Presidio's investment choices" and "[i]f the bank controls how the loan proceeds are used and when they are repaid, has the bank actually made a bona fide loan," contradicts the representation that Presidio acted independently of, and at arm's length from Deutsche Bank.  Plaintiff's Exhibit 2, Senate Exhibit 64.  KPMG email, May 1999, re: BLIPS- More Likely Than Not?

- Statement that loan is arranged by Presidio and neither the Investor nor LLC-1 has any involvement in structuring or negotiating the terms of the loan.  Plaintiff's Exhibit 2, Senate Exhibit 4.  Gibson, Dunn & Crutcher LLP Memorandum to KPMG, March 2000, re: BLIPS Tax Opinion.

- Statement that Gibson, Dunn & Crutcher was told by Presidio that changes to the loan documents would not be made [by the borrower], and statement as to investors lack of involvement in structuring and negotiating the loan with Deutsche Bank and the fact that the terms of the loan were fully negotiated by Presidio contradicts Deutsche Bank's representation that there is an arms length loan consistent with industry standards.  Plaintiff's Exhibit 2, Senate Exhibit 4.  Gibson, Dunn & Crutcher LLP Memorandum to KPMG, March 2000, re: BLIPS Tax Opinion.

THIRD AMENDED COMPLAINT - Page 94 of 131

- Presidio's statement, "[a]s you know, we have until 10/15 at the latest to close loans and 10/22 to activate the FX trading etc. (the 60 day countdown)," contradicts Deutsche Banks representation that there was a seven year loan and that Deutsche Bank acted independently of other participants in the investment program. Plaintiff's Exhibit 2, Senate Exhibit 29. KPMG email, September 1999, re: BLIPS-managing deal flow.

**Presidio represented that all of Partnership's foreign currency transactions were conducted over the counter. Therefore, Partnership did not undertake transactions on a national securities exchange registered with the Securities and Exchange Commission. Furthermore, Partnership did not undertake transactions on a domestic board of trade designated as a contract market by the Commodity Futures Trading Commission.**

- On February 24, 2006, an article was published in the New York Times by Lynnley Browing, entitled "Deutsch Bank Said to Seek Settlement on Tax Shelters." The article states that Deutsche Bank was in talks with the Justice Department in an effort to settle a criminal investigation over the bank's role in questionable tax shelters. The article states:

> In the past, Deutsche Bank has described the transactions it arranged for tax shelters, including ones known as BLIPS and Cobra, as regular and ordinary. But Deutsche Bank has been unable to provide to federal prosecutors in Manhattan paper documents detailing some transactions for these shelters, according to the people briefed on the case.
>
> * * *
>
> The documents, if they exist, would detail, among other things, loans, trades and swaps of stock and derivatives and accounting records, frequently through offshore entities set up in the Cayman Islands.
>
> * * *
>
> With Deutsche Bank, a lack of documents would raise questions about whether the transactions were ever executed at all.

THIRD AMENDED COMPLAINT - Page 95 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

**Presidio represented that there did not exist at the time Investor or any assignee entered into trading strategies, within the range of Permitted Investments, an Event of Default under the terms of the Credit Agreement.**

- KPMG's statement, "[t]he bank will control, via a veto power over Presidio, how the 'loan' proceeds are invested. Also, it appears that the bank will require this 'loan' to be repaid in a relatively short period of time (e.g., 60 days) even though it is structured as a seven-year loan. These factors make it difficult for me to conclude that a bona fide loan was ever made. If a bona-fide loan was not made, the whole transaction falls apart," discloses the existence of a side agreement to compel the cancellation of the credit agreement within 60 days through a prearranged event of default. Plaintiff's Exhibit 2, Senate Exhibit 80. Email, May 1999, re: BLIPS.

**Presidio represented that the descriptions of the Investment Fund and the economics of the financing arrangement used by Investor, as set forth in the Overview of Investment Program and the Investment Structure sections of this opinion letter, and in the Attachments hereto, are accurate.**

- Deutsche Bank's internal statement, "[i]t is imperative that the transaction be wound up after 45-60 days and the loan repaid due to the fact that the HNW individual will not receive his/her capital loss (or tax benefit until the transaction is wound up and the loan repaid," contradicts the representation that the description of the investment fund is accurate. Plaintiff's Exhibit 2, Senate Exhibit 70. Deutsche Bank New Product Committee Overview Memo: BLIPS Transaction.

**Deutsche Bank represented that the Credit Agreement and associated exhibits contained therein (i.e., the Pledge and Security Agreement and the Account Control Agreement) and the Assignment and Assumption Agreement entered into between the Investors and Deutsche Bank AG have been approved in the ordinary course of business by the competent authorities within Deutsche Bank AG as consistent, in the light of all circumstances such authorities consider relevant, with Deutsche Bank AG**

THIRD AMENDED COMPLAINT - Page 96 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

**credit and documentation standards which Deutsche Bank believes are consistent with industry standards.**

- Internal bank documents make it clear that the bank was aware that the tax product was potentially abusive and carried a risk to the reputation of any bank choosing to participate in it.  For example, a number of Deutsche Bank documents indicate that the bank knew BLIPS was a tax related transaction and posed a reputational risk to the bank if the bank chose to participate in it. One Deutsche Bank official working to obtain bank approval to participate in BLIPS wrote:

   > "In this transaction, reputation risk is tax related and we have been asked by the Tax Department not to create an audit trail in respect of the Bank's tax affaires. The Tax department assumes prime responsibility for controlling tax related risks (including reputation risk) and will brief senior management accordingly. We are therefore not asking R&R [Reputation & Risk] Committee to approve reputation risk on BLIPS. This will be dealt with directly by the Tax Department and [Deutsche Bank Chief Executive Officer] John Ross."

   > Email dated 7/30/99, from Ivor Dunbar of Deustche Bank, DMG UK, to multiple Deutsche Bank professionals, "Re: Risk & Resources Committee Paper - BLIPS," unreadable Bates number. See also email dated 7/29/99 from Mick Wood to Francesco Piovanetti and other Deutsche bank personnel, "Re: Risk & Resources Committee Paper - BLIPS," Bates DB BLIPS 6556 (paper prepared for the Risk & Resources Committee "skirts around the basic issue rather than addressing it head on (the tax reputational risk).").

- The Senate Report stated given the extensive and high level attention provided by the Bank regarding its participation in BLIPS, it seems clear that the bank had evaluated BLIPS carefully and knew what it was getting into. Other evidence shows that Deutsche Bank was aware that the BLIPS loans were not run-of the-mill commercial loans, but had unusual features. Deutsche Bank refused, for example, to sign a letter representing that the BLIPS loan structure, which included an unusual multi-million dollar "loan premium" credited to a borrower's account at the

THIRD AMENDED COMPLAINT - Page 97 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

start of the loan, was consistent with "industry standards."  Plaintiff's Exhibit 2,
Senate Report Appendix A.

- Jeffrey Eischeid, the KPMG's BLIPS National Deployment Champion, had asked
  the bank to make this representation to provide "comfort that the loan was being
  made in line with conventional lending practices."  When the bank declined to
  make the requested representation, the BLIPS National Deployment Champion
  tried a second time, only to report to his colleagues: "The bank has pushed back
  again and said they simply will not represent that the large premium loan is
  consistent with industry standards."  He tried a third time and reported: "I've
  pushed really hard for our original language. To say they are resisting is an
  understatement

- KPMG's statement, "The bank has pushed back the loan again and said they simply
  will not represent that the large premium loan is consistent with industry
  standards," contradicts Deutsche Bank's assertion that Deutsche Bank believes that
  the credit agreement and documentation are consistent with industry standards.
  Plaintiff's Exhibit 2, Senate Exhibit 110.  KPMG email, March 2000, re: Bank
  representation.

**Deutsche Bank misrepresented that Deutsche Bank AG acted independently of, and
at arm's length from, Investor and the other participants in the Investment Program.**

- Deutsche Bank's statement, "DB will have the right to approve/disapprove all
  trading activity in the Company.  This will allow DB to effectively force the closure
  of the company and repayment of its loan to DB," contradicts the representation
  that Deutsche Bank acted independently from the other participants in the

THIRD AMENDED COMPLAINT - Page 98 of 131

investment program.  Plaintiff's Exhibit 2, Senate Exhibit 114.  Deutsche Bank
New Product Committee Overview Memo: BLIPS Transaction.

- Deutsche Bank's statement, "[t]he holding period/life of the LLC will typically be
45 to 60 days. At the end of this time period, the LLC will unwind all transactions;
repay the loan par amount and premium amount. For tax and accounting purposes,
repaying the premium amount will 'count' like a loss for tax and accounting
purposes," contradicts the representation that Deutsche Bank AG acted
independently from the other participants in the investment program.  Plaintiff's
Exhibit 2, Senate Exhibit 109.  Deutsche Bank email, April 1999, re: Presidio-w.
revision.

- Deutsche Bank's internal statement that Expected Swap/loan/FX/Depo holding
period is estimated to be 45-90 days per account contradicts the representation that
Deutsche Bank acted independently from the other participants in the investment
program.  Plaintiff's Exhibit 2, Senate Exhibit 67.  Deutsche Bank email, July 1999,
re; Risk and Resources Committee Paper -BLIPS SUMMARY.

- KPMG's statement, "[t]he bank [Deutsche Bank] will control, via a veto power
over Presidio, how the 'loan' proceeds are invested.  Also, it appears that the bank
will require this 'loan' to be repaid in a relatively short period of time (e.g., 60
days) even though it is structured as a seven-year loan.  These factors make it
difficult for me to conclude that a bona fide loan was ever made.  If a bona-fide
loan was not made, the whole transaction falls apart," contradicts Deutsche Bank's
representation that Deutsche Bank acted independently from the other participants

THIRD AMENDED COMPLAINT - Page 99 of 131

in the investment program.  Plaintiff's Exhibit 2, Senate Exhibit 65.  KPMG email, May 1999, re: BLIPS

- KPMG's statement that it appears that the bank wants the loan repaid within approximately 60 days contradicts Deutsche Bank's representation that Deutsche Bank acted independently from the other participants in the investment program. Plaintiff's Exhibit 2, Senate Exhibit 64. KPMG email, May 1999, re: BLIPS- More Likely Than Not?

- Deutsche Bank participated in more than 50 BLIPS transactions in 1999 and 2000. providing credit lines that totaled as much as $2.8 billion.

- Deutsche Bank internal documents state that the bank earned more than $33 million from OPIS and expected to earn more than $30 million for BLIPS. See undated document entitled, "New Product Committee Overview Memo: BLIPS Transaction,"

**Deutsche Bank misrepresented that Deutsche Bank AG recorded for U.S. GAAP accounting purposes and U.S. regulatory purposes the Stated Principal Amount and the Initial Unamortized Premium Amount of the loan made pursuant to the Credit Agreement as follows: a $33,000,000, seven year loan and a $20,000,000, unamortized premium amount, respectively.**

- Deutsche Bank's internal statement, "[i]t is imperative that the transaction be wound up after 45-60 days and the loan repaid due to the fact that the HNW individual will not receive his/her capital loss (or tax benefit until the transaction is wound up and the loan repaid," contradicts Deutsche Bank's representation that there was a seven year loan.  Plaintiff's Exhibit 2, Senate Exhibit 70.  Deutsche Bank New Product Committee Overview Memo: BLIPS Transaction.

- KPMG's statement, "[t]he bank will control, via a veto power over Presidio, how the 'loan' proceeds are invested.  Also, it appears that the bank will require this

THIRD AMENDED COMPLAINT - Page 100 of 131

'loan' to be repaid in a relatively short period of time (e.g., 60 days) even though it is structured as a seven-year loan.  These factors make it difficult for me to conclude that a bona fide loan was ever made.  If a bona-fide loan was not made, the whole transaction falls apart," contradicts Deutsche Bank's representation that there was a seven year loan.  Plaintiff's Exhibit 2, Senate Exhibit 80.  Email, May 1999, re: BLIPS.  Also see, Plaintiff's Exhibit 2, Senate Exhibit 65.  KPMG email, May 1999, re: BLIPS.

- Presidio's (Amir Makov's) internal statement, "[o]n day 60, Investor exits partnership and unwinds all trades in partnership," contradicts Deutsche Bank's representation that Deutsche Bank acted independently from the other participants in the investment program and contradicts Deutsche Bank's representation that there was a seven year loan.  Plaintiff's Exhibit 2, Senate Exhibit 69.  Deutsche Bank/Presidio Advisors Memorandum, April 1999, re: BLIPS friction costs.

- Deutsche Bank's statement, "[t]he holding period/life of the LLC will typically be 45 to 60 days. At the end of this time period, the LLC will unwind all transactions; repay the loan par amount and premium amount.  For tax and accounting purposes, repaying the premium amount will 'count' like a loss for tax and accounting purposes," contradicts Deutsche Bank's representation that there was a seven year loan.  Plaintiff's 2, Senate Exhibit 109.  Deutsche Bank email, April 1999, re: Presidio-w. revision.

- Deutsche Bank's internal statement that Expected Swap/loan/FX/Depo holding period is estimated to be 45-90 days per account contradicts Deutsche Bank's

THIRD AMENDED COMPLAINT - Page 101 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

representation that there was a seven year loan.  Plaintiff's Exhibit 2, Senate

Exhibit 67.  Deutsche Bank email, July 1999, re; Risk and Resources Committee

Paper -BLIPS SUMMARY.

- Presidio's statement, "[a]s you know, we have until 10/15 at the latest to close loans

   and 10/22 to activate the FX trading etc. (the 60 day countdown)," contradicts

   Deutsche Banks representation that there was a seven year loan and that Deutsche

   Bank acted independently of other participants in the investment program.

   Plaintiff's Exhibit 2, Senate Exhibit 29. KPMG email, September 1999, re: BLIPS-

   managing deal flow.

- KPMG's statement that it appears that the bank wants the loan repaid within

   approximately 60 days contradicts Deutsche Bank's representation that there was a

   legitimate seven year loan program as the loan documents represent.  Plaintiff's

   Exhibit 2, Senate Exhibit 64. KPMG email, May 1999, re: BLIPS- More Likely

   Than Not?

**Deutsche Bank misrepresented that the Credit Agreement provides that the
Maturity Date of the loan made thereunder is the seventh anniversary of the
applicable Borrowing Date. Furthermore, Section 8 of the Credit Agreement sets
forth the conditions upon which the principal of and any accrued interest in respect
of the applicable Note, the applicable Prepayment Amount, if any, the applicable
Breakage Fee, if any, and all other obligations owing under such Credit Agreement
and the applicable Note may be declared to be, or become, due and payable prior to
the applicable Maturity Date. Excepts as provided in such Credit Agreement.**

- KPMG's statement, "[t]he bank will control, via a veto power over Presidio, how

   the 'loan' proceeds are invested.  Also, it appears that the bank will require this

   'loan' to be repaid in a relatively short period of time (e.g., 60 days) even though it

   is structured as a seven-year loan.  These factors make it difficult for me to

THIRD AMENDED COMPLAINT - Page 102 of 131

conclude that a bona fide loan was ever made.  If a bona-fide loan was not made, the whole transaction falls apart," contradicts Deutsche Bank's representation that there was a seven year loan and contradicts the statement that Deutsche Bank AG will not accelerate any stated principal or interest payment due under the Credit Agreement.  Plaintiff's Exhibit 2, Senate Exhibit 80.  Email, May 1999, re: BLIPS.

**Deutsche Bank misrepresented that while as part of the negotiation of the form of the Credit Agreement a form of Assignment and Assumption Agreement was negotiated and it was the expectation of Deutsche Bank AG that the Bank (as defined in the Credit Agreement) would be requested to give its consent to an assignment of the applicable Borrower's rights and obligation under the Credit Agreement pursuant thereto to the Presidio limited liability company used to effectuate the Investment Program, the Credit Agreement would not require the Borrower to assign the loan made thereunder to any Person and Deutsche Bank AG had no plan or intention to require such assignment.**

- Internal KPMG memorandum prepared by outside law firm states that the law firm is unable to determine business purpose of loan or assignment agreement, unable to understand relationship of loan to any currency transactions, and unable to verify that loan may be used for stated investment purpose contradicts Deutsche Bank's representation that the loan would be used to effectuate the investment program. Plaintiff's Exhibit 2, Senate Exhibit 4.  Gibson, Dunn & Crutcher LLP Memorandum to KPMG) March 2000, re: BLIPS Tax Opinion.

- Statement that Gibson, Dunn & Crutcher has serious doubts as to whether Bank can make representation that there is no plan or intention to require the Investor to convey the loan proceeds or assign the loan obligation to partnership contradicts Deutsche Bank's representation that the Bank had no plan or intention to require assignment of the loan.  Plaintiff's Exhibit 2, Senate Exhibit 4.  Gibson, Dunn & Crutcher LLP Memorandum to KPMG) March 2000, re: BLIPS Tax Opinion.

THIRD AMENDED COMPLAINT - Page 103 of 131

**Deutsche Bank misrepresented that Deutsche Bank AG did not, directly or indirectly, control or participate in the management or operations of Partnership. [Partnership is referenced as Longs Strategic Investment Fund, LLC.**

- Deutsche Bank's statement, "DB will have the right to approve/disapprove all trading activity in the Company.  This will allow DB to effectively force the closure of the company and repayment of its loan to DB" contradicts the representation that Deutsche Bank AG did not directly or indirectly, control or direct the management or operations of Partnership.  Plaintiff's Exhibit 2, Senate Exhibit 114.  Deutsche Bank New Product Committee Overview Memo: BLIPS Transaction.  See also Plaintiff's Exhibit 2, Senate Exhibit 109.  Deutsche Bank email, April 1999, re: Presidio-w. Revision.  See Also Plaintiff's Exhibit 2, Senate Exhibit 70.  Deutsche Bank New Product Committee Overview Memo: BLIPS Transaction.  See also Plaintiff's Exhibit 2, Senate Exhibit 67.  Deutsche Bank email, July 1999, re; Risk and Resources Committee Paper -BLIPS SUMMARY.  See also Plaintiff's Exhibit 2, Senate Exhibit 65.  KPMG email, May 1999, re: BLIPS.  See also Plaintiff's Exhibit 2, Senate Exhibit 64. KPMG email, May 1999, re: BLIPS- More Likely Than Not?  See also Plaintiff's Exhibit 2, Senate Exhibit 34. Email July 1999, re: BLIPS- Economic Substance Issue.  See also Plaintiff's Exhibit 2, Senate Exhibit 64.  KPMG email, May 1999, re: BLIPS- More Likely Than Not?  See also Plaintiff's Exhibit 2, Senate Exhibit 80.  Email, May 1999, re: BLIPS.

**Deutsche Bank misrepresented that Deutsche Bank AG did not, directly or indirectly, control or direct the investments of Partnership apart from its rights under a. Pledge and Security Agreement, Credit Agreement, and Account Control Agreement.**

THIRD AMENDED COMPLAINT - Page 104 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

- Deutsche Bank's statement, "DB will have the right to approve/disapprove all trading activity in the Company.  This will allow DB to effectively force the closure of the company and repayment of its loan to DB," contradicts the representation that Deutsche Bank AG did not directly or indirectly, control or direct the investments of Partnership.  Plaintiff's Exhibit 2, Senate Exhibit 114.  Deutsche Bank New Product Committee Overview Memo: BLIPS Transaction.

- Presidio's, (Amir Makov's) internal statement, "[o]n day 60, Investor exits partnership and unwinds all trades in partnership," contradicts the representation that Deutsche Bank AG did not directly or indirectly, control or direct the investments of Partnership.  Plaintiff's Exhibit 2, Senate Exhibit 69.  Deutsche Bank/Presidio Advisors Memorandum, April 1999, re: BLIPS friction costs .

- Deutsche Bank's internal statement that Expected Swap/loan/FX/Depo holding period is estimated to be 45-90 days per account contradicts the representation that Deutsche Bank did not control or direct the investments of Partnership.  Plaintiff's Exhibit 2, Senate Exhibit 67.  Deutsche Bank email, July 1999, re; Risk and Resources Committee Paper -BLIPS SUMMARY.

- KPMG's statement, "[t]he bank [Deutsche Bank] will control, via a veto power over Presidio, how the 'loan' proceeds are invested.  Also, it appears that the bank will require this 'loan' to be repaid in a relatively short period of time (e.g., 60 days) even though it is structured as a seven-year loan.  These factors make it difficult for me to conclude that a bona fide loan was ever made.  If a bona-fide loan was not made, the whole transaction falls apart," contradicts the representation

THIRD AMENDED COMPLAINT - Page 105 of 131

that Deutsche Bank AG did not directly or indirectly, control or direct the investments of Partnership.  Plaintiff's Exhibit 2, Senate Exhibit 65.  KPMG email, May 1999, re: BLIPS

- KPMG's statement, "[t]he bank will control how the 'loan' proceeds are invested via a veto power over Presidio's investment choices," and "If the bank controls how the loan proceeds are used and when they are repaid, has the bank actually made a bona fide loan," contradicted the representation that Deutsche Bank AG did not directly or indirectly, control or direct the investments of Partnership.  Plaintiff's Exhibit 2, Senate Exhibit 64.  KPMG email, May 1999, re: BLIPS- More Likely Than Not?

- KPMG's statement, "[g]entlemen, we have completed our review of the BLIPS loan documents. In general, these documents indicate that the loan proceeds will be invested in a very safe investments (e.g. money market instruments).  Thus it seems very unlikely that the rate of return on the investments purchased with the loan proceeds will equal or exceed the interest charged on the loan and the fees incurred by the borrower to secure the loan," contradicts the representation that Deutsche Bank did not directly or indirectly control the investments.

- Statement by KPMG that the partnership is the true borrower contradicts the statement that Deutsche Bank had no plan or intention to require that the borrower assign the loan to the partnership and the statement that the investor does not control the proceeds contradicts the statement that Deutsche Bank did not directly or indirectly control or direct the investments of the partnership or participate in the

THIRD AMENDED COMPLAINT - Page 106 of 131

management of the partnership [Longs Strategic Investment Fund].  Plaintiff's

Exhibit 2, Senate Exhibit 12.  Email, May 1999, re: Who is the Borrower in the

BLIPS transaction?

325. Defendants, and each of them, knew that these representations were false at the

time they were made.

326. Presidio represented that they believed there was a reasonable opportunity for

Investor to earn a reasonable pre-tax profit, in excess of all associated fees and costs, and

without regard to any tax benefits that may occur, by participating in the Investment Fund.

327. Defendants, and each of them, knew that there was only a remote chance that the

investment plan would make a profit.  Defendants also knew at all times mentioned herein

that the Deutsche Banks loans were shams.  Defendants also knew the opinion stated in

their canned opinion letter was false that if Plaintiff took a deduction on his income tax

return for his reported losses in the investment program it was "more likely than not" it

would be upheld if challenged by the IRS.

328. These representations were basic to the transaction and were meant to induce

Plaintiff to invest in the investment program by making him believe that the investment

program had economic substance and that the loans were not shams.

329. If Plaintiff had known the truth beforehand, he would not have purchased the

investment program.  First, he did not want to invest in a program that lacked economic

substance or utilized sham loans.  He would not have purchased the investment plan if he

had known that Defendants believed there was only a remote chance it would make a

profit or if he had known that the loans were shams.  Second, if the program did lose

money, Plaintiff wanted to be able to deduct the losses on his income tax return.

THIRD AMENDED COMPLAINT - Page 107 of 131

However, because the loans were shams, the IRS determined that the investment program lacked economic substance and Plaintiff was not allowed to deduct the money he lost in the investment program.  If Plaintiff had known the loan were shams, he would not have purchased the investment program.

330. In order to further deceive Plaintiff and induce him to enter into the investment plan, Defendants, and each of them, concealed from Plaintiff the fact of Defendants' joint venture, which had as a common purpose and community of interest the design, promotion, marketing, selling and implementation of abusive tax shelters, which utilized sham loans and lacked economic substance, but Defendants made the tax shelters appear to be legitimate investments to unsuspecting investors, including Plaintiff.

331. Defendants also concealed from Plaintiff the following facts: (1) a fiduciary relationship existed between all of the Defendants and Plaintiff by virtue of the joint venture and the relationships created pursuant to the investment program; (2) loans from Deutsche Bank were sham loans; (3) Deutsche Bank would have ultimate discretion and control over the investment funds; (4) Defendants believed the investment program lacked economic substance; (5) Defendants believed that Plaintiff would lose his entire Initial Contribution of $1.4 million; (6) Defendants joint venture partners profited at Plaintiff's expense through a secret agreement to apportion Plaintiff's Initial Capital Contribution among themselves according to pre-determined percentages before Plaintiff even paid his Initial Capital Contribution into the Investment Fund; and (7) that conflicts of interest existed between Defendants and Plaintiff, which constituted a breach of Defendants' fiduciary duties owed to Plaintiff.

THIRD AMENDED COMPLAINT - Page 108 of 131

332. Defendants, and each of them, knew the existence of the facts alleged in the preceding paragraph to be true, but intentionally concealed said facts (referred to herein as "concealed facts") from Plaintiff.

333. Plaintiff did not know the existence or truth of the concealed facts.

334. Defendants, and each of them, had a duty to disclose the concealed facts to Plaintiff because a fiduciary relationship existed between Plaintiff and Defendants.

335. Defendants KPMG, Presidio, and Deutsche Bank Defendants' non-disclosure to Plaintiff of the concealed facts is equivalent to a misrepresentation of the facts by Defendants, and each of them, to Plaintiff for the reason that KPMG, Presidio, and Deutsche Bank misrepresented to Plaintiff that that there was a reasonable opportunity to earn a profit in the investment program and that the Deutsche Bank loan proceeds would be used to facilitate Presidio's investment plan.  Defendants owed a duty to Plaintiff, therefore, to correct the misrepresentations they made by revealing the concealed facts.

336. The concealed facts were basic to the transaction.  The concealment of these facts was meant to induce Plaintiff to invest in the investment program by making him believe that the investment program had economic substance and that the loans were not shams. Defendants, and each of them, also concealed these facts to induce Plaintiff to invest in the investment program and to deceive Plaintiff into thinking that none of the Defendants had any undisclosed self-interest in the investment program, or any conflict of interest with Plaintiff or any duty to make any additional disclosures of information that had not already been disclosed to Plaintiff.

337. Defendants, and each of them made the misrepresentations and concealment of facts, as alleged herein, in the course and scope of their joint venture partnership

THIRD AMENDED COMPLAINT - Page 109 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

conspiracy and in concert and conspiracy with and as agents of the other Defendants in the perpetration of the illegal scheme. Each Defendant knew of each of the misrepresentations and concealments of fact by the other Defendants.

338. If Defendants, and each of them, had not misrepresented and concealed facts, as alleged herein, Plaintiff would not have invested in the investment program and would not have entered into the various organizational and banking transactions pertaining to the investment program.

339. As a result of the Defendants' unlawful actions, omissions, misrepresentations and concealment, Swartz has suffered injury in his business and property in that he has paid Defendants fees and has incurred losses and has incurred interest in an amount to be proven at trial, but believed to be in excess of $2 million; and Swartz has suffered severe emotional distress and anxiety, for which he is entitled to damages, according to proof.

## THIRD CLAIM
**(Breach of Fiduciary Duty; and Aiding and Abetting Breach of Fiduciary Duty—Against All Defendants)**

340. Plaintiff repeats, realleges, and incorporates by reference each and every allegation in Paragraphs 1 through 339, inclusive, as if fully set forth herein. In particular, Plaintiff repeats, realleges and incorporates by reference each and every allegation regarding Plaintiff's First (Joint Venture Conspiracy) and Second (Fraud) Causes of Actions, above.

341. Defendants, and each of them, were the fiduciaries of Plaintiff, or were the agents, principals, employees or authorized representatives of the fiduciaries of Plaintiff, which implied and necessitated great confidence and trust on Swartz' part in each of the Defendants and a high degree of good faith on the part of the Presidio Defendants. Since the Defendants were acting in this fiduciary capacity towards Swartz and Swartz was

THIRD AMENDED COMPLAINT - Page 110 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

relying on their expertise, the Defendants owed Swartz the fiduciary duties of good faith, undivided loyalty, candor and full disclosure of all material facts.

342. A fiduciary relationship existed at all times mentioned herein between Defendants, and each of them, and Plaintiff by virtue of the fact that Defendants, and each of them, were joint venture partners in the joint venture conspiracy to design, promote, market, sell and implement the investment program for Plaintiff.  As fiduciaries of Plaintiff pertaining to the investment program, Defendants owed a duty at all times mentioned herein to make full and truthful disclosure and representations to Plaintiff of all material facts pertaining to the investment program.

343. Each joint venture partner owed the same fiduciary duty to Plaintiff.

344. In addition to acting in their capacity as partners in the joint venture conspiracy, the Presidio Defendants were employed by Plaintiff in their capacities as "registered investment advisors" or were the agents, principals, employees or authorized representatives of registered investment advisors employed by Plaintiff, and thus the Presidio Defendants were the fiduciaries of Plaintiff for this reason.

345. The investment program, including all its transactional parts, constitutes a security.

346. Defendants, and each of them, as partners in the joint venture to design, promote, market, sell to and implement for Plaintiff and others the investment program, acted in the fiduciary capacity of aiders and abettors to the Presidio Defendants in their capacity as Investment Advisers under the Investment Advisers Act of 1940, 15 USCS §80b-2(11).

347. The Presidio Defendants and their agents, principals, employees or authorized representatives were the partners, agents, principals or authorized representatives of

THIRD AMENDED COMPLAINT - Page 111 of 131

Plaintiff in the Longs investment fund and in the deposit and investment accounts established with the Deutsche Bank Defendants pertaining to the investment program. The purposes and powers provision of the Longs Strategic Investment Fund, LLC agreement gave exclusive authority to Presidio Investment Advisors, as the sole managing member to manage the Investment Accounts at Deutsche Bank, subject to Deutsche Bank's Controlling Authority. Thus, the Presidio Defendants were the fiduciaries of Plaintiff.

348. The Deutsche Bank Defendants, and each of them, were the fiduciaries of Plaintiff by virtue of the special relationship that existed between Deutsche Bank Defendants and Plaintiff and the special knowledge pertaining to the investment program obtained by Deutsche Bank through its participation as a partner in the joint venture conspiracy.

349. The Deutsche Bank Defendants, and each of them, were the fiduciaries of Plaintiff by virtue of their discretionary authority and sole dominion and control over the Longs and Gascoyne Investment Fund, Pledge and Security Agreement, Credit Agreement, Collateral Agreement and Collateral Control Agreement.

350. Deutsche Bank Defendants are fiduciaries of Swartz by virtue of their superior knowledge of the BLIPS transactions, which Deutsche Bank acquired in its capacity as partner in the joint venture conspiracy, but which knowledge Swartz did not possess. Deutsche Bank knew that the loans were shams and that the investment plan lacked economic substance, and Deutsche Bank knew that the opinion letter contained the misrepresentation that the loan proceeds were intended to be used to facilitate Presidio's investment plan and that there was a profit motive associated with the plan. This knowledge was basic to the investment program. Deutsche Bank knew or should have

THIRD AMENDED COMPLAINT - Page 112 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

known that Swartz did not know the truth, since Deutsche Bank knew the opinion letter was purportedly for Swartz' use and benefit. Deutsche Bank, as the fiduciary of Swartz with this superior knowledge, should have disclosed it to him.

351. In addition to being partners in the joint venture, Walter, Conston, Alexander & Green, P.C. and Holland & Hart, LLP were legal counsel for Longs and for Gascoyne and, therefore, owed fiduciary duties to Plaintiff.

352. In addition to being partners in the joint venture, Grant Thornton International and Grant Thornton, LLP were accountants for Plaintiff and, thus, owed fiduciary duties to Plaintiff.

353. Defendants, and each of them, breached their duties as fiduciaries by failing to act in good faith and with honesty and candor towards Swartz, by placing their own interests ahead of Swartz' interests, by using the advantage of their position to gain benefits for themselves at Swartz' expense, by placing themselves in a position where their self-interest conflicted with their obligations as fiduciaries and by failing to disclose all important information to Swartz concerning transactions that affected Swartz' interests and by making material misrepresentations of facts to Swartz, upon which Swartz relied to his detriment.

354. Defendants, and each of them, as partners in the joint venture conspiracy, aided and abetted others who owed a fiduciary duty to Plaintiff to breach their fiduciary duty as well. Defendants, and each of them, gave substantial assistance and encouragement and aided and abetted KPMG and Brown & Wood to conceal and misrepresent facts to Plaintiff regarding the investment program, in breach of the fiduciary duty KPMG and Brown & Wood owed to Plaintiff.

THIRD AMENDED COMPLAINT - Page 113 of 131

355.  At the time Defendants, and each of them, aided and abetted KPMG, Presidio and Brown & Wood to breach the fiduciary duty KPMG and Brown & Wood owed to Plaintiff, Defendants, and each of them knew that the conduct of KPMG and Brown & Wood was wrongful and in breach of their fiduciary duty.

356. Those Defendants, and each of them, who aided and abetted fiduciaries of Plaintiff to breach their fiduciary duties to Plaintiff, as alleged herein, are liable to Plaintiff for the damages caused by the fiduciary's breach.

357. As a result of the Defendants' conduct, as alleged herein, including but not limited to Defendants' breach of fiduciary duty and aiding and abetting others to breach their fiduciary duties to Plaintiff and violation of constructive trust, Swartz has suffered injury in his business and property in that he has paid Defendants fees and has incurred losses and has incurred interest in an amount to be proven at trial, but believed to be in excess of $2 million; and Swartz has suffered severe emotional distress and anxiety, for which he is entitled to damages, according to proof.

358. As a result of Defendants' conduct, as alleged herein, including but not limited to Defendants' breach of fiduciary duty and aiding and abetting others to breach their fiduciary duties to Plaintiff and violation of constructive trust, Plaintiff has incurred attorney's fees and other costs.

**FOURTH CLAIM**
**(Constructive Trust—**
**Against All Defendants**

359. Plaintiff repeats, realleges, and incorporates by reference each and every allegation in Paragraphs 1 through 358, inclusive, as if fully set forth herein.

THIRD AMENDED COMPLAINT - Page 114 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

360. As a result of Defendants' acts and omissions, including but limited to misrepresentation and concealment and breach of their fiduciary duties to Plaintiff and aiding and abetting others to breach their fiduciary duties to Plaintiff, as alleged herein, Defendants have acquired and have retained property and money from Plaintiff. Defendants hold said property and money upon a constructive trust for Plaintiff, to which Plaintiff is entitled to enforce an equitable lien.  Plaintiff is entitled to enforce said constructive trust and equitable lien against Defendants, and each of them, and Plaintiff is entitled to the return of said property and money, including interest and costs, in an amount to be proven at tria.

361. As a result of Defendants' conduct, as alleged herein, including but not limited to Defendants' breach of fiduciary duty and aiding and abetting others to breach their fiduciary duties to Plaintiff, Plaintiff has had to incur attorney's fees and costs to enforce a constructive trust and equitable lien against Defendants and, therefore, Plaintiff is entitled to an award of attorney's fees and costs against Defendants.

## FIFTH CLAIM
### (Violation of Sections 10(b)-5, 12, 15 and 20(a) of the Exchange Act and Rule 10b-5—Against All Defendants)

362. Plaintiff repeats, realleges, and incorporates by reference each and every allegation in Paragraphs 1 through 361, inclusive, as if fully set forth herein. In particular, Plaintiff repeats, realleges and incorporates by reference each and every allegation regarding Plaintiff's Second (Fraud) and Third (Breach of Fiduciary Duty) Causes of Actions, above.

THIRD AMENDED COMPLAINT - Page 115 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

363. Defendants, and each of them, knew that the representations contained in the opinion letters, as alleged Plaintiff's Second (Fraud), were false at the time they were made.

364. The investment program as designed, promoted, marketed, sold to Plaintiff and implemented by Defendants for Plaintiff, involves the purchase and sale of a security.

**Violation of Section 10(b)-5 and Rule 10b-5**

365. Defendants, and each of them, in carrying out the investment program for Plaintiff and other investors and acting in the course and scope of their joint venture conspiracy, as alleged herein, (i) employed devices, schemes, and artifices to defraud Plaintiff, as alleged herein; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, as alleged herein; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Plaintiff, as alleged herein, in an effort to enrich themselves by promoting an investment program, which lacked economic substance and consisted of sham loans, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

366. In committing the acts and omissions in violation of Section 10(b) of the Exchange Act and Rule 10b-5, as alleged herein, Defendants, and each of them, acting in their capacities as joint venture partners, used or employed, directly or indirectly, the use of a means or instrumentality of interstate commerce or of the mails, or of a facility of any national securities exchange.  The Defendants' use of the instrumentalities of interstate commerce and the mails is alleged more fully in the Jurisdiction section above.

THIRD AMENDED COMPLAINT - Page 116 of 131

367. The investment program purchased by Plaintiff is connected with the purchase and sale of a security because Plaintiff, as the sole shareholder of Gascoyne Ventures LLC, opened a Managed Investment Account at Deutsche Bank Securities, Inc.  Plaintiff contributed $1.4 million in equity to a Managed Investment Account at Deutsche Bank Securities, Inc., that was under the name of Gascoyne Ventures LLC, but under the control of Deutsche Bank Securities, Inc.  The equity contribution was pledged as collateral for a $53 million Credit Agreement.  Based upon fraudulent representations and omissions by Deutsche Bank AG, Deutsche Bank Securities, Inc., Presidio Growth, LLC, and Presidio Advisory Services, Inc.  Plaintiff contributed the Managed Investment Account to Longs Strategic Investment Fund in exchange for a 90% interest in the profits.  Presidio Growth was given 10% interest in the profits of Longs Strategic Investment Fund in exchange for a capital contribution.  The contribution to Longs Strategic Investment Fund LLC such as promoted by Defendants are securities because there was a pooling of investors funds and because each member the LLC is given a net profits interest.  The equity contribution to Deutsche Bank Securities and the investment in Longs Strategic Investment Fund falls within the definition of an investment contract under the three part test set out in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946), and, hence, are securities.  *SEC V. Lauer*, 864 F. Supp. 784, 794 (N.D. Ill. 1994), aff'd 52 F.3d 667 (7th Cir. 1995).  Defendants' cannot escape liability under the securities laws by arguing that the securities did not exist.  *Id* at 792.  Moreover, the Plaintiff's equity contribution of $1.4 million to the Deutsche Bank Securities Investment Account constituted a security under the "Risk Capital Analysis."  The Plaintiff provided an initial value to the enterprise, subject to the risks of the enterprise, which was induced by representations that Plaintiff would realize a

THIRD AMENDED COMPLAINT - Page 117 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501

valuable benefit beyond the initial value. And the Plaintiff did not exercise practical and managerial control over the enterprise. *Simon Oil Co., Ltd, v. Norman*, 789 F.2d 780, 781-82 ([9th] Cir. 1986); *Silver Hills Country Club v. Sobieski*, 55 Cal 2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961)**.**

368. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

369. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, Plaintiff engaged in the investment plan transactions.

370. Plaintiff relied directly or indirectly on the false and misleading statements made by the Defendants and/or on the absence of material adverse information, which was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants to Plaintiff and Plaintiff was damaged thereby.

371. At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity, and believed them to be true. Had Plaintiff known of the truth concerning the investment plan, which was not disclosed by Defendants, Plaintiff would not have engaged in the investment program.

372. By virtue of the foregoing, Defendants, and each of them, have violated and are each primary violators of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

THIRD AMENDED COMPLAINT - Page 118 of 131

373. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with the purchase and sale of securities, in an amount to be proved at trial, but believed to be at least $2 million.

**Violation of Section 12**

374. At the time the investment program was offered for sale and purchase to Plaintiff, the Defendants, and each of them, knew or had reasonable grounds to believe that their oral statements and other documents, as alleged hereinabove, included untrue statements of a material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

375. Upon discovering that he had purchased an investment program that lacked economic substance, Plaintiff tendered the investment back to Presidio and requested rescission of the transaction and a refund of his investment price, but Presidio refused.

376. By virtue of the foregoing, Defendants, and each of them, have violated and are each primary violators of Section 12 of the Exchange Act.

377. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with the purchase and sale of securities, in an amount to be proved at trial, but believed to be at least $2 million.

**Violation of Sections 15 and 20(a)**

378. At the time the investment program was offered to Plaintiff for sale and purchase the Defendants, and each of them, as joint venture partners, had an equal voice and right of control with the other joint venture partners in the investment program as designed, promoted, marketed and sold to Plaintiff and as implemented for Plaintiff by Defendants, and each of them.

THIRD AMENDED COMPLAINT - Page 119 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

379. Defendants, and each of them, by virtue of their right of control with the other joint venture partners in the investment program, is a "control person" within the meaning and purpose of Sections 15 and 20(a) of the Exchange Act, of each Defendant in violation of Sections 10(b)-5 and 12 of the Exchange Act, as alleged above and, as such, are jointly and severally liable with and to the same extent as such controlled person to any person to whom such controlled person is liable.

380. Defendants, and each of them, by virtue of the fact that they are each partners in the same joint venture to design, promote, market and sell to Plaintiff and implement the investment plan purchased by Plaintiff, are deemed to possess the same knowledge pertaining to the joint venture as other partners in the joint venture possess.

381. Defendants, and each of them, by virtue of the fact that they are each partners in the same joint venture to design, promote, market and sell to and implement for Plaintiff the investment plan purchased by Plaintiff, had reasonable grounds and the means to know the existence of facts, including the acts, omissions, misrepresentations and omissions by the joint venture partners pertaining to the joint venture and to the investment program that give rise to liability of Defendants pursuant to violation of Section 12 of the Exchange Act, as alleged above.

382. Defendants, and each of them, in committing the acts and omissions alleged herein as partners in the joint venture conspiracy, acted in bad faith and directly or indirectly induced the act or acts constituting the violation of Sections 10(b)-5 and 12 of the Exchange Act, as alleged above and are jointly and severally liable with and to the same extent as such controlled person to any person to whom such controlled person is liable.

THIRD AMENDED COMPLAINT - Page 120 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

383. By virtue of the foregoing, Defendants, and each of them, have violated and are each primary violators of Sections 15 and 20(a) of the Exchange Act.

384. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with the purchase and sale of securities, in an amount to be proved at trial, but believed to be at least $2 million.

**SIXTH CLAIM**
**(Violation of Investment Advisors Act of 1940; and**
**Aiding and Abetting Violation of Investment Advisers Act of 1940—**
**Against All Defendants)**

385. Plaintiff repeats, realleges, and incorporates by reference each and every allegation in Paragraphs 1 through 384, inclusive, as if fully set forth herein. In particular, Plaintiff repeats, realleges and incorporates by reference each and every allegation regarding Plaintiff's First (Joint Venture Conspiracy), Second (Fraud) and Third (Breach of Fiduciary Duty) Causes of Actions, above.

386. The investment program as designed, promoted, marketed, sold by Defendants to Plaintiff and implemented by Defendants for Plaintiff and other investors, constitutes a device, scheme or artifice to defraud Plaintiff, and a transaction, practice or course of business which operates as a fraud or deceit upon Plaintiff and which was employed by Defendants, and each of them, in conjunction with the offer, sale or purchase of a security, in an effort to enrich themselves by promoting an investment program, which lacked economic substance and consisted of sham loans, in violation of the Investment Advisers Act of 1940, 15 USCS § 80b-6(1), (2) and (4).

THIRD AMENDED COMPLAINT - Page 121 of 131

Merriam & Isaacson, P.S.
701 Fifth Avenue, Suite 5800
Seattle, WA 98104
Telephone:  (206) 829-2500
Facsimile:  (206) 829-2501

387. On information and belief, Presidio Growth, LLC is a registered investment advisor under the Registered Investment Advisors Act of 1940, and is an affiliate or subsidiary of Presidio Advisory Services, LLC.

388. Defendants, and each of them, as partners in the joint venture conspiracy, materially aided in the transactions pertaining to the design, promotion, marketing, and sale of securities by Defendants to Plaintiff and the implementation of the transactions by Defendants for Plaintiff and, therefore, are liable jointly and severally with and to the same extent as Defendants in violation of 15 USCS § 80b-6(1), (2) and (4).

389. Defendants, and each of them, by participating as partners in the joint venture to design, promote, market, sell to and implement the investment program for Plaintiff and others, performed the functions of Investment Advisers within the meaning of 15 USCS § 80b-2 or aided and abetted in the performance of said functions, in that all of the joint venture partners were engaged in the business of advising Plaintiff and others, directly and through publications or writings, as to the value and benefits of the investment program and as to the advisability of investing in, purchasing, and withdrawing from the investment program, and who, for compensation and as part of the regular business of the joint venture, issued and promulgated analyses and reports concerning the investment program.

390. In committing the acts and omissions in violation of 15 USCS § 80b-6(1), (2) and (4) and in aiding and abetting the violation of 15 USCS § 80b-6(1), (2) and (4), as alleged herein, Defendants, and each of them, acting in their capacities as joint venture partners, used or employed, directly or indirectly, the means or instrumentality of interstate

THIRD AMENDED COMPLAINT - Page 122 of 131

commerce.  The Defendants' use of the instrumentalities of interstate commerce, including

the mails, as alleged in the Jurisdiction section of this complaint, above.

### SEVENTH
### (Violation of Washington State Securities Act— Against All Defendants)

391. Plaintiff repeats, realleges, and incorporates by reference each and every allegation

in Paragraphs 1 through 390, inclusive, as if fully set forth herein. In particular, Plaintiff

repeats, realleges and incorporates by reference each and every allegation regarding

Plaintiff's First (Joint Venture Conspiracy), Second (Fraud) and Third (Breach of

Fiduciary Duty) Causes of Actions, above.

392. The investment program as designed, promoted, marketed, sold by Defendants to

Plaintiff and implemented by Defendants for Plaintiff and other investors, constitutes a

scheme or artifice to defraud Plaintiff, employed by Defendants, and each of them, in

conjunction with the offer, sale or purchase of a security, in an effort to enrich themselves

by promoting an investment program, which lacked economic substance and consisted of

sham loans, in violation of the Washington State Securities Act, RCW 21.20.010(1) and

.430(1).

393. At the time the investment program was designed, promoted, marketed, sold by

Defendants to Plaintiff and implemented by Defendants for Plaintiff and others,

Defendants, and each of them, as partners of the joint venture, as alleged herein, knew or

had reasonable grounds to believe that their oral statements and other documents, as

alleged herein, included untrue statements of a material fact and/or omitted to state

material facts necessary in order to make the statements, in the light of the circumstances

THIRD AMENDED COMPLAINT - Page 123 of 131

under which they were made, not misleading, in violation of R.C.W. 21.20.010(2) and
.430(1).

394. At the time the investment program was designed, promoted, marketed, sold by
Defendants to Plaintiff and implemented by Defendants for Plaintiff and others,
Defendants, and each of them, as partners of the joint venture, as alleged herein, engaged
in acts, practices or courses of business which operated as a fraud or deceit upon the
Plaintiff in conjunction with the offer, sale or purchase of a security, in violation of the
Washington State Securities Act, RCW 21.20.010(3) and .430(1).

395. At the time the investment program was offered to Plaintiff and others for sale and
purchase the Defendants, and each of them, as joint venture partners, had an equal voice
and right of control with the other joint venture partners in the investment program as
designed, promoted, marketed and sold to Plaintiff and as implemented for Plaintiff by
Defendants, and each of them.

396. Defendants, and each of them, by virtue of their right of control with the other
joint venture partners in the investment program, is a "control person" within the meaning
and purpose of RCW 21.20.430(3), of each Defendant in violation of RCW 21.20.010(1)-
(3), as alleged above and, as such, are jointly and severally liable with and to the same
extent as such controlled person to any person to whom such controlled person is liable.

397. Defendants, and each of them, by virtue of the fact that they are each partners in
the same joint venture to design, promote, market and sell to Plaintiff and implement the
investment plan purchased by Plaintiff, are deemed to possess the same knowledge
pertaining to the joint venture as other partners in the joint venture possess.

THIRD AMENDED COMPLAINT - Page 124 of 131

398. Defendants, and each of them, by virtue of the fact that they are each partners in the same joint venture to design, promote, market and sell to and implement for Plaintiff the investment plan purchased by Plaintiff, had reasonable grounds and the means to know the existence of facts, including the acts, omissions, misrepresentations and omissions by the joint venture partners pertaining to the joint venture and to the investment program that give rise to liability of Defendants pursuant to violation of RCW 21.20.010(1)-(3), as alleged above.

399. Defendants, and each of them, as partners in the joint venture conspiracy, materially aided in the transactions pertaining to the design, promotion, marketing, and sale of securities by Defendants to Plaintiff and the implementation of the transactions by Defendants for Plaintiff and, therefore, are liable jointly and severally with and to the same extent as Defendants in violation of RCW 21.20.010(1)-(3).

400. Defendants, and each of them, by virtue of the fact that they are each partners in the same joint venture to design, promote, market and sell to Plaintiff and implement the investment plan purchased by Plaintiff, are deemed to possess the same knowledge pertaining to the joint venture as other partners in the joint venture possess.

401. Defendants, and each of them, by virtue of the fact that they are each partners in the same joint venture to design, promote, market and sell to and implement for Plaintiff the investment plan purchased by Plaintiff, had reasonable grounds and the means to know the existence of facts, including the acts, omissions, misrepresentations and omissions by the joint venture partners pertaining to the joint venture and to the investment program that give rise to liability of Defendants pursuant to violation of RCW 21.20.010(1)-(3), as alleged above.

THIRD AMENDED COMPLAINT - Page 125 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

402. As a result of violations by Defendants of RCW 21.20.010 and 21.20.430(3), Plaintiff has had to incur attorney's fees and costs and, therefore, Plaintiff is entitled to an award of attorney's fees and costs against Defendants, pursuant to RCW 21.20.430(1).

403. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with the purchase and sale of securities, in an amount to be proved at trial, but believed to be at least $ 2 million, plus interest and attorney's fees pursuant to RCW 21.20.430(1).

**EIGHTH CLAIM**
**(Professional Negligence; and Negligent Misrepresentation—**
**Against All Defendants)**

404. Plaintiff repeats, realleges, and incorporates by reference each and every allegation in Paragraphs 1 through 403, inclusive, as if fully set forth herein. In particular, Plaintiff repeats, realleges and incorporates by reference each and every allegation regarding Plaintiff's First (Joint Venture Conspiracy), Second (Fraud) and Third (Breach of Fiduciary Duty) Causes of Actions, above.

405. As Swartz' investment advisers, accountants, fiduciary lenders and attorneys, Defendants, and each of them, owed Swartz a duty of care, loyalty and honesty and to comply with the applicable provisions of their codes of professional responsibility and industry standards and regulations.

406. During the course of their representation of Swartz, Defendants, and each of them, made knowingly or negligently false affirmative representations and intentional or negligently misleading omissions of material fact to Swartz, including: (1) that there was a reasonable opportunity for the investment program to earn a profit; (2) that Deutsche Bank loan proceeds would be used to facilitate the investment plan; and (3)that KPMG would

THIRD AMENDED COMPLAINT - Page 126 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

provide Plaintiff with an opinion letter that addresses the tax consequences associated with participation in the investment program and would provide Plaintiff with an opinion that there is a greater than 50% likelihood (i.e., it is "more likely than not") that those consequences will be upheld if challenged by the Internal Revenue Service based on the knowledge that Presidio and Deutsche Bank had concealed and misrepresented material facts in the opinion letters.

407. Defendants, and each of them, violated their respective duties to Swartz by collaborating on the tax opinion letters, engagement letters, offering prospectus, loan documents and other documentation pertaining to the investment program, when they had a duty to provide independent professional judgment about the matters contained therein.

408. Furthermore, the Defendants breached their duties to Swartz by providing opinion letters and rendering professional services under conditions where they had a direct financial stake in Swartz' decision regarding his participation in the BLIPS transaction.

409. Defendants, and each of them, breached their duties to Swartz by misrepresenting and concealing the fact that they were joint venture partners in the same or similar investment program purchased by Swartz.

410. Swartz fully performed his obligations to Defendants, and each of them, under the terms of their engagement.

411. As a result of the Defendants' conduct, as alleged herein, including but not limited to Defendants' negligent misrepresentation concealment, and breach of professional duties, Swartz has suffered injury in his business and property in that he has paid Defendants fees and has incurred losses and has incurred interest in an amount to be proven at trial, but believed to be in excess of $2 million.

THIRD AMENDED COMPLAINT - Page 127 of 131

### NINTH CLAIM
### (Breach of Contract—
### Against All Defendants)

412. Plaintiff repeats, realleges, and incorporates by reference each and every allegation in Paragraphs 1 through 411, inclusive, as if fully set forth herein.

413. Defendants entered into oral and written contracts to provide Swartz with professionally competent investment advice, legal services, accounting services and financial services, to exercise the applicable standard of care, loyalty and honesty, and to comply with all applicable rules of professional responsibility and industry standards and regulations.

414. Swartz fully performed his obligations to the Defendants under the terms of their engagement.

415. The Defendants disregarded their obligations and instead provided Swartz with advice that these Defendants either knew or should have known to be wrong and illegal.

416. Additionally, Defendants' conduct constituted a breach of their duty of good faith and fair dealing, in that they, among other things, promised performance that they knew or should have known they could not deliver, structured the affairs of the transaction in a manner that guaranteed that it would fail in its essential purpose, withheld information from Swartz that they had a duty to disclose in the bargaining and contracting process, and unlawfully took advantage of superior knowledge where they had a duty to disclose such information to Swartz.

417. As a result of the Defendants' conduct, as alleged herein, including but not limited to Defendants' breach of contract and breach of their duty of good faith and fair dealing, Swartz has suffered injury in his business and property in that he has paid Defendants fees

THIRD AMENDED COMPLAINT - Page 128 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

and has incurred losses and interest in an amount to be proven at trial, but believed to be in excess of $2 million.

418. As a result of the Defendants' conduct, as alleged herein, including but not limited to Defendants' breach of contract and breach of their duty of good faith and fair dealing, Plaintiff has had to incur attorney's fees and costs and, therefore, Plaintiff is entitled to an award of attorney's fees and costs against Defendants, pursuant to contract.

**TENTH CLAIM**
**(Unjust Enrichment—**
**Against All Defendants)**

419. Plaintiff repeats, realleges, and incorporates by reference each and every allegation in Paragraphs 1 through 418, inclusive, as if fully set forth herein.

420. Defendants, and each of them, knew but never disclosed to Plaintiff that the investment program was based on sham loans and lacked economic substance. The investment program was misrepresented by the Defendants as one that sought to provide investors with a high rate of return, when in fact the investment program was a sham, designed to give the transaction the appearance, but not the reality, of economic substance.

421. Defendants and each of them were unjustly enriched by the fees and interest they charged and which Plaintiff has paid, in that they benefited, at Plaintiff's expense, by collecting fees and interest that were excessive, unreasonable, and improper. On information and belief, Defendants charged over 50 other clients the same or substantially similar fees for the same work and expended little, if any, additional time or effort in providing services to Swartz.

422. The Deutsche Bank Defendants charged bank fees that had no relationship to banking services rendered. The fees charged by Deutsche Bank and the other Defendants

THIRD AMENDED COMPLAINT - Page 129 of 131

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

were based strictly on Plaintiff's losses, not the value of the services rendered.  On

information and belief, Plaintiff was charged interest and feess for sham loans, when the

loan proceeds were not existent.

423. The Presidion Defendants purported to charge fees for asset management, but

there were no fees under its management.

424. Equity and good conscience demand the return of all fees and interest paid to

Defendants.

425. Accordingly, Plaintiff is entitled to restitution or recoupment of the fees and

interest that have been paid to Defendants, and each of them.

426. As a result of the Defendants' wrongful conduct, for which Defendants have been

unjustly enriched, Plaintiff has suffered injury in his business and property in that he has

paid Defendants fees and has incurred losses and interest in an amount to be proven at trial,

but believed to be in excess of $2 million, which Defendants must disgorge.

### ELEVENTH CLAIM
### (Rescission—
### Against All Defendants)

427. Plaintiff repeats, realleges, and incorporates by reference each and every

allegation in Paragraphs 1 through 426, inclusive, as if fully set forth herein.

428. Any and all agreements Swartz entered into in order to execute the loans and

transactions pertaining to the investment program were procured by fraud and

overreaching and in breach of Defendant's fiduciary duty to Plaintiff.

429. The joint venture conspiracy constitutes a corrupt agreement between all

Defendants to design, market, sell to and implement for Plaintiff.

THIRD AMENDED COMPLAINT - Page 130 of 131

430. Accordingly, Plaintiff is entitled to rescind all agreements entered into with the Defendants pertaining to any of the investment program transactions.

## **PRAYER FOR RELIEF**

WHEREFORE, Theodore C. Swartz prays for judgment in his favor as follows:

1.  Against all Defendants, jointly and severally, for actual damages, plus interest, in an amount to be proven at trial, and believed to be in excess of $2 million;

2.  Against all Defendants, jointly and severally, for equitable relief in the form of a constructive trust, rescission and restitution in amount to be proven at trial, but believed to be in excess of $2 million;

3.  Against all Defendants, jointly and severally, for attorneys' fees and costs to the maximum extent provided by any applicable provision of law; and

4.  For such other relief as the Court deems just and equitable.

DATED this 13th day of August, 2007.


MERRIAM & ISAACSON, P.S.



Brian G. Isaacson  WSBA # 25921
Attorneys for Plaintiff

MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE:  (206) 829-2500
FACSIMILE:  (206) 829-2501